**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:                              )   CHAPTER 7
                                    )
OPUS EAST, LLC et al.,              )   Case No. 09-12261 (MFW)
                                    )
             Debtor.                )   (Jointly Administered)
_____        )
                                    )
JEOFFREY L. BURTCH, CHAPTER 7       )
TRUSTEE FOR THE ESTATE OF           )
OPUS EAST, LLC,                     )
                                    )
             Plaintiff,             )
                                    )
     v.                             )   Adv. No. 11-52423 (MFW)
                                    )
OPUS, LLC, a Minnesota              )
limited liability company;          )
OPUS CORPORATION, A Minnesota       )
Corporation; GERALD                 )
RAUENHORST 1982 IRREVOCABLE         )
TRUST F/B/O GRANDCHILDREN and       )
the GERALD RAUENHORST 1982          )
IRREVOCABLE TRUST F/B/O             )
CHILDREN; KEITH P.                  )
BEDNAROWSKI and LUZ CAMPA, as       )
Trustees thereof; OPUS REAL         )
ESTATE VII, L.P.; OPUS REAL         )
ESTATE VIII, L.P.; MARK             )
RAUENHORST, individually;           )
KEITH P. BEDNAROWSKI,               )
individually, LUZ CAMPA,            )
individually, ADLER                 )
MANAGEMENT, LLC; MARSHALL M.        )
BURTON, individually; OPUS          )
PROPERTY SERVICES, LLC; OPUS        )
2, LLC; OPUS ARCHITECTS &           )
ENGINEERS, P.C.; OPUS               )
ARCHITECTS & ENGINEERS, INC.;       )
OPUS CORE, LLC; OPUS                 )
NORTHWEST, LLC; OPUS DESIGN         )
BUILD, LLC; OPUS                    )
DEVELOPMENT CORPORATION; OPUS       )
HOLDING, LLC; OPUS HOLDING,         )
INC.; OPUS AE GROUP, INC.,          )
             Defendants.            )

I.    PROCEDURAL BACKGROUND                                    2
II.   JURISDICTION                                             3
III.  FACTUAL BACKGROUND                                       3
IV.   DISCUSSION                                               7
      A.   Insolvency                                          7
           1.   Balance Sheet Test                            10
           2.   Inadequate Capital and Cash Flow Tests        15
      B.   Piercing the Corporate Veil                        24
           1.   Undercapitalization and Insolvency            30
           2.   Facade for Shareholder                        31
           3.   Observance of Corporate Formalities           36
           4.   Siphoning of Funds by Shareholder             40
           5.   Element of Injustice or Unfairness            43
      C.   Breach of Fiduciary Duty                           46
           1.   Standard of Fiduciary Duty                    46
           2.   Specific Breaches                             51
                a.   Transfer of ME to GAMD                   51
                b.   Management Co Property Transfers         61
                     i.   Contracts                           62
                     ii.  April Management Fees               65
                     iii. Funds Transferred to Northwest
                          Management                          66
                c.   Transfers Related to ODP Entities        68
                     i.   Creation of ODP Entities            69
                     ii.  Fees Owed by ODP Entities           70
                d.   $5 Million Transfer                      71
                e.   Tax Scheme                               77
      D.   Aiding and Abetting Breach of Fiduciary Duty       80
      E.   Successor Liability                                81
      F.   Avoidance of Fraudulent Transfers                  86
           1.   Standards for Avoidance                       86
           2.   Specific Transfers                            89
                a.   Distributions to LLC and Trusts          89
                b.   Transfers to Corp for Shared Services     90
                c.   Transfers Related to ODP Entities        94
                d.   Transfers to Core                        95
                e.   Transfers to Northwest                   99
                f.   Transfers to A&E and A&E PC             101
                g.   Transfer of Management Co Property      102
                h.   Transfer to TFC                         103
      G.   Avoidance of Preferential Transfers              105
           1.   Insider Preferences                         106
                a.   Insider Preference Period              106
                b.   Proof of Insider Preferences
                     Beyond 90 Days                         113
           2.   Defenses to Remaining Preferences          115
                a.   New Value                              116
                     i.   Corp                             117

|  |  |  |  |
|---|---|---|---|
|  | ii. | A&E | 117 |
|  | iii. | A&E PC | 118 |
|  | b. | Ordinary Course of Business Defense | 118 |
|  | i. | Corp | 122 |
|  | ii. | A&E | 125 |
|  | iii. | A&E PC | 128 |
|  | c. | No Defenses Offered | 130 |
|  | i. | Core | 130 |
|  | ii. | Northwest | 131 |
| H. | Unjust Enrichment | | 132 |
|  | 1. | Standard of Review | 132 |
|  | 2. | Specific Transfers | 133 |
|  | a. | Northwest Management Transfers | 133 |
|  | b. | $5 Million Transfer | 135 |
|  | c. | Tax Scheme | 135 |
|  | d. | GAMD, Management Co, and ODP Transfers | 138 |
| I. | Disallowance of Claims | | 140 |
| J. | Equitable Subordination of Claims | | 141 |
| K. | Revocation of Core's Certification of Dissolution | | 143 |
| L. | Constructive Trust | | 144 |
| M. | Tortious Interference with Contract | | 146 |
| N. | Conversion/Conspiracy to Commit Conversion | | 147 |
| O. | Pre-judgment Interest | | 149 |
| V. | CONCLUSION | | 151 |

|  |  |
|---|---|
| Ex. A-1 | Corp Historical Period |
| Ex. A-2 | Corp Preference Period |
| Ex. B-1 | A&E Historical Period |
| Ex. B-2 | A&E Preference Period |
| Ex. B-3 | A&E New Value Analysis (on or after 4/2/09) |
| Ex. B-4 | A&E New Value Analysis (2/1/09-4/1/09) |
| Ex. C-1 | A&E PC Historical Period |
| Ex. C-2 | A&E PC Preference Period |
| Ex. C-3 | A&E PC New Value Analysis |

OPINION[1]

Before the Court is the Third Amended Complaint filed by
Jeoffrey L. Burtch (the "Trustee"), the chapter 7 trustee of Opus
East LLC (the "Debtor"), which seeks recovery against former
fiduciaries of the Debtor and related business entities on
theories of piercing the corporate veil, breach of fiduciary duty
and aiding and abetting such a breach, successor liability,
avoiding fraudulent and preferential transfers, unjust
enrichment, disallowance and equitable subordination of claims,
revocation of a certificate of dissolution, imposition of a
constructive trust, tortious interference with contract, and
conversion and conspiracy to commit conversion.[2] After a trial
on the merits and for the reasons set forth below, the Court
concludes that the Trustee is entitled to partial judgment (and
pre-judgment interest): against Opus Core, LLC, on Counts 31, 32,
and 33 for preferences and fraudulent transfers, and on Count 47
for revocation of its certificate of dissolution; against Opus
Northwest, LLC, on Counts 35 and 36 for fraudulent transfers; and
against Opus Core, LLC, and Opus Northwest, LLC, on Count 39 for

---

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

[2] The Third Amended Complaint originally had 67 counts. In
response to the Defendants' motion for summary judgment, the
Trustee withdrew counts 8-11, 49-51, 54, 58-59 and 52 with
respect to certain transfers. (JPTO at § I, p.3; Adv. D.I. 216.)

disallowance of their claims.  Judgment on the remaining counts will be entered in favor of the Defendants.


I.    PROCEDURAL BACKGROUND

On July 1, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.  (JPTO at § IV, ¶ 1.)[3]  The Trustee was appointed the chapter 7 trustee of the Debtor's estate shortly thereafter.  As of February, 2014, the estate had approximately $5.9 million in a bank account and no other assets except this lawsuit.  (Tr. 2/4/14 at 174-75.)  There are $138 million to $500 million in creditor claims against the estate.  (Tr. 2/4/14 at 176-77; Ex. P-1360.)

On June 30, 2011, the Trustee filed a complaint against the above-named Defendants.  After the Third Amended Complaint was filed on August 7, 2013, the Defendants' answer was filed on August 30, 2013.  (Adv. D.I. 160 & 183.)  Trial was held over ten days, commencing on December 16, 2013, and concluding on February 7, 2014.  Post-trial briefing, which included proposed findings of fact and conclusions of law, was completed on May 24, 2014.

---

[3]  References to the record are: "D.I. #" for pleadings from the main case; "Adv. D.I. #" for pleadings from the adversary; "Tr. [date] at [page]" for the trial transcripts; "[name] Dep. at [page]" for deposition transcripts; "Ex. P-#" for the Trustee's exhibits; "Ex. D-#" for the Defendants' exhibits; "JPTO" for the Joint Pre-Trial Order filed on November 20, 2013, at Adv. D.I. 218.

The matter is ripe for decision.

## II.   <u>JURISDICTION</u>

The Court has core and related to jurisdiction over the counts in this adversary proceeding.  28 U.S.C. §§ 1334(b) & 157(a) & (b).  The parties have consented to the entry of a final judgment by this Court on all counts.  (JPTO at § III.)

## III. <u>FACTUAL BACKGROUND</u>

The Debtor is a Delaware limited liability company which was formed on September 14, 1994, to develop and sell commercial real estate projects in the Northeastern and Mid-Atlantic United States.  (JPTO at § IV, ¶¶ 19 & 25.)  It was a merchant builder that developed, built, and sold projects as soon as possible rather than holding and renting them.  (Tr. 12/17/13 at 228-29; Tr. 2/4/14 at 235; Tr. 2/7/14 at 90-91.)

The Debtor was part of a large network of real estate companies (sometimes referred to as the Opus Group) which grew from a construction company originally founded by Gerald Rauenhorst in 1953.  (Tr. 12/17/13 at 96; Tr. 12/16/13 at 21-26.) In 1982, Gerald Rauenhorst created two trusts (the "Trusts") for the benefit of his children and grandchildren.  (JPTO at § IV, ¶¶ 7 & 8; Tr. 12/16/13 at 21-22; Tr. 2/4/14 at 8.)  The Trusts owned and controlled two holding companies: Opus Corp. ("Corp") and

3

Opus LLC ("LLC").  (JPTO at § IV, ¶ 13; Tr. 12/16/13 at 25-26;
Exs. P-169 & P-173.)  The holding companies in turn owned five
subsidiaries that operated in different geographical areas.
(JPTO at § IV, ¶ 22; Tr. 12/16/13 at 26-27; Exs. P-169 & P-173.)
Separate holding companies and operating entities were
established in order to limit liability at the parent level,
particularly in the case of a catastrophic loss, and to be able
to attract the best CEOs by allowing them to run their own
operations.  (Tr. 12/19/13 at 85-86.)  The Debtor was an
operating subsidiary of LLC.  (JPTO at § IV, ¶ 22.)  For each
real estate project it developed, the Debtor created a special
purpose entity ("SPE").  (Tr. 12/17/13 at 4; Tr. 12/16/13 at 22-
23, 28.)

The Trusts owned other subsidiaries, including OUS TFC, LLC
("TFC") and Opus Financial, LLC ("Financial").  (Tr. 12/16/13 at
25-26; JPTO at § IV, ¶¶ 27-29.)  TFC had a revolving line of
credit with U.S. Bank, which was guaranteed by Corp and LLC.
(Exs. P-156 & P-1207; Tr. 2/6/14 at 171, 225.)  The credit line
was used by TFC to loan money to Corp, LLC, and their five
operating subsidiaries.  (Ex. P-1207; Tr. 2/4/14 at 157; Tr.
2/6/14 at 24.)  The Debtor also had a $20 million unsecured line
of credit with Bank of America ("BOA").  (JPTO at § IV, ¶ 51; Tr.
12/20/13 at 109-10; Tr. 2/3/14 at 81; Tr. 2/4/14 at 245-46; Ex.
D-2093.)  The Debtor and its SPEs also obtained construction

4

financing from outside banks to finance their real estate development projects.  (Exs. D-2255 & D-2093; Tr. 12/20/13 at 109-11; Tr. 2/7/14 at 83-84.)

The Trusts also owned Opus Core which was a pass-through payroll-services entity which paid the salaries of the senior executives at Corp and the operating companies owned by Corp and LLC.  (JPTO at § IV, ¶ 29.)  It was used to keep the compensation of those executives confidential.  (Tr. 2/5/14 at 192.)

Corp owned Opus Architects & Engineers, Inc. ("A&E") which provided architectural and engineering services to the Debtor and its SPEs.  (Tr. 2/6/14 at 195-196; Ex. D-2169.)  A&E would subcontract with Opus Architects & Engineers, P.C. ("A&E PC") in those states where the architectural firm of record for a project must be owned by a licensed architect as opposed to a corporation.  (Tr. 2/6/14 at 199-200.)  A&E PC is owned by individual architects and engineers, not Corp or LLC.  (Tr. 2/6/14 at 199.)

In addition, Corp itself provided certain services directly to the operating subsidiaries, including the Debtor.  Those services included corporate accounting, human resources, legal, risk management, payroll, office services, and tax services (the "Shared Services").  (Ex. D-2080 at 399; Tr. 2/5/14 at 180-81.)

Historically, the subsidiaries of Corp and LLC were required to make certain upstream distributions from excess income (the

5

"Distribution Policy") to Corp or LLC which would then make upstream distributions to the Trusts. The distributions had three components: (1) 35% of pre-tax income, (2) its share of pro-forma taxes, and (3) certain charitable contributions. (Bolin Dep. at 87; Tr. 12/16/13 at 30-33; Tr. 12/17/13 at 239-240; Tr. 12/19/13 at 113-14; Tr. 2/6/14 at 7; JPTO at § IV, ¶¶ 49 & 50; Exs. P-100, P-109, P-132 & P-146.) The tax distributions were made because the Debtor and its sole member, LLC, were pass-through entities, which paid no taxes; it was the Trusts that were assessed taxes attributable to the income earned by the Debtor. (JPTO at § IV, ¶ 48.)

The Debtor successfully operated from 1994 until 2008, growing its equity from $12 to $75 million. (Tr. 12/17/13 at 245-46.) On September 15, 2008, Lehman Brothers filed bankruptcy, which had a significant impact on the credit and capital markets, commercial real estate, and real estate developers. (Tr. 12/20/13 at 141; Bolin Dep. at 189-90.) With the failure of Lehman Brothers and the subsequent collapse of the financial markets, the Debtor was unable to sell its completed real estate projects because buyers could not obtain financing. The Debtor was similarly unable to obtain financing to complete projects in process. Although the Debtor considered filing a chapter 11 reorganization case, it was ultimately forced to file under chapter 7 when it could not obtain debtor-in-possession

6

financing.  (Exs. D-2067 & D-2081 at 321 & 337; Tr. 12/19/13 at
137-38; Tr. 2/4/14 at 222-33; Grindall Dep. at 181.)

IV.  DISCUSSION

   A.  Insolvency

   The insolvency of the Debtor is a predicate to several of
the Trustee's claims against the Defendants, including piercing
the corporate veil, fraudulent transfers, and preferences.  The
Trustee and Defendants disagree on the date the Debtor became
insolvent, with the Trustee claiming it occurred as early as
December, 2006, and the Defendants claiming it did not occur
until the Debtor filed for bankruptcy on July 1, 2009.

   The Bankruptcy Code defines insolvency as the "financial
condition such that the sum of such entity's debts is greater
than all of such entity's property, at a fair valuation."  11
U.S.C. § 101(32).  This standard is commonly called the balance
sheet test.  Determining whether a company is insolvent under the
balance sheet test is a mixed question of fact and law.  In re
Trans World Airlines, Inc., 134 F.3d 188, 193 (3d Cir. 1998).

   The Trustee also contends that the Debtor was insolvent as
early as December, 2006, based on two alternative tests under the
fraudulent conveyance provisions of the Bankruptcy Code and
Delaware law.  Under the Bankruptcy Code, certain transfers may
be avoided as fraudulent transfers if the debtor:

> (I) was insolvent on the date that such transfer was
> made or such obligation was incurred, or became
> insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was
> about to engage in business or a transaction, for which
> any property remaining with the debtor was an
> unreasonably small capital; [or]
> (III) intended to incur, or believed that the debtor
> would incur, debts that would be beyond the debtor's
> ability to pay as such debts matured . . . .

11 U.S.C. § 548(a)(1)(B)(ii)(I-III). Delaware has a similar

provision. See Del. Code Ann. tit. 6, § 1304(a)(2) (providing

that certain transfers may be avoided if the Debtor "a. was

engaged or was about to engage in a business or a transaction for

which the remaining assets of the debtor were unreasonably small

in relation to the business or transaction; or b. intended to

incur, or believed or reasonably should have believed that the

debtor would incur, debts beyond the debtor's ability to pay as

they became due."); Del. Code Ann. tit. 6, § 1305(a) (providing

that certain transfers may be avoided if the Debtor "was

insolvent at that time or the debtor became insolvent as a result

of the transfer or obligation").

These two tests are commonly called the "inadequate capital"

test and the "cash flow" test. See, e.g., EBC I, Inc. v. America

Online, Inc. (In re EBC I, Inc.), 380 B.R. 348, 359 (Bankr. D.

Del. 2008), aff'd sub nom. In re EBC I, Inc., 400 B.R. 13 (D.

Del. 2009), aff'd, 382 F. App'x 135 (3d Cir. 2010).

The "inadequate capital" test analyzes whether at the time

of the transfer the debtor had insufficient capital, including

8

access to credit, for operations.  Id.  Unreasonably small capital means "the inability to generate sufficient profits to sustain operations.  Because an inability to generate enough cash to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency."  Peltz v. Hatten, 279 B.R. 710, 744-45 (D. Del. 2002) (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992)).

Insolvency is proven under the "cash flow" test if at the time of a transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.  EBC I, 380 B.R. at 359 ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.") (quoting WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.), 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001)).

The plaintiff bears the burden of proving insolvency by a preponderance of the evidence.  In re Fruehauf Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006); Litig. Trust of MDIP, Inc. v. De La Rue Cash Sys., Inc. (In re MDIP, Inc.), 332 B.R. 129, 132 (Bankr.

9

D. Del. 2005) (holding that the preponderance of the evidence
standard also applies to Delaware fraudulent conveyance claims
brought pursuant to § 544(b) of the Bankruptcy Code).  Therefore,
the Trustee bears the burden of proving that at the time of each
of the challenged transfers, the Debtor was balance sheet
insolvent, inadequately capitalized, or unable to pay its debts
as they came due.  Fruehauf Trailer, 444 F.3d at 210-11; 11
U.S.C. § 548(a)(1)(B); Del. Code Ann. tit. 6, § 1304(a)(2).

### 1.   Balance Sheet Test

The Debtor's audited financials reflect that on December 31,
2006, the Debtor's assets were over $150 million while its
liabilities were slightly more than $95 million, leaving equity
in excess of $55 million.  (Exs. D-2251 & D-2027 at 3; Tr. 2/7/14
at 34.)  The Debtor's audited financials reflect that on December
31, 2007, the Debtor's assets were over $237 million while its
liabilities were more than $168 million, leaving equity in excess
of $68 million.  (Exs. D-2251 & D-2028 at 3; Tr. 2/7/14 at 34.)
Although the Debtor did not issue audited financials for 2008, it
is evident that there was no substantial change in the Debtor's
circumstances through at least March 31, 2008, because the
financial statements issued on that date included no events
through that date that caused KPMG to question the Debtor's
ability to continue as a going concern.  (Tr. 2/7/14 at 20-22;
Tr. 2/5/14 at 234-35.)

10

The Trustee's expert, Quentin Mimms, opined that under the balance sheet test the Debtor became insolvent at least as early as June 30, 2008. (Tr. 12/16/13 at 36-39, 48-50, 56-58, 66; Exs. P-1240 & P-1241.) The Defendants' expert, Daniel Lentz, disagreed. (Tr. 2/7/14 at 34; Ex. D-2251.) The experts' assessment of the Debtor's liabilities as of June 30, 2008, are close; Lentz asserts they were $237 million while Mimms contends that they were $242 million. (Exs. D-2258, D-2251 & P-1240.) It is the difference in the experts' valuation of the Debtor's assets that results in a disagreement about the Debtor's solvency. (Tr. 12/16/13 at 45, 52-53; Exs. P-1240 & D-2251; Tr. 2/7/14 at 27, 34.)

The Trustee's expert, Mimms, stated that while the Debtor reported $317 million in assets on its June 30, 2008, financial statements, the fair value of those assets was really only $153 million to $196 million. (Tr. 12/16/13 at 35-36, 61-65; Ex. P-1240.) In his valuation, Mimms used the liquidation (as opposed to the going concern) value of the assets because: (1) demand notes held by TFC and Financial could be required to be paid back at any moment; (2) additional capital was needed to cover the Debtor's current operating expenses; and (3) the Debtor was required to reduce its third-party line of credit from BOA to zero by August, 2008. (Tr. 12/16/13 at 38, 61-63, 202.)

11

The Defendants' expert, Lentz, disagreed with Mimms'
analysis, opining that while generally accepted accounting
principles require that demand notes be recorded as current
liabilities from the moment they are issued, such notes should
not be considered matured and immediately payable until demand is
actually made for repayment.  (Tr. 2/7/14 at 67.)  The notes
required that any demand by TFC or Financial be in writing, and
payment was not required until 5 days after the written demand
was received by the Debtor.  (Tr. 2/7/14 at 67-71; Exs. D-2010,
D-2011 & D-2080 at 424-25.)  There were never any demands for
payment by TFC or Financial.  (Tr. 2/6/14 at 22; Tr. 12/18/13 at
212.)  Consequently, Lentz opined that the notes never became
mature.  (Tr. 2/7/14 at 67-69.)

Lentz also testified that the Debtor's obligation to reduce
its third-party line of credit to zero by August, 2008, did not
justify the use of liquidation value because the Debtor knew
about this requirement months in advance and had time to plan a
strategy to repay that loan without liquidating any of its
assets.  (Tr. 2/7/14 at 75-77; Ex. D-2259.)  In fact, the Debtor
did pay down the line of credit without liquidating any assets,
adding validity to Lentz's analysis.  (Tr. 2/7/13 at 77; Ex. D-
2259.)

The Court concludes that the use of liquidation value for
the Debtor's assets in June, 2008, is not justified.  See, e.g.,

12

Moody, 971 F.2d at 1067 ("Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going-concern basis."); EBC I, 380 B.R. at 355 ("A business does not have to be thriving in order to receive a going concern valuation.  Before the going concern valuation is to be abandoned, the business must be 'wholly inoperative, defunct or dead on its feet.'") (quoting In re Am. Classic Voyages Co., 367 B.R. 500, 508 (Bankr. D. Del. 2007)).

Although the Debtor had issued demand notes due to TFC and Financial, there was no demand for repayment of them at any time and in fact TFC and Financial continued to extend loans to the Debtor until November, 2008.  (Tr. 2/7/14 at 40-41; Tr. 2/6/14 at 22; Tr. 12/18/13 at 212.)  Further, the Debtor was able to pay off its third party line of credit as required in August, 2008, without liquidating its assets, through loans from affiliates and sales of assets in the ordinary course of business.  (Tr. 2/7/14 at 48-49.)  As a result, the Debtor was able to continue its normal business operations through the use of cash reserves and loans from both third parties and related entities.

The Debtor's continued commercial viability after June, 2008, is also evidenced by the fact that it did sell several projects at more than liquidation value, even as late as the third quarter of 2008.  (Exs. D-2083 at 795 & D-2254; Tr. 2/7/14

13

at 48-49.)  Further, the Debtor had an agreement of sale for the
100 M Street Project[4] at a fair market value of $93 million which
was to close by October or November of 2008.  (Bolin Dep. at 192-
93, 265-66; Tr. 12/17/13 at 233-34; Tr. 12/20/13 at 144-45.)  The
third-party buyer had made a $5 million non-refundable earnest-
money deposit in May, 2008, with the Debtor's SPE which owned the
project.  (JPTO at § IV, ¶¶ 72 & 73; Ex. D-2123.)  The Debtor
originally expected the 100 M Street Project to bring in $23
million in gross profit and projected a profitable 2008 based on
that sale.  (Tr. 2/4/14 at 207, 213; Ex. D-2083 at 766, 749, 774,
794, 809, 834; Bolin Dep. at 189-93; Tr. 12/18/13 at 201-04; Tr.
12/17/13 at 233-34.)  When the credit markets froze in the fall
of 2008, the 100 M Street Project sale did not close.  (Bolin
Dep. at 192-93.)  The Debtor continued through early 2009 to work
with the purchaser and remained optimistic that the sale would
occur because it did not believe that the purchaser would walk
away from a $5 million deposit.  (Tr. 2/4/14 at 207-08, 216-17,
221-22, 253; Bolin Dep. at 192-93; Exs. D-2127 & D-2123.)

It was not until January 31, 2009, that the Debtor finally
realized that the 100 M Street Project would not sell.  (Ex. D-
2020; Tr. 2/4/14 at 216-19, 221; Tr. 12/18/13 at 204-05.)
Because of the financial crisis, as reflected in the inability of

---

[4]  The 100 M Street Project was a project the Debtor had
developed and built in Washington DC through an SPE.

14

the Debtor to close on the sale of the 100 M Street Project, the Court concludes that the Debtor's assets at that time had to be valued at liquidation, rather than going concern value.

Therefore, the Court finds that the Debtor was insolvent based on the balance sheet test beginning February 1, 2009, as a result of the Debtor's lack of available credit and inability to sell its completed projects because of the recession.  However, the Court concludes that the Debtor was solvent under the balance sheet test prior to that date because the Debtor had adequate capital and credit and was able to sell its projects at going concern values before then.  (Tr. 2/7/14 at 10-11, 34, 48-49; Exs. D-2251, D-2254 & D-2255.)

### 2.    Inadequate Capital and Cash Flow Tests

The Trustee's expert, Mimms, opined that absent loans from related entities, the Debtor did not have the capital to continue its real estate operations past December, 2006.  (Tr. 12/16/13 at 144; Exs. P-1241 & P-1259.)  He testified that this means that the Debtor was insolvent under both the inadequate capital and the cash flow tests because it was incurring debts that it would not be able to pay and did not have enough capital to cover its operating expenses.

In contrast, the Defendants' expert, Lentz, stated that the Debtor had sufficient capital to continue operations after December, 2006.  (Tr. 2/7/14 at 74.)  Lentz found that the Debtor

15

had adequate cash flow and regularly paid its bills as they came due through early 2009.  (Bolin Dep. at 259; Tr. 12/17/13 at 250-51; Tr. 2/7/14 at 43-46; Ex. 2252.)  The Debtor continued to operate its real estate business successfully during that period, completing and selling seven of its projects in the ordinary course of business.  (Ex. D-2254.)

The Trustee argues, however, that in analyzing whether the Debtor was cash flow insolvent, it is immaterial whether the Debtor was continuing to operate and was current on its debt payments, if the Debtor was only in that position because it was able to borrow money in a manner unrelated to its own creditworthiness.  See, e.g., Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 195 (3d Cir. 2003) (discussing relevance of infusion of shareholder loans in determination of insolvency); In re Mama D'Angelo, Inc., 55 F.3d 552, 556-57 (10th Cir. 1995) (finding the debtor insolvent because it continued to operate, not on the basis of adequate income from its sales or capital contributions from its shareholders, but solely because of massive loans from its major shareholder);  United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981) (considering loans to and from shareholder in determining whether corporation was actually insolvent or undercapitalized). Mimms opined that absent loans from related entities the Debtor lacked the capital to continue operations.  (Tr. 12/16/13 at 144;

16

Ex. P-1259.)

Lentz noted, however, that the Trustee and Mimms fail to acknowledge that the Debtor had access to third party loans between December, 2006, and December, 2008.  (Ex. D-2255.)  During this time, the Debtor had its own $20 million unsecured line of credit from BOA, with an interest rate at prime.  (JPTO at § IV, ¶ 51; Tr. 12/20/13 at 109-11; Tr. 2/3/14 at 81; Tr. 2/4/14 at 239, 245-46; Exs. D-2093 & D-2032.)  Lentz stated that this demonstrates that BOA had significant confidence in the financial strength and capital adequacy of the Debtor.  (Tr. 2/4/14 at 245.)  In addition, other banks believed that the Debtor was creditworthy because it was able to obtain third party construction financing for its projects through the fourth quarter of 2008.  (Ex. D-2255; Tr. 12/20/13 at 109-11; Tr. 2/7/14 at 83-84.)  The Debtor accurately reported to its lenders that it remained in compliance with their loan covenants through the end of 2008.  (Tr. 12/18/13 at 195-97; Ex. D-2032; Bolin Dep. at 180-81; 313-15.)

Mimms also noted that in comparison with others in its industry, the Debtor was undercapitalized.  (Tr. 12/16/13 at 125-32; Exs. P-1253 & P-1254.)  Based on his analysis and adjustment of the Debtor's projections, Mimms concluded that the Debtor's capitalization metrics were among the worst in the industry.  The Debtor's net working capital — current assets minus current

17

liabilities — averaged negative $80 million, and its current ratio — the availability of highly liquid assets to pay liabilities — was lower than the industry's lowest quartile. (Tr. 12/16/13 at 125-32; Exs. P-1253 & P-1254.)  Mimms testified that the Debtor had positive cash flow from operations just twice between 2000 and 2008 and that its chronic negative cash flow was another strong indicator that its capital was unreasonably low for its continued operations.  (Tr. 12/16/13 at 132-33; Ex. P-1256.)

Lentz criticized Mimms' attempts to prove that the Debtor was inadequately capitalized by using liquidity ratios purporting to compare its financial condition to that of its peers saying that the analysis was flawed because the companies used were not comparable; they were real estate investment trusts (REITS) which typically bought and held commercial real estate, while the Debtor was a merchant builder which built and promptly sold its projects.  (Tr. 2/4/14 at 235-36; Tr. 12/17/13 at 228; Tr. 2/7/14 at 92-94.)

In addition, Lentz contended that Mimms compared ratios that had little relevance to the financial condition of the Debtor, such as the current ratio.  (Tr. 2/7/14 at 95.)  Because of the Debtor's business model (with its uneven cycle of sales), Lentz stated that current ratios have no predictive power in determining if the Debtor would be able to sustain its

18

operations.   (Tr. 2/7/14 at 94-96; Exs. D-2254 & P-1254 at 3.)

Even Mimms admitted that his peer analysis had limited value,

saying he used it only as a "sanity check" for his other

analysis.   (Tr. 12/16/13 at 125-26.)

Lentz also criticized Mimms for "adjusting" the Debtor's

projections and cash flows to make it appear that the Debtor had

inadequate cash.   The Debtor's financial statements did not

distinguish between current and non-current assets and

liabilities and consequently, Mimms had to create the data

necessary to do his current ratio analysis.   (Ex. D-2083 at 6;

Tr. 2/7/14 at 95.)   While Mimms' "adjusted" cash flow projections

for the Debtor show a $7 million cash shortfall in the first five

months of 2007, Lentz notes that the cash shortfall did not

occur.   Instead, Lentz concluded that the Debtor's cash-flow

projections were reasonable and showed that the Debtor had

adequate capital as of December 31, 2006, December 31, 2007, and

March 31, 2008, and at all times in between those dates.   (Exs.

D-2251, D-2254 & D-2255; Tr. 2/7/14 at 43-46, 48-53.)

The Court rejects Mimms' revision of the Debtor's

projections and his conclusion that the Debtor was insolvent

beginning in December, 2006.   Such cash flow projections created

by expert witnesses for litigation purposes are inherently

suspect.   In re Emerging Commc'ns, Inc. S'holders Litig., No.

Civ. A. 16415, 2004 WL 1305745, at *15 (Del. Ch. June 4, 2004)

19

(noting that "<u>post hoc</u> litigation-driven forecasts have an 'untenably high' probability of containing 'hindsight bias and other cognitive distortions.'") (citations omitted).  In contrast, the Court finds that the Debtor's projections were reasonably based on what the Debtor expected to sell and borrow. <u>Moody</u>, 971 F.2d at 1064 (noting that "the critical question is whether the parties' projections were reasonable," and finding the downturn in the economy, not a lack of capital, caused the debtor's demise); <u>Merion Cap., L.P. v. 3M Cogent, Inc.</u>, Civ. A. No. 6247-VCP, 2013 WL 3793896, at *11 (Del. Ch. July 8, 2013) (courts presumptively favor management's projections that are created for business purposes).

In determining whether a company has adequate capital, the Court must consider its assets, access to borrowing (both third party and affiliate), and equity.  (Tr. 2/7/14 at 46-53.)  <u>See, e.g.</u>, <u>Moody</u>, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital."); <u>EBC I</u>, 380 B.R. at 359 (holding debtor was solvent where it was able to obtain a $40 million line of credit); <u>Peltz</u>, 279 B.R. at 745 ("the test for unreasonably small 'capital' should include . . . all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period.").  The

20

Debtor had a line of credit from a third party, BOA, and its SPEs had construction financing from third party lenders as well. (Ex. D-2255.)  While cash flow timing issues did arise from time to time (for example when a loan or sale closed later than expected), the Debtor addressed these timing issues by borrowing under its line of credit with BOA, borrowing from a related-party lender (TFC or Financial), obtaining capital infusions from its parent company, triaging projects, or selling an asset.  (Bolin Dep. at 196-202; Tr. 2/7/14 at 51-52; Tr. 12/17/13 at 251-52, 269; Tr. 12/18/13 at 165-66, 200-02; Tr. 12/20/13 at 108-09.)

Significantly, the Debtor had sufficient capital and cash flow to operate and to pay its debts as they came due through the end of January, 2009, as it had predicted.  (Tr. 12/18/13 at 195-97, 205-06; Tr. 12/20/13 at 144; Tr. 2/4/14 at 219-20; Tr. 2/7/14 at 35-38; Exs. D-2082 at 121, D-2252, & D-2253.)  The Debtor had initially been capitalized in 1994 by a capital contribution of $12 million from LLC.  (Tr. 12/17/13 at 245-46.)  The Debtor received additional capital contributions from LLC of $10 million in 2007 and $10 million in 2008.  (Exs. P-265 & D-2083 at 700 & 745.)  However, the primary source of capital for the Debtor was its retained earnings.  (Tr. 12/20/13 at 108-09.)  By the end of 2008, through its operations and additional equity contributions from its member, the Debtor's equity had grown from $12 million to $75 million.  (Tr. 12/17/13 at 245-46; Ex. D-2251.)  The

Debtor utilized its equity as a source of capital to fund its operations.  (Tr. 12/20/13 at 108-09; Tr. 12/17/13 at 230; Tr. 2/4/14 at 238-39.)  The Debtor experienced significant success with this model when the real estate market was thriving, and the Debtor was often able to sell buildings without having to identify tenants in advance.  (Tr. 12/17/13 at 229-30.)

The Debtor's solvency through at least March, 2008, is confirmed by the Debtor's financial statements, which were audited by KPMG.  (Exs. D-2026, D-2027 & D-2028; Tr. 12/17/13 at 232; Tr. 12/19/13 at 107-08.)  KPMG issued unqualified audit opinions for 2006 and 2007, meaning it had no reservations about the ability of the Debtor to continue to operate in the ensuing years.  (Exs. P-819, D-2134, D-2135, D-2026, D-2027 & D-2028; Tr. 2/7/14 at 13-20; Tr. 2/5/14 at 229.)  Although KPMG initially identified possible risks to the Debtor, after going through the procedures necessary to complete its audits, KPMG concluded that the financial statements were presented fairly.  (Tr. 2/5/14 at 226-28; Tr. 2/7/14 at 13-16; Ex. P-819 at 6133-34.)

The Debtor's insolvency was caused by the unexpected depth and breadth of the market collapse after the bankruptcy filing of Lehman Brothers in September, 2008.  (Tr. 12/18/13 at 93; Tr. 12/19/13 at 128-31; Tr. 12/20/13 at 141; Bolin Dep. at 189-93; Tr. 2/4/14 at 212-13.)  The Debtor's management did not initially realize the severity of the 2008 market downturn or the impact it

22

would have on the Debtor.  (Ex. D-2160; Bolin Dep. at 190; Tr. 2/4/14 at 212-13.)  Rather, management's projections through the end of 2008 anticipated that the Debtor would remain profitable. (Bolin Dep. at 189; Tr. 12/18/13 at 200-02; Tr. 2/7/14 at 41; Exs. D-2088 & D-2160.)  By the end of 2008, however, the country was in a severe economic recession and the capital markets were frozen.  (Tr. 12/19/13 at 130.)  Nonetheless, the Debtor still believed it would be profitable in 2008 based on the anticipated closing on the sale of the 100 M Street Project.  (Tr. 12/17/13 at 233-34; Tr. 12/18/13 at 205; Tr. 12/20/13 at 145; Tr. 2/7/14 at 42.)

It was not until January 31, 2009, that the Debtor revised its financial projections and assumed for the first time that the 100 M Street Project would not sell.  (Ex. D-2020; Tr. 2/4/14 at 216-19, 221-22; Tr. 12/18/13 at 203-05.)  The revised projection showed that, without the 100 M Street Project sale, the Debtor would run out of cash.  (Ex. D-2020; Tr. 2/4/14 at 216-19, 221; Tr. 12/18/13 at 203-05.)  As a result, on January 31, 2009, the Debtor went into cash conservation mode and began holding bills for the first time.  (Tr. 12/18/13 at 205-06; Bolin Dep. at 204-05; Tr. 2/4/14 at 219-20.)  The Debtor's accounts payable increased dramatically between the end of January and March, 2009, by which time the Debtor had over $14 million in accounts payable older than 60 days.  (Tr. 12/16/13 at 140-41; Ex. D-

23

2253.)

The Court concludes that, based on both the "cash flow" and "unreasonably small capital" test, the Debtor was not insolvent until February 1, 2009.  (Ex. D-2254.)  Prior to that time, the Debtor had access to third party and affiliate financing, as well as significant cash flow from operations.  The Court finds that the Debtor had adequate capital to sustain and actually did sustain its operations through January, 2009.  (Exs. D-2251, D-2254 & D-2255; Tr. 2/7/14 at 89.)

Consequently, the Court concludes that under the balance sheet, inadequate capital, and cash flow tests, the Debtor was solvent until February 1, 2009.

B.   Piercing the Corporate Veil

The Trustee asserts an alter ego claim seeking to pierce the corporate veil of LLC and the Trusts, thereby making the Trusts liable for the Debtor's debts.

Under Delaware law, to prevail on an alter ego claim the Trustee must show that the Debtor, LLC, and the Trusts operated as a single economic entity that resulted in an overall element of injustice or unfairness.  Trevino v. Merscorp, Inc., 583 F. Supp. 2d 521, 528 (D. Del. 2008); Official Comm. of Unsecured Creditors v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC), 444 B.R. 51, 101 (Bankr. D. Del. 2010) (citing Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D.

24

Del. 1990), aff'd 932 F.2d 959 (3d Cir. 1991)).  See also
Official Comm. of Unsecured Creditors v. Highland Capital Mgmt.,
L.P. (In re Moll Indus., Inc.), 454 B.R. 574, 587 (Bankr. D. Del.
2011).

Respect for the corporate form is so fundamental that the
usual preponderance of the evidence test does not even apply.
"[T]he appropriate standard of proof by which one must prove a
case for a piercing of the corporate veil under Delaware law is,
if not a clear and convincing evidence standard, at least
somewhat greater than merely a preponderance of the evidence
standard."  Brown v. General Elec. Capital Corp. (In re Foxmeyer
Corp.), 290 B.R. 229, 237 (Bankr. D. Del. 2003).  See also Lutyk,
332 F.3d at 188; Mobil Oil Corp. v. Linear Films, Inc., 718 F.
Supp. 260, 270 (D. Del. 1989).  The corporate identity for
single-member LLCs is also respected.  Dougherty v. Snyder, 469
Fed. App'x 71, 72 (3d Cir. 2012) ("even single-member LLCs have a
legal identity separate from their members.").

The purpose of allowing the corporate veil to be pierced on
an alter ego theory is to hold the party actually responsible for
the inequitable conduct accountable and to prevent that party
from using another corporation to shield itself from liability.
Official Comm. of Unsecured Creditors v. Morgan Stanley & Co.,
Inc. (In re Sunbeam Corp.), 284 B.R. 355, 365 (Bankr. S.D.N.Y.
2002) (applying Delaware law) (internal citation omitted).

25

Piercing the corporate veil is not to be done lightly, however. Entities should be disregarded only in "exceptional circumstances" and "limited liability is the general rule, not the exception." Mobil Oil, 718 F. Supp. at 270.  Persuading a Delaware court to disregard the corporate entity is a difficult task, and "[t]he party who wishes the court to disregard that form bears the burden of proving that there are substantial reasons for doing so."  Id.

In order to determine if the Trusts, LLC, and the Debtor operated as a single economic entity, the Court must consider whether (1) the Debtor was undercapitalized; (2) there was a failure to observe corporate formalities; (3) a dividend was paid; (4) the Debtor was insolvent; (5) the dominant stockholder siphoned funds from the Debtor; (6) there was an absence of corporate records; and (7) the Debtor was a facade for the operations of its stockholder.  Pisani, 646 F.2d at 88.  See also Lutyk, 332 F.2d at 194.  Courts value each of these factors differently and decisions are fact-intensive.

The Trustee offered the testimony of Shepherd Pryor as an expert in corporate affairs who opined that the Trusts, LLC, Corp, and the operating subsidiaries, including the Debtor, operated as a single entity.  (Tr. 2/3/14 at 13-15.)

Prior to trial, the Defendants had filed a motion in limine to exclude the testimony of Pryor.  (Adv. D.I. 173.)  At the pre-

26

trial conference, the Court reserved ruling on that motion until
the expert was subjected to voir dire at trial.  On voir dire,
Pryor admitted that his opinion was based only on his personal
experience serving on corporate boards.  (Tr. 2/3/14 at 69-73.)
He was not an attorney or CPA.  (Tr. 2/3/14 at 65.)  He had never
been qualified or testified as an expert on the issue of the
independence of a subsidiary and its parent corporation.  (Tr.
2/3/14 at 66.)  He cited no treatise, case law, or other
authority supportive of his methodology or opinions.  (Tr. 2/3/14
at 69-73.)  He had no experience with limited liability
companies.  (Tr. 2/3/14 at 63, 71.)

    The admissibility of expert testimony is governed by Rule
702 of the Federal Rules of Evidence which provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if:
>     (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in
> issue;
>     (b) the testimony is based on sufficient facts or
> data;
>     (c) the testimony is the product of reliable
> principles and methods; and
>     (d) the expert has reliably applied the principles
> and methods to the facts of the case.

Fed. R. Evid. 702.  "Rule 702 embodies a trilogy of restrictions
on expert testimony: qualification, reliability and fit."
Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404
(3d Cir. 2003).  Qualification "refers to the requirement that

the witness possess specialized expertise." Id.  "A broad range

of knowledge, skills, and training qualify an expert."  In re

Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994).

Reliability means that an expert's opinion must be "based on the

'methods and procedures of science' rather than on 'subjective

belief or unsupported speculation.'"  Id. at 742 (citations

omitted).  "Finally, an expert's testimony must fit the issues in

the case by providing 'a valid scientific connection to the

pertinent inquiry' in the case."  Ellison v. United States, 753

F. Supp. 2d 468, 476 (E.D. Pa. 2010).

Courts should consider several factors when determining

whether expert testimony is reliable:

> (1) whether a method consists of a testable hypothesis;
> (2) whether the method has been subject to peer review;
> (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the
> technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the
> technique to methods which have been established to be
> reliable; (7) the qualifications of the expert witness
> testifying based on the methodology; and (8) the non-
> judicial uses to which the method has been put.

Paoli R.R. Yard PCB Litig, 35 F.3d at 742 n. 8 (citing Daubert v.

Merrill Dow Pharms., Inc., 509 U.S. 579, 593-03 (1993)).

Applying these factors to the case sub judice convinces the

Court that Pryor's experience did not make him qualified,

reliable, or a fit for the facts of this case.  His experience

was limited to serving on several boards of corporations, but

never on the board of a limited liability corporation.  His

method was simply to rely on his own experience which is more akin to a subjective test rather than any methodology that could be subject to peer review or tested in a controlled manner.[5] Further, his opinion was not generally accepted: he had never testified on this issue before, had not been qualified as an expert, and could point to no one who had relied on his expertise in this area.  Though experience in a field may provide qualification as an expert witness, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable _any_ conceivable opinion the expert may express."  United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004) (stating that the witness must explain how his/her experience is relevant to the facts at hand and why that experience alone is a sufficient basis for his/her opinion).

Because the Court finds that Pryor's experience did not make him an expert, the Court has not considered his opinion, but rather has relied on the facts of the case as presented and Delaware law on the proper conduct of officers and directors of

---

[5]  Although the Trustee cites cases for the proposition that experience alone may be a sufficient basis on which to find an expert's testimony reliable, the Court finds those cases distinguishable.  See, e.g., Ellison, 753 F. Supp. 2d at 480-83 (finding an expert qualified whose 37 years of experience included teaching oral surgery and serving as an examiner on the American Board of Oral and Maxillofacial Surgery and who had, in fact, relied on medical literature in support of his methods).

limited liability corporations.[6]

     1.   <u>Undercapitalization and Insolvency</u>

The Court has determined that the Debtor was not undercapitalized or insolvent until February 1, 2009, five months before the bankruptcy filing.  Therefore, the Court finds that this factor does not favor piercing the corporate veil any earlier than that date.

However, insolvency alone does not mean that the Debtor became the alter ego of LLC or the Trusts.  "Companies commonly become insolvent, then bankrupt; piercing the corporate veil is an exception reserved for extreme situations, rather than the rule. . . .  Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business."  <u>Lutyk</u>, 332 F.3d at 197; <u>Parker Hannifin Corp. v. North Sound Props.</u>, No. 10 Cv. 6359(MHD), 2013 WL 1932109, at *13 (S.D.N.Y. May 8, 2013) (holding that the filing of bankruptcy is not sufficient reason to pierce the corporate veil; "otherwise every insolvent subsidiary would have its veil pierced.").  <u>Cf.</u> <u>Autobacs Strauss, Inc. v. Autobacs Seven Co.</u>,

---

    [6]  The Court finds it unnecessary to rule on the Plaintiff's post-trial Motion for Consideration of Errata to the Trial Testimony of Pryor which the Defendants opposed.  (Adv. D.I. 276 & 278.)

Ltd. (In re Autobacs Strauss, Inc.), 473 B.R. 525, 577 (Bankr. D. Del. 2012) (piercing the corporate veil because the acts of the parent and grandparent company had prevented the debtor from generating enough cash flow to sustain operations).

Because insolvency alone is not dispositive, the Court must consider the other factors to determine if the Debtor was created for an improper purpose.

### 2.   Facade for Shareholder

The Trustee contends that, though proper in form, the Opus Group operated as a single economic unit.  Gerald Rauenhorst described the five operating subsidiaries as battleships surrounding the Trusts who would take the torpedo (or any losses) instead of the Trusts.  (Tr. 12/17/13 at 272.)  The Trustee contends that the interlocking directors and officers are evidence that the separate corporations were mere facades for the single enterprise.  (JPTO at § IV, ¶¶ 20, 21 & 14-17.)

The Trustee notes that during the Holding Companies' board meetings no distinction was made between the operations and financial health of one operating company versus the others; that is, "all projects were talked about at one time, in one meeting." (Tr. 12/20/13 at 75; Exs. P-112 & P-113.)  The operating companies themselves could not make final decisions on projects — approval had to come from Defendant Mark Rauenhorst ("Rauenhorst").  (Tr. 12/17/13 at 184; Exs. P-253 & P-816 at

494.)  The Trustee argues that the Opus Group was so successful at marketing itself as a single economic entity that they convinced a consortium of world class banks, including U.S. Bank, BOA, and JP Morgan Chase, to extend a $150 million unsecured line of credit to TFC, a shell entity with no employees, no operations, and no assets.  (Ex. P-1207.)

The Court is not convinced that the Debtor was created only as a facade for LLC and the Trusts.  Rather the Court finds that the Debtor was created for a legitimate business purpose and acted independently of LLC and the Trusts.  "The Opus Group of Companies" or the "Opus Group" was never a legal entity.  (Tr. 12/19/13 at 87; Tr. 2/3/14 at 88-90.)  No loan or contract was ever made by or with the "Opus Group" and banks, vendors, and other business partners of the Debtor were never told or mislead into believing that they were doing business with any legal entity called "The Opus Group of Companies" or the "Opus Group."  (Tr. 12/19/13 at 116-17; Tr. 2/3/14 at 89-90.)

Corp, LLC, and the operating companies were all separately incorporated and operated in a decentralized fashion in which each operating company had its own management, financing, and financial-reporting department.  (Ex. P-819 at 6126; Tr. 2/5/14 at 225; Tr. 12/19/13 at 116-18.)  The Debtor was a separate legal entity, a Delaware limited liability company.  (Ex. D-2081 at 1-111.)

The Debtor's executive team, which included James Lee, Johanna Bolin, Geoff Wood, and Marshall Burton, ran the Debtor. (Tr. 2/4/14 at 214.)  The Debtor's officers understood that the companies were separate and that the Debtor was their employer. (Tr. 12/17/13 at 174-76, 220; Tr. 2/4/14 at 189; Tr. 12/18/13 at 128-30, 190-91; Grindall Dep. at 6, 97-98.)

The Trustee emphasizes Lee's testimony that he felt the Debtor was a division because major projects needed Rauenhorst's approval.  (Tr. 12/17/13 at 184, 223-24; Exs. P-253 & P-816 at 494.)  The Court concludes that Lee's testimony as a whole, however, shows the independence of the Debtor.

Lee was president and CEO of the Debtor from 2004 through the end of 2008, when it had as many as 100 employees.  (Tr. 12/17/13 at 214-16.)  Lee's duties included responsibility for development strategy and decisions in the region, general management and oversight of personnel, working with staff to build projects, and running a profitable business.  (Tr. 12/17/13 at 218-19; Tr. 12/19/13 at 98-99.)  Lee made decisions on his own and managed and operated the company as if it was his own money. (Tr. 12/17/13 at 224.)  The Debtor, under Lee, successfully completed a significant portfolio of projects, generating over a billion dollars in revenue and increasing equity to $75 million. (Tr. 12/17/13 at 222, 245-46.)  Though Rauenhorst had to approve major projects, the Court does not find that unusual.  Rauenhorst

33

was the chairman of the Debtor's board and major projects cost
many millions of dollars and took years to complete and earn a
return.

As CFO of the Debtor, Bolin was the principal financial
officer and had primary overall responsibility for the financial
and accounting activities of the Debtor.  (Tr. 12/18/13 at 187-
88.)  She oversaw the Debtor's accounting department, which
prepared cash-flow projections and financial statements for the
benefit of Lee and the Debtor's board.  (Ex. D-2163 at 6; Tr.
12/17/13 at 231; Tr. 12/18/13 at 189-90.)

The primary source of capital for the Debtor was its
operations, from which it generated significant retained
earnings.  (Tr. 12/17/13 at 218-20; Tr. 12/20/13 at 108-09.)  The
Debtor also obtained financing from banks to operate the
business, including its $20 million line of credit from BOA and
construction financing for projects, none of which was guaranteed
by LLC or the Trusts.  (Tr. 12/20/13 at 108; Exs. D-2093 & D-2083
at 570, 735 & 838; JPTO at § IV, ¶ 51; Tr. 2/4/14 at 12-13, 245-
47; Tr. 2/3/14 at 81; Tr. 2/6/14 at 170; Tr. 12/17/13 at 244-45;
Tr. 12/19/13 at 117.)

The Debtor borrowed from related entities, TFC and
Financial, to assist with cash flow management.  (Tr. 12/20/13 at
113; Bolin Dep. at 206-07.)  These loans were evidenced by demand
notes whose terms were similar to other lenders' terms and were

34

acceptable to the Debtor.  (Tr. 2/6/14 at 14-15, 19-20; Tr. 12/18/13 at 209-11; Exs. D-2009, D-2010, D-2011 & D-2080 at 424-25; Bolin Dep. at 224-28.)  The loans to the Debtor from TFC and Financial were properly recorded on the books and records of the Debtor.  (Tr. 2/7/14 at 17-18; Tr. 12/18/13 at 188, 208.)  The Debtor decided when to repay TFC or Financial and only made payments when it had excess cash.  (Tr. 2/6/14 at 22; Tr. 12/18/13 at 211-12; Bolin Dep. at 208-09; Tr. 2/7/14 at 72-73.)

The Debtor did not share offices with LLC, Corp, any other operating subsidiary, or the Trusts.  (Tr. 12/17/13 at 240-41; Tr. 12/19/13 at 93-95.)  Instead, it maintained headquarters in Maryland and offices in Philadelphia, PA, and in Stamford, CT. (JPTO at § IV, ¶ 19; Bolin Dep. at 43-44; Tr. 12/17/13 at 240; Tr. 12/19/13 at 93.)  All the Debtor's employees worked in the Debtor's offices or at its project sites, not in the offices of any other entities.  (Tr. 12/19/13 at 94-95.)

No other operating subsidiary did business in the states where the Debtor operated.  (Tr. 2/4/14 at 243; Tr. 12/19/13 at 86-87, 91-92; Tr. 12/17/13 at 240-41; Ex. D-2217.)  LLC and the Trusts never did business under the Debtor's name and the Debtor never did business under the Trusts' or LLC's name.  (Tr. 12/19/13 at 116; Tr. 12/17/13 at 241.)

Consequently, the Court finds that the Debtor was not a mere facade for LLC or the Trusts.

35

### 3.   Observance of Corporate Formalities

The Trustee contends that the Trusts, LLC, Corp, and all the operating subsidiaries, including the Debtor, were all one operation and that corporate formalities were not observed.  He notes that the Debtor, LLC, and the Trusts had overlapping officers and directors and even the Debtor's "independent" directors were hand-picked by the holding companies and were expected to support Rauenhorst's decisions.  (JPTO at § IV, ¶¶ 14-17, 20 & 21; Tr. 2/3/14 at 53-55; Ex. P-167; Tr. 12/19/13 at 22-25, 196, 204-05.)  The Trustee contends that the Debtor was not run as an "independent" operating company, but rather as an operating division of a single entity.  (Ex. P-169; Tr. 12/17/13 at 175-77; Tr. 12/18/13 at 128-30.)

As an example, the Trustee contends that the Debtor's Board meetings were a sham.  The Trustee notes that the Debtor's Board resolutions were drafted in advance by Corp's legal department in Minnesota and were sent to the Debtor for signature at its board meeting.  (Ex. P-966; Tr. 12/18/13 at 152-53.)  Bolin testified that, in her six years at the Debtor, she was not aware of a single resolution that ever failed to pass and never even heard a "no" vote.  (Tr. 12/18/13 at 152-53; Tr. 12/17/13 at 191.)  Board resolutions were sometimes provided after the fact with a prior effective ("as of") date.  (Ex. P-315.)  Minutes of the Debtor's board meetings were sometimes materially changed by individuals

who were neither officers nor directors of the Debtor.  (Ex. P-207).

The Defendants respond that Delaware law does not require limited liability companies, such as the Debtor, to observe corporate formalities.  See, e.g., Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC), 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009) (stating that the Delaware LLC Act "requires little more than that an LLC execute a proper certificate of formation, maintain a registered office in Delaware, have a registered agent . . . and maintain certain records for membership and tax purposes.").  Nonetheless, the Defendants contend that the Debtor did observe corporate formalities.

The Defendants note that the Debtor kept its own separate accounting books, records, and financial statements.  (Bolin Dep. at 179-80, 282-86; Tr. 2/4/14 at 215-16; Tr. 12/18/13 at 187-88.) The accounting software system was set up such that only accountants working for the Debtor could enter data into the system for the Debtor or companies owned by the Debtor.  (Tr. 2/5/14 at 177.)

The Debtor had its own real, functioning board of directors that met in person quarterly, where board members engaged in substantive discussions, often going deep into the strategies of the company, the market, and projects.  (Exs. D-2081 & D-2083;

37

Tr. 12/19/13 at 105-09;   Tr. 2/3/14 at 80-81; Tr. 12/18/13 at
151-52; Tr. 12/17/13 at 189-90, 224-25.)   Bolin took the minutes
for the Debtor's board meetings which were kept in the Debtor's
minute book.  (Ex. D-2081 & D-2083; Bolin Dep. at 82-83; Tr.
12/17/13 at 224-25.)[7]  Bolin and her staff prepared the Board
Books used at the Debtor's board of directors meetings, which
included minutes from the previous meeting, employee information,
information on current and prospective projects, reports on
mortgage and loan status, marketing efforts, and financial
statements including cash-flow projections.  (Ex. D-2083; Tr.
12/19/13 at 105-06; Bolin Dep. at 83, 183-85; Tr. 12/17/13 at
231; Tr. 12/18/13 at 189.)

The Court finds that the evidence supports a finding that
the Debtor observed corporate formalities.  The Debtor had a
separate board of directors and had its own officers.  It held
periodic board meetings at which its affairs were discussed in
depth, and it maintained separate corporate records.  The Debtor
had its own accounting and finance department and personnel which
kept its financial records.  The Debtor borrowed from banks in
its own name, with no guarantors.  The Debtor operated in a
distinct geographic region of the United States in which none of

---

[7]  LLC and Corp similarly maintained their own boards of
directors, which also met in person quarterly, and kept minutes
of those meetings, which were maintained along with written
actions in their own minute books.  (JPTO at § IV, ¶¶ 14 & 16;
Ex. D-2082.)

the other operating subsidiaries did business.  See, e.g., Bahr v. Sunrise Senior Living, Inc., No. 07-CV-3931, 2010 WL 432273, at *4 (N.D. Ill. Feb. 3, 2010) (facts did not support piercing the corporate veil where parent and subsidiary were incorporated in different states 13 years apart, subsidiary was headquartered in a different state, and subsidiary's own executive directors ran its day-to-day operations.)  Because the Debtor observed corporate formalities and maintained its own independent books and records, the Court concludes that this factor does not favor piercing the corporate veil.

The Trustee argues, however, that even if corporate formalities were technically followed by the Debtor, it does not foreclose piercing the corporate veil when other factors weigh in favor of doing so.  See Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 521 (S.D.N.Y. 2012) (granting partial summary judgment and piercing the corporate veil without finding that corporate formalities were disregarded); Foxmeyer, 290 B.R. at 245-46 (considering whether adherence to corporate formalities was "merely a facade to cover the fact that Fox Drug and Fox Corp. were one and the same"); Golden Acres, 702 F. Supp. at 1105-06 (finding that although some corporate formalities were observed, the nominal role of president and one-sided nature of directors meetings indicated a "disregard for corporate formalities").

39

The Court agrees with the Trustee that this one factor is not dispositive and consequently considers all factors in determining whether to pierce the corporate veil.

### 4. Siphoning of Funds by Shareholder

The Trustee argues that both the distribution policy and specific transfers of assets from the Debtor to affiliates are examples of improper siphoning of funds from the Debtor. See Trustee of Nat'l Elevator Indus. Pension Health Benefit & Educ. Funds v. Lutyk, 140 F. Supp. 2d 447, 458 (E.D. Pa. 2001), aff'd, 332 F.3d 188 (3d Cir. 2003) (holding that the payment of dividends, the repayment of loans from shareholders, or other diversion of corporate assets at a time when the company's finances are in trouble may strongly indicate siphoning). The Trustee argues that the mandatory distribution policy, by which 77.5% of the Debtor's (and other operating companies') net profits were upstreamed to the holding companies and ultimately to the Trusts, are evidence that the Opus Group was a single economic enterprise. (Exs. P-746, P-132, P-100 & P-109.).

However, the payment of dividends annually is not sufficient evidence to pierce the corporate veil. In fact, it is usually the failure to pay dividends (while instead siphoning funds from the subsidiary though other means) that evidences a subsidiary is a mere facade of the parent. See Moll Indus., 454 B.R. at 588. The Court finds that the regular payment of dividends by the

Debtor to LLC (which paid dividends to the Trusts) is
insufficient to cause the Court to pierce the corporate veil of
LLC (or the Trusts), particularly when dividend payments were
only made while the Debtor was profitable and did not jeopardize
the Debtor's ability to run or grow its business.  (Tr. 12/19/13
at 113; Tr. 2/4/14 at 247; Tr. 2/6/14 at 8-9.)

Similarly, the policy requiring the Debtor to upstream taxes
based on its income does not support the Trustee's claim to
pierce the corporate veil.  The Debtor, like many companies, was
a pass-through entity for tax purposes.  That fact alone does not
warrant piercing the corporate veil.

Further, many of the cited distributions were used to pay
for Shared Services provided to the Debtor by related entities.
The Court finds that the Debtor received an actual benefit from
the Shared Services performed for it.  (See Part F2b infra.)  The
Court concludes that the payment for Shared Services was not the
siphoning of assets away from the Debtor to avoid creditors that
would justify piercing the corporate veil.  Moll Indus., 454 B.R.
at 590-91 (dismissing piercing corporate veil claim and finding
that parent directing subsidiary to pay secured debt or buy a new
facility was not "siphoning").

The Trustee also asserts that the transfer of assets under
the Debtor's control to other Opus entities justifies piercing
the corporate veil.  In particular, the Trustee emphasizes the

41

transfer of contracts owned by Opus East Management, LLC ("Management Co") to Opus Property Services LLC ("OPS") for no consideration which were sold shortly thereafter for hundreds of thousands of dollars. As the Court finds below, however, the contracts purchased by OPS from Management Co were fundamentally different from the ones later sold by OPS. (See Part C2bi infra.) The Management Co contracts were worthless to the Debtor who did not have the funds necessary to perform them and who had never realized a profit from them. (Id.)

The Court finds that the transfers of which the Trustee complains are insufficient to show a pattern of siphoning of funds away from the Debtor. In contrast, the Debtor maintained bank accounts in its own name separate from all other Opus-related entities, and the Debtor's funds were not commingled with any other entity's funds or taken from its accounts by LLC or the Trusts. (Tr. 12/18/13 at 191-92; Tr. 12/19/13 at 117; Tr. 2/4/14 at 13-14, 243; Bolin Dep. at 282-83.) Neither Rauenhorst nor anyone else other than the Debtor's officers had signing authority for any of the Debtor's bank accounts. (Tr. 12/19/13 at 117-18; Bolin Dep. at 282-83; Tr. 2/4/14 at 243.) Neither LLC, the Trusts, nor any other related entity ever paid the Debtor's bills or any other obligation of the Debtor. (Tr. 2/4/14 at 220-21; Tr. 12/19/13 at 118.) Funds were not taken from any of the Debtor's bank accounts against its will. (Bolin

42

Dep. at 282-83; Tr. 12/18/13 at 191-92.)

The Court finds that the Debtor regularly paid dividends when it had income and did not allow LLC or the Trusts to siphon funds from it.  As a result the Court concludes that this factor does not favor piercing the corporate veil.

### 5.   Element of Injustice or Unfairness

The Defendants contend that even if the Court finds in favor of the Trustee on all the other elements of piercing the corporate veil, that claim must still fail because the Trustee has failed to prove that the parties' actions had any element of injustice or unfairness.  "Merely presenting evidence of dominion or control of the parent over the subsidiary, without evidence of fraud or similar injustice, will not support alter ego liability." Bahr, 2010 WL 432273, at *4 (citing Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower Inc., 685 A.2d 724, 729 (Del. Super. Ct. 1996)).  Instead, the Trustee's burden is to prove that the Defendants used the corporate form to "defeat the ends of justice, to perpetuate fraud, to accomplish a crime, or otherwise evade the law." Trevino, 583 F. Supp. 2d at 529 (quoting Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002)); Foxmeyer, 290 B.R. at 236 (holding that to prevail, the plaintiff would have to prove "something that is similar in nature to fraud or a sham.").  To meet this element, "fraud or injustice [must] be found in the

defendants' use of the corporate form" itself.  Mobil Oil, 718 F.
Supp. at 269.  Accord Blair v. Infineon Techs. AG, 720 F. Supp.
2d 462, 473 (D. Del. 2010) ("The fraud or injustice that must be
demonstrated in order to pierce a corporate veil must 'be found
in the defendants' use of the corporate form.'"); Owl Fumigating
Corp. v. California Cyanide Co., Inc., 24 F.2d 718, 721 (D. Del.
1928) (finding that subsidiary was not created or used "to
justify wrong, protect fraud, or defend crime" and therefore
alter ego claim was not supported).

The Trustee argues that such injustice or unfairness is
found in the fact that the Opus Group held itself out to the
world as being a single economic entity headed and financially
backed by the Trusts.  (Exs. P-1129, P-172 & P-884.)  Banks
relied upon the Opus Group's representations by extending a $150
million unsecured line of credit to a company (TFC) with no
assets, no business, and no operations.  (Ex. P-1207.)  The
Trustee contends that the Trusts knew that creditors of the Opus
Group believed they were a single entity backed by the Trusts.
(Ex. D-2077 at 130.)

The Trustee also complains that LLC made an equity
contribution to the Debtor in March, 2008, only so it could make
distributions required to LLC and the Trusts, but LLC refused to
extend a loan to the Debtor later in the year to continue its
operations as the economy worsened.  (Exs. P-115, P-116 & P-743.)

The Court finds that the Debtor was not harmed by the March, 2008, equity infusion.  In essence, the Trustee's complaint is that the Trusts and LLC failed to bail the Debtor out of its financial troubles when the economic recession hit later in 2008. (Adv. D.I. 285 at ¶ 692.)  There was, however, no legal obligation of the Trusts or LLC to do so.

The Trustee cites cases for the proposition that the obligation to provide sufficient capitalization is an ongoing one, which begins at the time of incorporation and continues throughout the corporation's existence.  See, e.g., Lutyk, 140 F. Supp. 2d at 458 (citing United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988)).

Although Lutyk cites Golden Acres for the proposition that sufficient capitalization of a corporation is an ongoing duty, nowhere in Golden Acres is that stated.  In Golden Acres, the defendants admitted that the corporation was undercapitalized when they obtained control of it and throughout their ownership. 702 F. Supp. at 1105.  In Lutyk the Court found the fact that the corporation continued to operate for three years after it became insolvent was evidence of the lack of capitalization relevant to the piercing the corporate veil claim.  140 F. Supp. 2d at 458.

This case is different.  The Debtor had been adequately capitalized initially and had almost fifteen successful years operating while it grew its equity to $75 million.  The Debtor

45

continued to operate only five months after it became insolvent.
When the recession hit, the Court finds that LLC had no legal
obligation to continue to support the Debtor.  In fact, given the
depth and length of the recession, LLC might have had to continue
to prop up the Debtor (and the other operating subsidiaries) for
years.  The law does not require this.  Otherwise, every parent
of an insolvent company would have to support it, completely
blurring corporate lines.  <u>Lutyk</u>, 332 F.3d at 197 ("piercing the
corporate veil is an exception reserved for extreme situations");
<u>Parker Hannifin</u>, 2013 WL 1932109, at *13 (piercing the corporate
veil not mandated simply because a company became insolvent).

The Court concludes that there was no injustice or
unfairness in the treatment of the Debtor by LLC or the Trusts.
Thus, the Court concludes that the Trustee has failed to prove by
a preponderance of the evidence any of the factors necessary to
establish an alter ego claim.  <u>See, e.g.</u>, <u>Lutyk</u>, 332 F.3d at 188;
<u>Mobil Oil</u>, 718 F. Supp. at 270; <u>Foxmeyer</u>, 290 B.R. at 237.
Accordingly, the Court will enter judgment in favor of the
Defendants on Count 1 of the Third Amended Complaint.

C.   <u>Breach of Fiduciary Duty</u>

1.   <u>Standard of Fiduciary Duty</u>

Many of the claims in dispute involve the fiduciary duty of
the Debtor's officers and directors.  The parties disagree about
the applicable legal standard for breach of those fiduciary

46

duties.

Under Delaware law, an officer or director owes its company what has been described as a "triad of duties." Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners L.P. (In re Fedders North America, Inc.), 405 B.R. 527, 539 (Bankr. D. Del. 2009). This triad includes a duty of care, a duty of loyalty, and a duty to act in good faith. Id.

A claim for breach of the duty of care requires a showing of gross negligence which generally "requires directors and officers to fail to inform themselves fully and in a deliberate manner." Id. (citing Cargill, Inc v. JWH Special Circumstance LLC, 959 A.2d 1096, 1113 (Del. Ch. 2008)). See also Broadstripe, 444 B.R. at 104-05; In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 64 (Del. 2006). In determining whether a manager breached the duty of care, the manager's intent, i.e., whether the manager acted in bad faith, is irrelevant. Walt Disney Co., 906 A.2d at 64-66 (the duty of care may be breached when a manager has engaged in conduct that constitutes gross negligence). See also Broadstripe, 444 B.R. at 104-05.

The duty of loyalty mandates that the best interest of the company and its shareholders takes precedence over any interest possessed by a director, officer, or controlling shareholder which is not shared by the other stakeholders. Fedders, 405 B.R. at 539. A claim for breach of the duty of loyalty requires a

47

showing that a fiduciary was on both sides of a transaction and that the transaction was not entirely fair to the company.  Id. at 540.  If the plaintiff proves that the defendant was on both sides of the transaction, then the burden shifts to the defendant to prove that the transaction was entirely fair.  Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools), 386 B.R. 37, 47 (Bankr. D. Del. 2008).  The "entire fairness" standard is Delaware's most onerous standard and requires that the defendant prove that the transaction was the product of both fair dealing and fair price.  In re Trados Inc. S'holder Litig., 73 A.3d 17, 45 (Del. Ch. 2013); Broadstripe, 444 B.R. at 106.  Not even an honest belief that the transaction was entirely fair is sufficient to establish entire fairness — the transaction itself must be objectively fair, independent of the fiduciary's belief.  Trados, 73 A.3d at 45.

The duty of good faith requires "true faithfulness and devotion to the interests of the corporation and its shareholders" and is breached when, among other things, a manager acts with a purpose other than that of advancing the best interests of the corporation.  Walt Disney Co., 906 A.2d at 67; Fedders, 405 B.R. at 540.  A claim for breach of the duty of good faith may be established in several ways.  The Delaware courts have identified three examples of such a breach.

> A failure to act in good faith may be shown, for
> instance, where the fiduciary intentionally acts with a

48

> purpose other than that of advancing the best interests
> of the corporation, where the fiduciary acts with the
> intent to violate applicable positive law, or where the
> fiduciary intentionally fails to act in the face of a
> known duty to act, demonstrating a conscious disregard
> for his duties.

Walt Disney Co., 906 A.2d at 67 (quoting lower court decision

which "echo[ed] pronouncements our courts have made throughout

the decades.").

Delaware law, however, allows creators of limited liability

companies to modify the level of fiduciary duty that is owed to

the company by its officers and directors, including to

> **provide for the limitation or elimination of any and
> all liabilities for breach of contract and breach of
> duties (including fiduciary duties)** of a member,
> manager or other person to a limited liability company
> or to another member or manager or to another person
> that is a party to or is otherwise bound by a limited
> liability company agreement; provided, that a limited
> liability company agreement **may not limit or eliminate
> liability for any act or omission that constitutes a
> bad faith violation of the implied contractual covenant
> of good faith and fair dealing.**

Del. Code Ann. tit. 6, § 18-1101(e) (emphasis added).

In this case, the Debtor's LLC Company Agreement (the "LLC

Agreement") did modify the fiduciary duty that officers owed to

the Debtor.  Section 12.3(ii) of the LLC Agreement states the

applicable standard of fiduciary duty when resolving a conflict

of interest:

> unless otherwise expressly provided herein,
> (a) whenever a conflict of interest exists or arises
> between Covered Persons, or (b) whenever this Agreement
> or any other agreement contemplated herein or therein

49

provides that a Covered Person shall act in a manner
that is, or provides terms that are, fair and
reasonable to the Company or any Member, the Covered
Person shall resolve such conflict of interest, taking
such action or providing such terms, considering in
each case the relative interest of each party
(including its own interest) to such conflict,
agreement, transaction or situation and the benefits
and burdens relating to such interests, any customary
or accepted industry practices, and any applicable
generally accepted accounting practices or principles.
**In the absence of bad faith by the Covered Person, the
resolution, action or term so made, taken or provided
by the Covered Person shall not constitute** a breach of
this Agreement or any other agreement contemplated
herein or of any duty or obligation of the Covered
Person at law, in equity or otherwise, including
without limitation, **a breach of fiduciary duty.**

(Ex. D-2081 at 23 (emphasis added).)

The Court concludes that the Defendants, as officers and
directors of the Debtor, are required only to meet the
requirements of section 12.3(ii) of the LLC Agreement and can
only be found to have breached their fiduciary duty if they acted
in bad faith.

The Trustee contends that Rauenhorst, Burton, and Campa were
fiduciaries of the Debtor: Rauenhorst was Chair of the Debtor's
Board of Directors from April 1, 1999, through July 1, 2009;
Campa was an officer of the Debtor from April 28, 2004, through
May 15, 2009; and Burton was an officer of the Debtor from August
1, 2008, through July 1, 2009.  (JPTO at § IV, ¶¶ 20 & 21.)  They
are therefore "managers" within the definition in the LLC
Agreement and under Delaware law.  (Ex. P-284 at 3.)  See Del.
Code Ann. tit. 6, § 18-101(10).  The Trustee contends that they

50

breached their fiduciary duties in six areas.

     2.   <u>Specific Breaches</u>

     a.   <u>Transfer of ME to GAMD</u>

In 2004 the U.S. General Services Administration ("GSA") issued a solicitation for proposals to build the National Oceanic and Atmospheric Administration National Center for Weather and Climate Prediction in Maryland (the "NOAA Project").  (JPTO at § IV, ¶ 54; Ex. P-826.)  The Debtor formed a special purpose entity, Maryland Enterprises, LLC ("ME") for the purpose of bidding on the NOAA Project.  (JPTO at § IV, ¶ 56; Tr. 12/17/13 at 155.)  ME submitted a proposal for the NOAA Project and was awarded the contract by GSA in March, 2005.  (JPTO at § IV, ¶ 55; Ex. P-826.)

Construction on the NOAA Project was originally scheduled to begin in December, 2005, but experienced many delays, in part caused by GSA.  (JPTO at § IV, ¶¶ 59, 60 & 61; Ex. P-826.) Though it considered not starting construction, the Debtor decided to proceed because (1) abandoning a commitment was not the way it typically conducted business, (2) being put on a "bad contractor" list would compromise its chances for further government work, and (3) abandoning the project might result in a GSA claim for the increased costs of hiring a replacement contractor.  (Tr. 12/17/13 at 256-58; Tr. 12/19/13 at 120-22.)

By the time construction began in March, 2007, the cost of construction materials had substantially increased, by at least $22 million.  (JPTO at § IV, ¶¶ 62 & 64; Tr. 12/17/13 at 204-05; Ex. P-826; Tr. 2/4/14 at 259.)  The Debtor had problems finalizing its project financing with BOA because of GSA's failure to cooperate in adjusting the construction schedule to reflect delays and GSA's refusal to cover the significant additional costs.  (Exs. P-626 & P-1136; Tr. 12/17/13 at 204-06.) While the Debtor waited for the loan from BOA to be finalized, it borrowed funds from TFC and Financial to start the NOAA Project. (Exs. P-1136 & P-272.)  When the BOA loan was finalized, it was used to repay in part those loans from TFC and Financial.  (Ex. P-272.)  The BOA loan was to the Debtor, guaranteed by ME.  (Ex. P-457 at 85829-77, 85981-99.)

As construction on the NOAA Project progressed, GSA issued various change orders totaling approximately $37 million.  (JPTO at § IV, ¶ 63; Ex. P-826.)  The Debtor did not have the internal capacity to fund the change orders, and GSA was not willing to pay for the changes until completion of the project.  (Bolin Dep. at 110-11; Tr. 2/4/14 at 266-67; Exs. P-615, P-826, P-801 & P-135 at 795.)  The Debtor's officers concluded that the NOAA Project was "a train wreck."  (Bolin Dep. at 110-11; Tr. 12/17/13 at 259.)

After numerous attempts to resolve the differences with GSA, the decision was made in December, 2008, to stop construction on the NOAA Project. (Tr. 12/19/13 at 122-23.) Even after construction stopped, there were ongoing efforts to settle with GSA. (Tr. 2/4/14 at 260-61.) In March, 2009, GSA proposed a settlement with ME that included a $7.1 million payment, but this proposal was not feasible because it still left ME $16 million short on the cash necessary to complete the construction and GSA did not commit to make interim payments to the Debtor to fund completion of the project. (Exs. D-2150, P-878, P-768, D-2244, P-664 & P-755; Tr. 2/4/14 at 266-72.)

In April, 2009, the Debtor received a notice of default from BOA on the $59 million construction loan for the NOAA Project. (Ex. D-2151.) The Debtor concluded that the NOAA Project dispute could not be settled and it could not restructure the loan as demanded by BOA. (Tr. 2/4/14 at 261-63, 272-73.) Because they felt that GSA had overstepped its authority and breached the agreement, Corp's general counsel and the Debtor's outside counsel supported filing a lawsuit against GSA. (Tr. 2/4/14 at 265-66.) The Debtor's CEO at the time, Marshall Burton, did not think that the lawsuit would succeed or had any value and opposed it. (Tr. 2/4/14 at 266, 274; Ex. P-755.) Nonetheless, on May 12, 2009, ME filed a complaint for declaratory judgment against GSA seeking $37 million in damages. (JPTO at § IV, ¶ 65; Exs. D-

2108 & P-905 at 300076-96.)

In the interim, the Debtor talked to several potential buyers for the NOAA Project but was unable to sell it because no one offered more than the bank debt, which BOA would not agree to reduce. (Tr. 2/4/14 at 273-77; Tr. 2/5/14 at 148-49.) As a result, the Debtor's general counsel, Brian Grindall, proposed that the Debtor reorganize its portfolio and shed assets, including putting ME into a separate entity owned by a related party, in order to avoid potential complications in the Debtor's anticipated bankruptcy. (Ex. P-213; Tr. 2/4/14 at 262-65.) Rauenhorst agreed with the decision because he felt that ME had little value and neither the Debtor nor ME had any cash to pursue litigation against GSA. (Tr. 12/19/13 at 72-77.) Chatham Financial was consulted and recommended structures for a disposition of the Debtor's interest in ME. (Ex. P-241.)

The Trusts created and invested $100,000 in GAMD on June 29, 2009, for the purpose of purchasing the Debtor's membership interest in ME.[8] (Exs. P-79 & P-85.) On that same day, the Debtor sold its interest in ME to GAMD for $100,000 in cash plus an interest in the first $400,000 of proceeds (if any) from the GSA lawsuit. (Exs. D-2081 at 335, D-2086, P-669, P-312, P-315,

---

[8] On December 17, 2009 (retroactive to June 29, 2009), the Trusts rescinded their $100,000 capital contribution to GAMD and instead made a $100,000 capital contribution to LLC. LLC then made a $100,000 capital contribution to GAMD and became the sole owner of GAMD. (Exs. P-85 & P-229.)

P-75, P-76, P-77, P-78 & P-846; Tr. 12/19/13 at 50-51, 70-71; Tr. 2/4/14 at 273.)

The Peterson Companies subsequently signed an agreement with GAMD for an option to purchase GAMD's interest in ME.  Peterson paid a total of $150,000 for the option and its extensions, but it ultimately cancelled the agreement and never acquired ME. (Ex. P-87; Tr. 2/4/14 at 153.)  GAMD spent nearly $650,000 pursuing the GSA lawsuit, but it ultimately recovered nothing. (Tr. 2/4/14 at 152.)

After the Debtor filed bankruptcy, the secured lenders on the NOAA Project obtained stay relief and got a receiver appointed.  (Ex. D-2060 at ¶ 15; Tr. 2/4/14/ at 183-85.) Subsequently, over the objection of GAMD, the receiver and secured lenders reached a global settlement with GSA resulting in the dismissal of the litigation against GSA and the payment of a portion of the mechanics lien and secured claims on the NOAA Project.  (Ex. D-2060 at ¶¶ 16 & 17.)

On May 4, 2011, the Trustee filed a motion in the Bankruptcy Court for approval of a settlement with NOAA Maryland LLC (which intended to take over the NOAA Project).  (Ex. D-2060; Tr. 2/4/14 at 183-84.)  Pursuant to the settlement agreement, the Trustee received $100,000 from NOAA Maryland LLC in exchange for his agreement to abandon the Debtor's interest in ME and any right to avoid the Debtor's transfer of ownership in ME to GAMD.  (Ex. D-

2060 at ¶ 23; Tr. 2/4/14 at 185.)  The settlement was approved by the Court on May 24, 2011.  (D.I. 434.)

The Trustee claims that Rauenhorst[9] breached all three of his fiduciary duties to the Debtor in connection with the GAMB transfer.  The Trustee argues that Rauenhorst breached his duty of care by failing to inform himself of the facts surrounding the transfer.  The Trustee notes that Rauenhorst knew few details of the GSA contract itself, didn't review any valuation reports, and was not familiar with who owned the buyer, GAMD.  (Tr. 12/19/13 at 47-49, 52-53.)

Rauenhorst counters that he was involved enough to satisfy his modified duty of care.  Rauenhorst testified that he had conversations about the transfer with key members of the Debtor's management team and others involved in the GSA negotiations, including Burton.  (Tr. 12/19/13 at 72.)  He contends that at the time of the transfer, he had enough information to conclude that the NOAA Project had little or no value to the Debtor.  (Tr. 12/19/13 at 72-75.)  Additionally, Rauenhorst argues that the Trustee provided no evidence as to any bad faith motivation for his alleged failure to inform himself to a greater degree, as required by the LLC Agreement.

---

[9]  Although the Trustee alleges in Count 2 that Burton also breached his fiduciary duties in connection with the NOAA Project, the Trustee's evidence and arguments related only to Rauenhorst's actions.  (Adv. D.I. 283, 284 & 285.)

The Court concludes that Rauenhorst did not violate his duty of care.  He properly relied upon key members of the Debtor's management team to keep him informed of the particulars of the NOAA Project and ultimately the transfer of ME to GAMD.  (P-135.) Burton, the highest ranking officer of the Debtor at the time, consented to the sale and felt it was in the best interest of the Debtor's creditors because he believed that there was no value in the project or the GSA litigation and no reasonable offer had been received from an outside buyer.  (Tr. 2/4/14 at 274-77.)

The Trustee also claims Rauenhorst violated his duty of loyalty.  The Trustee claims that Rauenhorst is not entitled to the modified standard in the LLC Agreement because Rauenhorst failed to take into account the interests of both sides of the transaction.  Under the traditional standard, the Trustee argues that Rauenhorst breached his duty of loyalty by being on both sides of the transaction (as a beneficiary of the Trusts who owned GAMD and as a director of the Debtor) and by not establishing that the transaction was entirely fair to the Debtor.

Rauenhorst responds that he did take all parties' interests into account in determining that the transfer to GAMD was in the Debtor's best interest.  (Tr. 12/19/13 at 74-75, 126.)  He testified that in making the decision, he took into account that the transfer would provide the Debtor with much needed cash in

57

the amount of $100,000 and the potential for up to $400,000 more
if the GSA litigation was successful.  (Tr. 12/19/13 at 70-71.)
Rauenhorst also testified that the NOAA Project's greatest chance
for recovery, the GSA litigation, could not be fully exploited by
the Debtor because it did not have the funds to prosecute that
claim.  (Tr. 12/19/13 at 75-76.)

     The Court concludes that Rauenhorst did not violate his duty
of loyalty to the Debtor.  Rauenhorst did consider the best
interests of the Debtor in doing the transaction and so is
entitled to the lower standard set forth in the LLC Agreement.
Under the standard of care articulated in the LLC Agreement, the
Court finds that Rauenhorst did not violate the duty of loyalty
as there is no credible evidence that he acted in bad faith in
connection with the GAMB transaction.  Further, the Court
concludes that, even under the traditional standard, Rauenhorst
did not violate his fiduciary duty.  The Court finds that the
transfer to GAMD was entirely fair to the Debtor because the
Debtor could find no other buyers, did not have the funds to
complete the NOAA Project, and had no cash to prosecute any claim
against GSA, which was questionable at best.  (Bolin Dep. at 110-
11; Tr. 12/19/13 at 70-77; Tr. 2/4/14 at 152, 261-66, 272-74;
Exs. P-615, P-826 & P-755.)

     Finally, the Trustee argues that Rauenhorst breached his
duty of good faith.  He contends that this is proven by the

58

disparity between the Chatham valuation reports of the NOAA Project that were created for the Debtor and GAMD.  In the report created for the Debtor, the Trustee contends that the value of the NOAA Project is estimated at $12 to $16 million.  (Exs. P-690 & P-691.)  The opinion letter created for GAMD, however, states that the value GAMD paid for the NOAA Project ($100,000 in cash and the potential $400,000 litigation recovery) was fair.  (Exs. D-2152 & P-522.)  The Trustee also claims that Rauenhorst's failure to accept the GSA settlement offer of $7.1 million evidenced his breach of the duty of good faith.  Finally, the Trustee alleges that Rauenhorst failed to inform the Debtor's officers and directors about the GAMD transaction, thereby breaching his obligations to the Debtor.

Rauenhorst claims that none of the alleged actions constitute a breach of his duty of good faith.  First, Rauenhorst testified that he does not recall ever seeing either of the Chatham valuation reports prior to trial.  (Tr. 12/18/13 at 124, 126.)  This testimony is confirmed by the fact that although Chatham was working on a valuation of ME for the Debtor, the analysis had not been finalized.  (Exs. P-690, P-691, P-230 & D-2159; Tr. 2/5/14 at 145-47.)  Rauenhorst also testified that the Debtor was fully informed, because he relied on the Debtor's president, Burton, to keep him informed about the transaction.  (Tr. 12/17/13 at 258-59; Tr. 12/19/13 at 19, 60, 72-77, 98, 123.)

Finally, Rauenhorst asserts that the GSA offer of $7.1 million was actually a bad deal for the Debtor because it was substantially less than the cost to complete the NOAA Project. (Tr. 2/4/14 at 268.)

The Court concludes that Rauenhorst did not violate his duty of good faith.  The Court finds that Rauenhorst acted in good faith in relying on information from the Debtor's president. Further, the Court finds that the transfer of ME to GAMD was in the Debtor's best interest because the Debtor could find no other buyers, did not have the funds to complete the NOAA Project, and had no cash to prosecute any claim against GSA.  (Bolin Dep. at 110-11; Tr. 12/19/13 at 70-77; Tr. 2/4/14 at 17-19, 152, 261-66, 272-74; Exs. P-615, P-826 & P-755.)  Finally, the Court concludes that the GSA settlement offer was not a viable option because the Debtor did not have the funds to complete the NOAA Project and would not have realized a profit even if it did.  (Ex. 2244; Tr. 2/4/14 at 268-72.)  The lack of value in the NOAA Project is evident from the fact that neither the Debtor nor GAMD were able to find a buyer for it.  (Ex. P-87; Tr. 2/4/14 at 153, 273.)

Therefore, the Court concludes that Rauenhorst and Burton did not violate any fiduciary duties in connection with the transfer of ME to GAMD.  Accordingly, the Court will enter judgment in favor of the Defendants on Count 2 of the Third Amended Complaint.

b.   <u>Management Co Property Transfers</u>

The Debtor's property management subsidiary, Management Co,[10] provided management services (such as collecting rent, arranging janitorial services, paying utility bills and taxes, and maintenance) for the buildings that the Debtor developed, until the buildings could be sold.  (JPTO at § IV, ¶ 66; Ex. D-2236; Tr. 2/4/14 at 279-80.)

In April 2009, OPS was formed by LLC to take over the on-site property management.  (JPTO at § IV, ¶ 69; Tr. 2/4/14 at 19.)  Shortly thereafter, Management Co transferred its assets, including its management contracts, to OPS.  (JPTO at § IV, ¶ 68; Tr. 2/4/14 at 283; Tr. 12/16/13 at 176-77; Tr. 12/19/13 at 35-38; Exs. P-269, P-352, P-341.56 & P-353.)  OPS paid book value ($1,038.23) for all of the hard assets and assumed the obligations Management Co had under the transferred contracts. (Tr. 2/5/14 at 106-07, 150-51; Tr. 12/16/13 at 176-77; Tr. 12/20/13 at 160; Exs. P-352, P-353 & P-269.)

On October 1, 2009, OPS sold its property management contracts and certain other assets to NorthMarq Real Estate Services, LLC ("NorthMarq") for approximately $3.9 million. (Exs. P-289 & P-279.)  Of the price paid by NorthMarq, the

---

[10]   Management Co cancelled its registration in Delaware on June 1, 2011.  (Tr. 2/4/14 at 280.)  Management Co did not file a bankruptcy petition, and the Trustee is not a trustee, officer, or director of Management Co.  (Tr. 2/4/14 at 181.)

Trustee contends that approximately $700,000 is attributable to Management Co's contracts.  (Tr. 12/16/13 at 177-78.)

In addition, Management Co had earned management fees for services rendered by it pursuant to the property management contracts during April, 2009.  (Exs. P-282, P-414, P-349 & P-340.)  Despite objections by the Debtor's officers, OPS kept the April 2009 management fees.  (Exs. P-282, P-349 & P-340.)

Finally, Management Co owed fees to Opus Northwest Management LLC ("Northwest Management") for accounting services. (Ex. P-281.)  When Management Co was unable to pay Northwest Management, Northwest Management retained $75,203 in funds due to Management Co as a setoff.  (Exs. P-281, P-699 & P-357.)

### i.  Contracts

The Trustee contends that Rauenhorst and Burton breached their duty of good faith in connection with the transfer of the Management Co contracts to OPS.  The Trustee contends that Burton (the Debtor's highest ranking officer at the time) knew the Debtor's management vehemently objected to the transfer of the contracts.  (Ex. P-282; JPTO at § IV, ¶ 21.)  In response to these complaints, the Trustee asserts Burton did nothing.

The Trustee contends that Rauenhorst[11] was clearly on both sides of the transaction and breached his modified fiduciary duty

---

[11]  Rauenhorst was the Chairman of the Board of Directors of the Debtor and the President and CEO of OPS.  (JPTO at § IV, ¶¶ 20 & 71.)

of care, by failing to take both parties' interests into account. The Trustee contends this is evidenced by Rauenhorst's lack of information about the value of Management Co's contracts.  The Trustee also alleges that Rauenhorst breached his duty of loyalty to the Debtor by acting in bad faith, evidenced by the fact that only nominal consideration was paid for the Debtor's interest in the Management Co contracts while OPS later sold those contracts for over $700,000.  (Tr. 12/16/13 at 176-78.)

The Trustee argues that Rauenhorst and Burton were grossly negligent and acted in bad faith by authorizing or permitting the transfer of Management Co's contracts to OPS, thereby breaching their fiduciary duty of care to the Debtor.  (Exs. P-269, P-341.56, P-340, P-352, P-353, P-349 & P-282.)  Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins, No. Civ. A. 20228-NC, 2004 WL 1949290, at *17 n.92 (Del. Ch. Aug. 24, 2004) (circumstantial evidence can play a key role in proving an individual's bad faith because "[r]arely, if ever, will a plaintiff have direct evidence of a board's intent. . . .  Thus, the Court will generally be required to look to the Board's actions as circumstantial evidence of state of mind.").

The Defendants respond that the transfer of the Management Co contracts to OPS benefitted the Debtor.  Rauenhorst testified that the contracts were not valuable and needed to be transferred because the Debtor had lost money on them every year and did not

63

have the funds necessary to perform those contracts in 2009.
(Tr. 12/18/13 at 112-13, 218-20; Exs. D-2154, D-2155, D-2156 & D-2157; Tr. 2/4/14 at 280-82.)

Further, the Defendants contend that the contracts sold by OPS to NorthMarq were fundamentally different from the ones Management Co held.  The sale to NorthMarq included management contracts transferred to OPS by the other operating subsidiaries. (Exs. P-341.56 & P-269.)  In addition the Management Co contracts were terminated by OPS, and new contracts were executed with the clients.  (Tr. 12/19/13 at 38-39.)  The new management contracts sold by OPS to NorthMarq were more valuable because they were non-cancellable for at least one year; in addition, NorthMarq paid a premium for OPS' agreement to a five-year non-compete. (Ex. P-289 at § 7.5; Tr. 2/4/14 at 25-27; Tr. 2/5/14 at 149; Tr. 12/19/13 at 39.)

The Court concludes that Rauenhorst and Burton did not violate their duty of good faith.  The Court finds that there was minimal value in the management contracts to the Debtor or Management Co.  The contracts were essentially worthless because they were cancellable at will and did not generate any income.[12] (Tr. 2/4/14 at 283-85.)  The only value Management Co had was to

---

[12]  Management Co had lost money for the prior three years and was projected to continue to lose substantial money on those contracts in 2009.  (Tr. 12/18/13 at 112-13, 218-20; Tr. 2/4/14 at 280-82; Exs. D-2154, D-2155, D-2156 & D-2157.)

support the Debtor in developing, leasing, and selling a
building.  (Tr. 12/19/13 at 78-79; Tr. 2/4/14 at 282.)  When the
Debtor was no longer able to operate because of the collapse of
the real estate market, Management Co became a burden, not an
asset, to it.  The transfer of those contracts actually
benefitted the Debtor because it eliminated the losses Management
Co had been incurring.  (Exs. D-2154, D-2155, D-2156 & D-2157;
Tr. 12/18/13 at 112-13, 218-20; Tr. 2/4/14 at 280-85.)

Therefore, the Court concludes that the decision to transfer
the Management Co contracts to another entity was an acceptable
and "pro-Debtor" solution that did not evidence any bad faith.
Neither Burton nor Rauenhorst violated their duty of good faith
or duty of care in connection with that transaction as alleged in
Count 4 of the Third Amended Complaint.

### ii.  April Management Fees

As part of Count 4, the Trustee also contends that Burton
and Rauenhorst breached their fiduciary duties by allowing OPS to
"steal" management fees owed to the Debtor for April, 2009.
(Exs. P-349, P-340 & P-282.)  When OPS took over the Management
Co contracts in May, 2009, it insisted on retaining the fees that
had been earned by Management Co in April, 2009, and were paid in
May, 2009.  (Exs. P-349, P-340 & P-282.)  This essentially
provided the seed money for OPS to start operating.  (Exs. P-349,
P-340 & P-282.)

The Trustee asserts that Burton, the Debtor's highest ranking officer did nothing in response to Bolin's complaints about this.  (Exs. P-349, P-340 & P-282; JPTO at § IV, ¶ 21.) The Trustee contends that Rauenhorst was clearly on both sides of the transaction and, therefore, to fulfill his modified fiduciary duty of care, he had to take both parties' interests into account.

The Trustee fails to recognize, however, that Management Co was not the Debtor and the funds due to Management Co were not property of the Debtor.  There is no evidence that Rauenhorst or Burton was an officer or director of Management Co and, therefore, no evidence that either owed Management Co any fiduciary duty.  Therefore, the Court concludes that judgment must be entered in favor of the Defendants on Count 4 of the Third Amended Complaint.

### iii. Funds Transferred to Northwest Management

Prior to March, 2009, Management Co owed Northwest Management an account receivable for accounting services performed for Management Co.  (Ex. P-281.)  The officers of the Debtor had informed the officers of Northwest Management that Management Co did not have the funds to pay it.  (Exs. P-281, P-357 & P-699.)  In April, 2009, Northwest Management retained $75,203 of funds otherwise due to Management Co to offset the receivable Management Co owed to it.  (Exs. P-281, P-699 & P-

66

357.)  The Debtor's CFO, Bolin, complained that the offset of the funds prevented the Debtor from making its payroll that month and requested a return of those funds.  (Ex. P-281.)

The Trustee characterizes these as transfers to Opus Northwest LLC ("Northwest") when in fact they were transfers to Northwest Management.  (Ex. P-281.)  The Trustee contends that Polacek, the CFO of Corp and LLC, with the knowledge and consent of Rauenhorst, authorized the setoff by Northwest Management despite the objections of the Debtor.  (Exs. P-281, P-357 & P-699.)  The Trustee argues that Rauenhorst breached his fiduciary duties to the Debtor through his action and inaction involving the setoff by Northwest Management.  The Trustee argues that Rauenhorst breached his duty of care and duty of loyalty because he had approved the transfer of those funds from Management Co to Northwest Management, without determining if there was a good faith dispute as to the ownership of the money.

According to the evidence, however, Rauenhorst did not authorize or know anything about the payment; the offset was approved by Polacek.  (Tr. 12/19/13 at 127-28; Ex. P-281.)  Further, the offset was effected by Northwest Management; Northwest was not a party to the transfer.  (Ex. P-281.)  Although Rauenhorst was the Chairman of the Debtor's Board of Directors and an officer of Northwest at the time, there is no evidence he was an officer or director of Northwest Management.

67

(JPTO at § IV, ¶¶ 20, 16 & 17; Ex. P-1166.)

Additionally, contrary to the Trustee's suggestion, the funds transferred were not property of the Debtor, they were property of Management Co.  There is no evidence that Rauenhorst held any position with Management Co, the subsidiary from which Northwest Management took the funds.

Therefore, the Court will enter judgment in favor of the Defendants on Count 14 of the Third Amended Complaint.

c.   <u>Transfers Related to ODP Entities</u>

The Trustee contends that Rauenhorst and Campa breached their fiduciary duties in connection with the transfer of valuable projects from the Debtor to the ODP Entities.[13]  The ODP Entities at issue are: ODP Rock Spring, LLC ("ODP Rock Spring") (established in July, 2004), ODP Princeton, LLC ("ODP Princeton") (established in April, 2006), ODP Manassas, LLC ("ODP Manassas") (established in January, 2008) and ODP Enterprise, LLC ("ODP Enterprise") (established in October, 2008) (collectively the "ODP Entities").  (JPTO at § IV, ¶ 35.)

---

[13]  Rauenhorst was a director of the Debtor and of Opus Properties which was the manager of ODP Princeton and ODP Rock Spring at the time of the construction fee dispute.  (JPTO at § IV, ¶¶ 20, 33 & 34.)  Campa was an officer of the Debtor and an officer and director of Opus Properties at the time ODP Princeton and ODP Rock Spring were created.  (JPTO at § IV, ¶¶ 21, 33 & 34.)

i.   Creation of ODP Entities

The Trustee characterizes the establishment of the ODP Entities as transfers by the Debtor of valuable projects to benefit Corp and LLC (to the detriment of the Debtor).  The ODP Entities' investors included Gerald Rauenhorst, Bednarowski, and several other "high net worth" individuals who sought to acquire promising development projects from the Debtor.  (Exs. P-327, P-529, P-391 & P-532.)  Opus Properties, LLC ("Opus Properties") had a 1% general-partner interest in and served as the manager of the ODP Entities.  (Tr. 2/4/14 at 19-20.)

The Court finds, however, that the ODP Entities were really joint ventures among the Debtor, Opus Properties, and the third-party investors.  (JPTO at § IV, ¶ 35; Exs. D-2001 at 220, D-2101, D-2099, D-2102, D-2100 & D-2095.)  The Debtor made an initial capital contribution of land, cash, or both to the ODP Entities to obtain its ownership interest, typically 10-15%, and entered into a development agreement and construction contract with each ODP Entity.  (JPTO at § IV, ¶ 35; Exs. D-2001 at 220-21, D-2095, D-2101, D-2099, D-2102 & D-2100.)  The Debtor offered properties to the joint ventures in order to free up cash for the Debtor's own operations.  (Ex. D-2083 at 795.)  The Debtor had a call right to buy the joint venture property if the investors did not want it, as well as put rights to force the investors to buy the Debtor's interest at fair market value.  (Ex. D-2001 at 220-

69

21.)  The Debtor shared in the profits and also earned a variety of fees, including a construction fee, development fee, and guarantee fee from the ODP Entities.  (Bolin Dep. at 186-87; Tr. 2/4/14 at 278; Ex. D-2001 at 220-21.)  The profit-sharing structure allowed the Debtor to earn a preferred return of 50% of the profit from the sale of an ODP project after the Debtor and the other investors obtained a 10% return.  (Exs. D-2001 at 220-21, D-2101, D-2099, D-2102 & D-2100.)  There was no evidence presented that the Debtor could have developed the projects on its own or that the Debtor would have realized more of a profit by doing it alone rather than as a joint venture.

The Court concludes that the creation of the ODP Entities was entirely fair to the Debtor.  The Debtor retained an equity interest in the projects and was entitled to earn substantial fees for working on them.  Therefore, the Court concludes that the Trustee has failed to establish that Rauenhorst or Campa breached their fiduciary duties by the Debtor's participation in the joint ventures as alleged in Count 6 of the Third Amended Complaint.

## ii.  Fees Owed by ODP Entities

The Trustee also contends that Rauenhorst and Campa breached their fiduciary duties by not getting the ODP Entities to pay the Debtor fees it was owed for the ODP projects in the spring of 2009.  (Tr. 2/4/14 at 278-79; Tr. 12/16/13 at 146-47, 181-82; Ex.

P-901.)  Specifically, the Trustee contends that in January, 2009, Rauenhorst was informed that ODP Princeton and ODP Rock Spring owed at least $7 million in fees to the Debtor but did nothing to get those fees paid.  The Trustee contends that Rauenhorst and Campa had a conflict of interest with respect to the fee dispute between the Debtor and the ODP Entities.

The Court concludes that the Trustee's claim that Rauenhorst and Campa breached their fiduciary duties by not getting the ODP Entities to pay receivables they owed to the Debtor is unfounded. First, neither was asked by the Debtor to take any action to collect those fees.  (Tr. 2/4/14 at 278-29.)  Though Rauenhorst was informed of the fee dispute, there is no evidence that Campa was.  (Ex. P-901.)  Further, there was a legitimate dispute regarding whether the fees were currently due or were due only on completion of the ODP projects.  (Tr. 2/4/14 at 278-79.)

Therefore, the Court will enter judgment in favor of the Defendants on Count 6 of the Third Amended Complaint.

d.   $5 Million Transfer

As noted above, one of the Debtor's projects was the 100 M Street Project.  It was developed by an SPE solely owned by the Debtor named 100 M Street SE, LLC (the "100 M Street SPE").  The 100 M Street Project was completed in early 2008 and an agreement of sale was signed in May, 2008.  The purchaser made a $5 million non-refundable deposit against the $93 million purchase price.

71

(JPTO at § IV, ¶¶ 72 & 73; Exs. D-2123 at § 7 & P-215.)  When it could not get financing, the purchaser was unable to complete the sale and forfeited the deposit.  (Ex. D-2123; Tr. 12/17/13 at 63-64, 233-34.)

Beginning in January, 2009, BOA sent letters demanding that the $5 million deposit be transferred to an account the 100 M Street SPE had at BOA.  (Exs. P-215, P-216 & P-217.)  BOA asserted that it had a valid, perfected security interest in the $5 million deposit and that its loan agreement "expressly prohibits any distribution by the Borrower to its members [the Debtor] of any revenue received . . . until all sums owing under the Loan have been repaid in full."  (Exs. P-215, P-216 & P-217.)

Although there was an internal debate at the Debtor about whether BOA had a perfected security interest, the $5 million deposit was transferred to the 100 M Street SPE's account at BOA on April 1, 2009.  (Exs. D-2065, P-652, P-138, P-218 & P-142; Tr. 2/4/14 at 249-50, 257; Tr. 2/5/14 at 140-44.)  BOA promptly froze those funds, and on June 30, 2009, BOA set off the $5 million deposit against the outstanding loan balance owed by the 100 M Street SPE.  (Exs. D-2240 & P-22; Tr. 12/17/13 at 69-70; Tr. 2/4/14 at 250; Tr. 2/7/14 at 98-99.)

The Trustee claims that Rauenhorst breached his fiduciary duties to the Debtor by authorizing the transfer of the deposit into an account at BOA, where it was later taken by BOA.  The

72

Trustee contends that Steven Polacek,[14] the CFO of Corp, directed the Debtor's management, over their objection, to transfer the funds to the BOA account. (Tr. 12/17/13 at 67-68; Tr. 12/18/13 at 226; Tr. 12/20/13 at 93-95.) The Trustee claims that Rauenhorst permitted the transfer in order to allow all of the Opus companies to curry favor with BOA. The Trustee argues that Rauenhorst breached his duty of loyalty by being on both sides of the transaction which was not entirely fair to the Debtor. See Fedders, 405 B.R. at 540. The Trustee contends further that Rauenhorst breached his duty of good faith, by intentionally acting with a purpose other than advancing the best interests of the Debtor. Id.

Rauenhorst argues that he did not breach any fiduciary duty he owed to the Debtor. He claims that at the time of the transfer, the funds were in a bank account owned by the 100 M Street SPE, not the Debtor. The funds were earned by, and belonged to, the 100 M Street SPE, not the Debtor. (JPTO at § IV, ¶¶ 72 & 73; Exs. D-2123, P-215 & P-218.) The 100 M Street SPE was indebted to BOA on a loan on that project. BOA was not happy that the 100 M Street SPE had deposited the funds into a non-BOA account, demanding that they be placed in an account at BOA. (Exs. P-215, P-216 & P-217; Tr. 2/4/14 at 251-52.)

---

[14] Polacek was not an officer or director of the Debtor. (JPTO at § IV, ¶¶ 20 & 21.)

73

Further, Rauenhorst insists that the decision to transfer the deposit was made by Polacek, not him.  (Tr. 12/17/13 at 67-68; Tr. 12/18/13 at 226; Tr. 12/20/13 at 93-95; Ex. P-142.)

There is conflicting evidence about whether the deposit was ever held in any of the Debtor's accounts.  The Trustee contends that it was in the Debtor's operating account when it was transferred to the 100 M Street SPE's account at BOA.  The Trustee sought to prove this with exhibits that purported to be part of the Debtor's records showing two wire transfers from its account in late March/early April of $900,000 and $4.1 million. (Tr. 2/5/14 at 42-45; Exs. P-1361 & P-1362.)  However, neither the documents nor the witness identified these as transfers to the 100 M Street SPE account.  (Tr. 2/5/14 at 42-45; Exs. P-1361 & P-1362.)  More importantly, no evidence was presented that the $5 million deposit for the 100 M Street Project was ever put <u>into</u> the Debtor's account.  (Exs. P-1361, P-1362, P-636 & P-637.)

In contrast, the Defendants presented credible evidence that the funds were always in an account belonging to the 100 M Street SPE.  (Tr. 12/19/13 at 127; Exs. P-22, P-141, P-142 & P-654; Tr. 2/4/14 at 249-50, 257; Tr. 2/5/14 at 46, 140-44; Tr. 12/17/13 at 63-68; Tr. 12/20/13 at 93-98.)

Even if the $5 million had been deposited into the Debtor's bank account, however, the Court concludes that Rauenhorst did not breach any fiduciary duty he owed to the Debtor.  The funds

were not the Debtor's property; they belonged to the 100 M Street
SPE.[15]   (Exs. P-138, P-215 & D-2123; JPTO at § IV, ¶¶ 72 & 73.)
If the funds had been placed in the Debtor's account (in
violation of the ownership interests of the 100 M Street SPE and
the terms of the loan agreement with BOA), the return of those
funds was not a breach of Rauenhorst's fiduciary duty to the
Debtor.   Although the Debtor had hoped to use those funds to help
it reorganize, the Debtor's officers understood, and their
attorneys advised them, that the money was tied up in the 100 M
Street Project by the loan agreement and could not be used for
any other purpose.   (Exs. P-138, P-218 & D-2065; Tr. 2/4/14 at
250-51; Tr. 12/17/13 at 65-68; Tr. 12/18/13 at 181; Tr. 12/20/13
at 92-95, 146-50; Grindall Dep. at 30-32, 164-65; Tr. 2/5/14 at
139-40, 145.)   Finally, the funds were ultimately used to reduce
the 100 M Street SPE's obligation to BOA, which provided a
benefit to the SPE and the Debtor, which had guaranteed that
loan.   (JPTO at § IV, ¶ 74; Exs. D-2063, D-2065, P-215, P-216 &
P-217.)

Furthermore, given the significance of the Debtor's
relationship with BOA and the need for BOA cooperation in any
workout of the Debtor, the Court finds that it was not

---

[15]   Although the 100 M Street SPE also filed a chapter 7
petition on July 1, 2009, and the Trustee was also appointed the
chapter 7 trustee of it, the 100 M Street SPE is not a plaintiff
in this adversary and the Trustee is only suing on behalf of the
Debtor.   (Adv. D.I. 160.)

unreasonable for Rauenhorst and others to try to maintain that relationship.[16]  (Tr. 12/20/13 at 93-94, 147-50.)  Consequently, the Court is not convinced that Rauenhorst violated his duty of care to the Debtor or acted in bad faith in connection with the transfer of the $5 million deposit to the 100 M Street SPE's account at BOA.  (Tr. 12/19/13 at 126-27.)

In addition, the transfer failed to involve any entity to which Rauenhorst owed a fiduciary duty.  The funds were transferred from one account owned by the 100 M Street SPE to another account owned by the 100 M Street SPE.  (Tr. 12/19/13 at 127; Exs. P-22, P-142 & P-141; Tr. 2/4/14 at 249-50, 257; Tr. 2/5/14 at 140-44; Tr. 12/17/13 at 63-68; Tr. 12/20/13 at 93-98.) Rauenhorst was not on both sides of the transaction: there is no evidence that he was an officer or director of the 100 M Street SPE.

Further, the Court finds that Rauenhorst did not take any intentional acts regarding the $5 million transfer; Polacek authorized the transfer.  (Tr. 12/17/13 at 67-68; Tr. 12/18/13 at 226; Tr. 12/20/13 at 93-95.)  Nor was Rauenhorst personally benefitted in any way.  (Tr. 12/19/13 at 127.)

---

[16]  BOA was the Debtor's largest and primary lender, providing the Debtor's $20 million operating line of credit and construction loans on a number of Debtor projects totaling approximately $180 million.  (Ex. D-2093; Grindall Dep. at 169; Tr. 2/5/14 at 144-45; Tr. 12/19/13 at 134; Tr. 2/4/14 at 244-46.)

Because the funds at issue were not property of the Debtor, Rauenhorst was not an officer of the 100 M Street SPE, Rauenhorst did not take any actions in connection with that transfer, and the transfer did not harm the Debtor, the Court concludes that Rauenhorst did not breach any fiduciary duty owed to the Debtor. Accordingly, the Court will enter judgment in favor of the Defendants on Count 12 of the Third Amended Complaint.

e.   Tax Scheme

The Trustee also claims that Rauenhorst and Burton[17] breached their fiduciary duties by engaging in a conspiracy with the Trusts to have the Debtor incur huge losses in order for the Trusts to recognize a tax benefit.  (Tr. 12/19/13 at 132.)  The Trustee contends that the Trusts decided in 2008 that rather than put money into the Debtor to keep it alive through the economic downswing, they would transfer the handful of potentially valuable assets owned by the Debtor to other Opus entities and let the Debtor collapse.  (Exs. P-326 & D-2077 at 130-32, 495-501.)  The Trustee asserts that because assets that retained any value were removed from the Debtor, it was forced into liquidation in 2009.  As a result, the Trustee contends that the Trusts were able to carry-back the Debtor's substantial losses

---

[17]   Although the Trustee named Burton in this Count, little evidence was presented of his participation in any such scheme. Further, because Burton had no interest in the Trusts, the Court finds that he did not benefit by any scheme to destroy the Debtor.

and obtained over $27 million in tax refunds and savings.[18]
(Exs. P-721, P-92, P-91, P-90, P-974, P-990, P-991 & P-1270; Tr.
12/16/13 at 147.)  Although the Debtor's officers were trying to
position the Debtor to file under chapter 11, the Trustee
contends that Rauenhorst and the Trusts instructed the Debtor's
restructuring professionals to prepare for a liquidation instead
without informing the Debtor's officers.

The Trustee argues that Rauenhorst breached his duty of care
by failing to fully inform himself of the effects of the numerous
transactions that were part of the tax scheme.  The Trustee also
claims that Rauenhorst breached his duty of loyalty by
participating in the tax scheme.  He argues that Rauenhorst was
on both sides of the various transactions that were part of the
tax scheme and failed to assure the fairness of those
transactions.  Finally, the Trustee claims that by advancing his
own interests through the alleged tax scheme, Rauenhorst acted
for a purpose other than the best interest of the Debtor.

The Court finds the Trustee's argument unpersuasive.  First,
it is internally inconsistent to argue that Rauenhorst failed to
fully inform himself of the effects of the tax scheme while also
arguing that Rauenhorst actually directed the transactions as
part of a tax scheme to benefit the Trusts and himself.  Second,

---

[18]  The Trusts filed consolidated tax returns that included
all gains or losses incurred by their direct and indirect
subsidiaries.  (Tr. 12/19/13 at 142-43; Tr. 2/4/14 at 138-41.)

the Trustee's evidence that there was a scheme to destroy the
Debtor for tax benefits is not convincing.  Numerous witnesses
testified that there was no pre-determined plan for the Trusts to
reap a tax benefit from the losses of the Debtor.  (Tr. 12/19/13
at 131-32; Tr. 2/4/14 at 41-42, 160-62, 234-35.)  Rauenhorst
testified that the Debtor was an entity that had been profitable
and that he wanted to see thrive.  (Tr. 12/19/13 at 132.)  The
Court finds that testimony credible because it would not have
been to the advantage of Rauenhorst, LLC, or the Trusts to
destroy the Debtor which was a valuable investment of theirs.  It
would have been more beneficial to all if the Debtor had retained
its value and continued operating, rather than be forced to
liquidate so the Trusts could realize tax benefits worth only a
fraction of the Debtor's value.

Further, the Trustee ignores the fact that the Debtor's
efforts to reorganize were unsuccessful because it was unable to
get financing.  The Debtor's management considered a chapter 11
filing and sought debtor-in-possession financing from their
existing banks, other outside investors, and the Trusts, all
without success.  (Ex. P-224; Tr. 12/19/13 at 137-38; Tr. 2/4/14
at 222-27; Grindall Dep. at 181.)  When they were not able to
secure that financing, the Debtor's executive team, with advice
from its professionals, recommended to the Board of Directors
that the Debtor file bankruptcy under chapter 7 because they were

running out of cash.  (Tr. 2/4/14 at 228-35; Ex. D-2081 at 321.)
There was no discussion of filing a chapter 7 bankruptcy to reap
tax benefits.  (Tr. 2/4/14 at 234-35.)

The Court concludes that the Trustee has failed to prove
that Rauenhorst or Burton violated their duty of care, duty of
loyalty, or duty of good faith by participating in a scheme to
destroy the Debtor to realize tax benefits.  For these reasons,
the Court will enter judgment in favor of the Defendants on Count
16 of the Third Amended Complaint.

D.   Aiding and Abetting Breach of Fiduciary Duty

For each of the counts alleging a breach of fiduciary duty,
the Trustee contends that other Defendants aided and abetted that
breach.  Any person or entity who knowingly participates in a
breach of fiduciary duty is liable for aiding and abetting the
breach.  Broadstripe, 444 B.R. at 107.  Under Delaware law, a
claim that a defendant aided and abetted a breach of fiduciary
duty requires proof of the following: (1) the existence of a
fiduciary relationship, (2) breach of a fiduciary duty, (3)
knowing participation in the breach, and (4) damages proximately
caused by the breach.  Id.  The plaintiff "must demonstrate that
the party knew that the other's conduct constituted a breach of a
fiduciary duty and gave substantial assistance or encouragement
to the other in committing that breach."  Id.

80

Because the Court concludes that there was no breach of any fiduciary duty owed to the Debtor, no aiding and abetting claim can be upheld.  In re Alloy, Inc. S'holder Litig., C.A. No. 5626-VCP, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) (holding that a predicate breach of fiduciary duty is an element of an aiding and abetting claim) (citing Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001)).  Therefore, the Court will enter judgment in favor of the Defendants on Counts 3, 5, 7, 13, 15, and 17 of the Third Amended Complaint as well.

E.    Successor Liability

At the end of January, 2009, the Trusts formed Opus Holding, LLC ("Holding LLC"), with Campa executing the Certificate of Formation.  (JPTO at § IV, ¶ 40; Exs. P-486 & P-1083; Tr. 12/19/13 at 182.)  The Trustee alleges that all the assets of LLC were acquired by Holding LLC or its wholly owned subsidiaries, Opus 2 LLC and Opus Design Build LLC (collectively, the "LLC Successors").  (Adv. D.I. 160 at ¶ 516.)  Similarly, the Trusts formed Opus Holding, Inc. ("Holding Inc."), on April 9, 2009.  (JPTO at § IV, ¶ 44.)  The Trustee alleges that all of the assets of Corp were acquired by Holding Inc. or its wholly owned subsidiaries, Opus AE Group, Inc., and Opus Development Corp. (collectively, the "Corp Successors").  (Adv. D.I. 160 at ¶ 522.)

The Trustee claims that the LLC Successors and the Corp Successors are liable under the theory of successor liability for

all of the debts incurred by LLC and Corp.  (Adv. D.I. 160 at ¶¶ 520, 526, 532 & 538.)  The Trustee contends that the Opus Group still operates from the same headquarters in Minnesota using the same trade name and trademarks pursuant to the same business policies and philosophy that have always governed the Opus entities.  (Tr. 2/6/14 at 58-62; Ex. P-1006.)  The Opus Group holds itself out as being the same group that it has always been since the 1950s.  (Tr. 12/17/13 at 160-62; Exs. P-1205 & P-1006.) The successor companies are largely controlled by the same individuals who controlled the predecessor entities.  (JPTO at § IV, ¶¶ 38, 39, 41, 42, 45, 46, 33, 34 & 14-17.)  The Trustee argues that the mere continuation of the business constitutes a valid exception that would make the present owners of the assets liable for the claims against LLC and Corp.

The Defendants claim that under relevant Minnesota law,[19] the successor entities could not be liable for the debts of LLC or Corp unless those corporations specifically accepted and adopted the liabilities as their own, which they did not.  (Exs. P-1173, P-1168, P-1176 & P-1172; JPTO at § IV, ¶ 43.)  18 Minn. Stat. Ann. § 302A.661 subd. 4.

---

[19]  The sale of assets to the LLC Successors and Corp Successors specified that Minnesota law applies and most of the entities involved were incorporated in Minnesota.  (Exs. P-100 at § 8.8, P-101 at §§ 2.1, 2.3 & 7.13, P-102 at §§ 2.1, 2.4 & 7.12; JPTO at § IV, ¶¶ 23, 24, 44 & 47.)

The Court agrees with the Defendants.  Under Minnesota law, the mere continuation of a business is no longer an exception to the traditional rule that a transferee of assets is not liable for the debts and liabilities of the transferor.  This change occurred through a 2006 amendment to the Minnesota statute which eliminated the common law exceptions to the traditional successor liability rule.  18 Minn. Stat. Ann. § 302A.661 subd. 4 ("The transferee shall not be liable solely because it is deemed to be a continuation of the transferor").  See also 18 Minn. Prac., Corporation Law & Practice § 7:22 (3d ed.).  Thus, even if a corporation acquires all the assets of another and continues its business operations, the acquirer will not be liable for the debts of the acquired company unless it expressly assumes them.

The Trustee argues nonetheless that case law supports his contention that when a corporation sells or transfers all of its assets to another entity, the purchasing, or successor, company remains liable for the seller's debts if the successor entity is merely a continuation of the selling entity.  Johnson v. USL Prods., Inc., No. A11-1774, 2012 WL 2078478, at *5 (Minn. Ct. App. Aug. 12, 2012).  See also Knott v. AMFEC, Inc., No. 09-CV-1098, 2010 WL 1528393, at *6 (D. Minn. April 15, 2010); Noack v. Colson Constr., Inc., No. A08-0148, 2009 WL 305114, at *9 (Minn. Ct. App. Feb. 10, 2009).

The Court finds these cases unpersuasive.  Both the Johnson
and the Noack cases are designated unpublished decisions which
may not be cited as authority.  Further, the cases cited by the
Trustee rely on cases that preceded the 2006 amendment to the
Minnesota statute.  See Johnson, 2012 WL 2078478, at *5 (citing
Niccum v. Hydra Tool Corp., 438 N.W.2d 96, 98 (Minn. 1989));
Knott, 2010 WL 1528393, at *2 (citing J.F. Anderson Lumber Co. v.
Myers, 206 N.W.2d 365, 368 (Minn. 1973)); Noack, 2009 WL 305114,
at *9 (citing Niccum, 438 N.W.2d at 98 and J.F. Anderson, 206
N.W.2d at 368).  More importantly, when discussing altered
section 302A.661, subd. 4, the Johnson Court claimed that "[t]he
second part was added by the Minnesota legislature to clarify
application of the statute" not to change it.  Johnson, 2012 WL
2078478, at *5.  In coming to this conclusion, though, the
Johnson Court cited the second edition of Minnesota Practice §
7.21 published in 2004, which was before the statute was amended.

More recent cases and the most recent edition of the
Minnesota Practice treatise interpret the changes to the statute
as having a more profound effect on the law.  The Third Edition
of Minnesota Practice § 7.22 states that

> In response to the conflict between these decisions and
> Section 302A.661, Subdivision 4, the Minnesota
> legislature amended the MBCA in 2006 to expressly
> provide that the disposition of all or substantially
> all of a corporation's assets is not considered a de
> facto merger under the MBCA or otherwise and that the
> **transferee organization will not be liable as such**
> **solely because it is deemed to be a continuation of the**

**transferor**.

18 Minn. Prac., Corporation Law & Practice § 7:22 (3d ed.) (emphasis added).  The Court in <u>Matson Logistics, LLC v. Smiens</u>, Civ. No. 12-400 ADM/JJK, 2012 WL 2005607 (D. Minn. June 5, 2012) came to a similar conclusion: "the amended statutory language of Minn. Stat. § 302A.661 clearly abrogates the common law exceptions of de facto merger and mere continuation. . . ."  <u>Id.</u> at *9.

Accordingly, the Court concludes that the mere fact that the LLC Successors and the Corp Successors were a continuation of the business of LLC and Corp does not render them liable for the debts of LLC or Corp under Minnesota law.

The Trustee argues, however, that successor liability may be established if there was a fraudulent transfer pursuant to the Minnesota Fraudulent Transfer Act.  <u>See</u> <u>Quinn v. Elite Custom Transporters & Motorcoaches, LLC</u>, No. 10-118, 2011 WL 1869391, at *9 (D. Minn. May 16, 2011) ("[A] claim for successor liability does exist if there was a fraudulent transfer."); <u>Schwartz v. Virtucom, Inc.</u>, No. A08-1059, 2009 WL 1311816, at *2 n.2 (Minn. Ct. App. July 22, 2009) (same); 2006 Reporters Notes to Minn. Stat. § 302A.661 Subd. 4.  Thus, a purchasing company remains liable for the seller's debts if the transaction is entered into fraudulently in order to escape liability for such debts. <u>Johnson</u>, 2012 WL 2078478, at *5.

85

However, the Court concludes that the Trustee has not established that LLC and Corp fraudulently transferred their assets to the LLC Successors or the Corp Successors.  Based on the evidence presented, the Court cannot find that LLC and Corp were insolvent at the time, that there was any fraudulent intent in making the transfers, or that fair value was not given.  Further, the Court concludes herein that LLC and Corp have no liability on any count of the Third Amended Complaint.  Therefore, even if the LLC Successors and the Corp Successors were successors to LLC and Corp, the Trustee has no claim against them.  Consequently, the Court will enter judgment in favor of the Defendants on Counts 43, 44, 45, and 46 of the Third Amended Complaint.

F.   Avoidance of Fraudulent Transfers

1.   Standards for Avoidance

In several counts of the Amended Complaint, the Trustee seeks to avoid transfers to various Defendants under section 548(a) of the Bankruptcy Code.  A transfer of property of a debtor can be avoided by the Trustee if (1) it occurred within two years of the petition date; (2) the debtor was insolvent at the time of the transfer or became insolvent as a result of it; and (3) the debtor received less than reasonably equivalent value in exchange.  11 U.S.C. § 548(a)(1)(B).

86

The Trustee also seeks to avoid transfers as fraudulent under Delaware law pursuant to section 544 of the Bankruptcy Code. The elements for avoidance of a fraudulent conveyance under Delaware law are essentially identical to those of section 548(a)(1)(B). See Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305(a); 11 U.S.C. §§ 548(a)(1)(B) & 544. The most significant difference between sections 1304(a)(2) and 1305(a) of the Delaware statute and section 548 of the Bankruptcy Code is that the Delaware statutes have a four year reach-back period. Del. Code Ann. tit. 6, § 1309.

Because the Court has found in this case that the Debtor was solvent through January 31, 2009, under either the balance sheet test or the inadequate capital/cash flow tests, the Court need consider only whether transfers after that date are avoidable as fraudulent transfers. (See Part A supra.)

The Trustee contends that the remaining transfers are avoidable as constructively fraudulent under the Bankruptcy Code and Delaware state law. The Defendants argue that they are not avoidable because the Trustee has failed to prove a necessary element of his claim: that the transfers were for less than reasonably equivalent value. 11 U.S.C. § 548(a)(l)(B); Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305(a).

Reasonably equivalent value is not defined in either the Bankruptcy Code or the Delaware statute. To determine whether

87

"reasonably equivalent value" was exchanged, courts first determine whether the debtor received any "value" in the transaction.  In re R.M.L., Inc., 92 F.3d 139, 154 (3d Cir. 1996).

The Court then must determine whether the value received was "reasonably equivalent" to what the debtor transferred.  R.M.L., 92 F.3d at 154.  This requires a comparison of what was transferred with what was received by the debtor but does not require a dollar-for-dollar exchange.  Id. at 145; Fedders, 405 B.R. at 547 ("[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"); Walker v. Sonafi Pasteur (In re Aphton Corp.), 423 B.R. 76, 89 (Bankr. D. Del. 2010) (same).

Payments made on account of valid antecedent debts are presumptively made for reasonably equivalent value.  The Bankruptcy Code and Delaware statute both define "value" to include satisfaction of an antecedent debt.  11 U.S.C. § 548(d)(2)(A); Del. Code Ann. tit. 6, § 1304(a)(2).  See also Pashaian v. Eccelston Props., Ltd., 88 F.3d 77, 85 (2d Cir. 1996) ("the general rule is that the satisfaction of a preexisting debt qualifies as fair consideration. . . ."); Official Comm. of Unsecured Creditors v. Credit Suisse (In re Champion Enters.), Adv. No. 10-50514, 2010 WL 3522132, at *18 (Bankr. D. Del. Sept. 1, 2010) ("The Court agrees with Defendants that generally under

88

the Fraudulent Conveyance Act, satisfaction of an antecedent debt is 'fair consideration' for a conveyance.") (citing <u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623, 634 (2d Cir. 1995)).

The burden of proof is on the Trustee to establish that less than reasonably equivalent value was received by the Debtor for the allegedly fraudulent transfers. <u>See, e.g.</u>, <u>VFB LLC v. Campbell Soup Co.</u>, 482 F.3d 624, 630 (3d Cir. 2007) (noting that plaintiff had burden of proving that reasonably equivalent value was not received in exchange for the transfer sought to be avoided); <u>R.M.L.</u>, 92 F.3d at 146 ("Section 548(a)(2)(A) requires the trustee to show that the debtor received 'less than a reasonably equivalent value.'").

        2.   <u>Specific Transfers</u>

        a.   <u>Distributions to LLC and Trusts</u>

The Trustee contends that each of the distributions made by the Debtor under the Distribution Policy were transferred to LLC on account of its equity ownership in the Debtor and that the Debtor received no value or benefit in exchange for them.  (Tr. 12/16/13 at 187.)  Therefore, the Trustee seeks to avoid those transfers as fraudulent conveyances.  The Defendants contend that none of the transfers were fraudulent conveyances.

Under the Distribution Policy, the Debtor made distributions only when it had profits.  (Tr. 12/19/13 at 113; Tr. 2/4/14 at 247; Tr. 2/6/14 at 8-9.)  Accordingly, the Debtor did not make a

89

distribution after 2008 to LLC because the Debtor did not have
positive net income that year.  (Tr. 2/6/14 at 10-11.)  Thus,
none of the distributions made by the Debtor to LLC under the
Distribution Policy were made while the Debtor was insolvent.
(Ex. P-1328A.)  Therefore, the Court concludes that the
distributions are not avoidable as fraudulent transfers.  11
U.S.C. §§ 544 & 548(a)(1)(B); Del. Code Ann. tit. 6, §§
1304(a)(2) & 1305(a).  Accordingly, the Court will enter judgment
in favor of the Defendants on Counts 18 and 19 of the Third
Amended Complaint.

b.   <u>Transfers to Corp for Shared Services</u>

The Trustee seeks to avoid certain pre-petition transfers
made to Corp for Shared Services as fraudulent conveyances and to
recover their value from Corp and the Trusts.  The Defendants
contend that all of those transfers were for reasonably
equivalent value and therefore are not avoidable.

The Trustee did not provide any evidence of the value of the
Shared Services provided to the Debtor by Corp.  (Tr. 2/4/14 at
182.)  However, the Trustee asserts that the amounts paid by the
Debtor for Shared Services were not tied to the value of the
services actually received by the Debtor.  He notes that Bolin,
the Debtor's former CFO, believed that the allocation of expenses
was a "big dark secret" and that the Debtor would get nothing
more than "an expense number for the year and then the amount to

90

pay." (Ex. P-254; Tr. 12/18/13 at 138.)

Those comments related to Core allocations, however, not the Shared Services provided by Corp. (Exs. P-125, P-254, P-256, P-257 & P-844; Tr. 12/18/13 at 138.) The Corp allocations, in contrast, were not kept confidential; the operating companies' presidents and CFOs were provided with spreadsheets identifying the Shared Services charges for each operating company in each category, so that the Debtor could compare what it was paying against what the other entities were paying for a particular service category. (Tr. 2/5/14 at 181-84, 210-16; Exs. D-2080 at 399, P-1196, P-559 at 146461-65 & P-311.)

The Trustee complains that Corp charged the Debtor for a share of Corp's own overhead. The Defendants offered evidence that the corporate overhead still provided a benefit to the Debtor because otherwise Corp could not have provided the Shared Services to the Debtor. (Tr. 2/5/14 at 178-80.) Further, the allocation did not harm the Debtor, because if the Debtor did not pay for the overhead through the Shared Services, it would have realized more income, which would have been distributed up to its parent to pay the overhead anyway. (Tr. 2/5/14 at 178-80.)

There is no dispute that Corp provided administrative, legal, human resources, corporate accounting, risk management, payroll, and tax services to the Debtor (and the other operating subsidiaries) for a number of years. (Exs. D-2080 at 399, D-2170

91

& D-2171; Tr. 2/5/14 at 180-81.)  Corp billed the operating

companies, including the Debtor, for the Shared Services that

were provided to them and for an allocation of its overhead.

(Tr. 2/5/14 at 177-78; Ex. D-2170.)  The Debtor actually received

and benefitted from the Shared Services performed by Corp on a

day-to-day basis because it would have had to pay someone else

for the Shared Services it received.  (Tr. 12/18/13 at 214-15;

Tr. 12/17/13 at 259-60.)  KPMG's audits of the Debtor determined

that the Shared Services and corporate overhead allocation

recorded in the Debtor's general ledger were consistent with the

supporting documentation provided.  (Tr. 2/5/14 at 235-37; Ex. P-

1196.)

The Trustee contends, however, that the expenses charged to

the Debtor and the other operating companies included allocations

for the personal expenses incurred by individual Rauenhorst

family members.  (K. Rauenhorst Dep. at 45; Exs. P-64, P-162, P-

911 & P-137.)  He asserts that they also included the expenses

for Gerald Rauenhorst's cars and use of a private jet, which even

Mark Rauenhorst thought was "questionable."  (Exs. P-162 & P-

911.)

The Defendants dispute this, contending that the Debtor did

not pay the expenses of the Rauenhorst family or beneficiaries of

the Trusts and that, instead, they were paid by the beneficiaries

through Adler Management, LLC.  (Tr. 2/5 at 209-12.)  Rauenhorst

family members did receive some services from Corp, but were billed for those separately as reflected under the column heading "Other Total" on the spreadsheets the Debtor received.  (Tr. 2/5/14 at 209-12; Ex. P-559 at 146464.)  Dennis Power, the Director of Finance of Corp, testified that it was not Corp's practice to charge the operating companies for any portion of services or expenses that were incurred by the Rauenhorst family, the Trusts, or any entities associated with them.  (Tr. 2/5/14 at 212.)

The Court accepts as credible the testimony that the Debtor was not charged for the family expenses.  (K. Rauenhorst Dep. at 45; Tr. 2/5/14 at 209-12; Ex. P-559 at 146464.)  Even if family members' expenses were allocated to the Debtor and other subsidiaries, however, that would not mean that the payment of Shared Services by the Debtor was a fraudulent transfer.  The issue is not whether the Debtor received dollar-for-dollar value for what it paid, rather it is whether the Debtor received "reasonably equivalent" value for what it paid for the Shared Services.  Fedders, 405 B.R. at 547 ("[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'").  The Trustee did not provide any evidence establishing what, if any, amount he contends that the Debtor paid for Shared Services provided to others.  (Tr. 2/4/14 at 181-82.)  The burden of proof is on the Trustee to establish

93

that less than reasonably equivalent value was given for the allegedly fraudulent transfer.  See, e.g., VFB, 482 F.3d at 630; R.M.L., 92 F.3d at 146.

Given the evidence that Corp provided services for the Debtor and the lack of evidence as to how much of the family's expenses (if any) were actually paid by the Debtor in contrast to how much was paid for services actually rendered for the Debtor, the Court concludes that the Trustee has failed to establish that the Debtor received less than reasonably equivalent value when it paid Corp for the Shared Services.  See, e.g., R.M.L., 92 F.3d at 145-46 (holding that payments made for services a creditor provides to a debtor constitute reasonably equivalent value); Pashaian, 88 F.3d at 85 (holding that payments made on account of valid antecedent debts are presumptively made for reasonably equivalent value); Champion Enters., 2010 WL 3522132, at *18 (same).

Accordingly, the Court will enter judgment in favor of the Defendants on Counts 23 and 24 of the Third Amended Complaint.

c.   Transfers Related to ODP Entities

The Trustee contends that the transfers to the ODP Entities of projects that the Debtor was developing were fraudulent conveyances for which Corp and LLC are liable.  The ODP Entities at issue are: ODP Rock Spring, LLC ("ODP Rock Spring") (established in July, 2004), ODP Princeton, LLC ("ODP Princeton")

94

(established in April, 2006), ODP Manassas, LLC ("ODP Manassas") (established in January, 2008) and ODP Enterprise, LLC ("ODP Enterprise") (established in October, 2008).  (JPTO at § IV, ¶ 35.)

As the Court concluded previously, however, the creation of the ODP Entities was not the transfer of valuable property of the Debtor but was instead the creation of joint ventures in which the Debtor obtained valuable property interests and substantial fees in exchange for its contributions.  (See Part C2c supra.)

Even if the Trustee is correct that the formation of the joint ventures constituted a transfer of an interest of the Debtor (a corporate opportunity to develop these projects on its own instead of jointly), these transfers all occurred before the Debtor became insolvent and therefore cannot be recovered as fraudulent transfers under the Bankruptcy Code or Delaware law. See 11 U.S.C. §§ 544 & 548(a)(1)(B); Del. Code Ann. tit. 6, §§ 1304(a)(2) & 1305(a).  Accordingly, the Court will enter judgment in favor of the Defendants on Counts 37 and 38 of the Third Amended Complaint.

d.   Transfers to Core

The Trustee also seeks to avoid certain pre-petition transfers made to Core as fraudulent conveyances.  The Defendants contend that the transfers were for reasonably equivalent value.

95

The Trustee relies on a summary exhibit to show the following transfers were made to Core: $5,702,161.02 (between December 1, 2006, and July 1, 2009); $3,706,281.02 (between July 1, 2007, and July 1, 2009); $2,374,059.00 (between July 1, 2008, and July 1, 2009); and $15,000 (between April 2, 2009, and July 1, 2009). That summary does not identify which portion of the transfers between July 1, 2008, and July 1, 2009, occurred after the Debtor became insolvent on February 1, 2009, other than the $15,000 which occurred during the 90 days before the Petition Date. However, the Trustee did introduce into evidence, through his expert Mimms, a print-out of the Debtor's check/cash register for the years 2006 to 2009. (Tr. 12/16/13 at 41-43; Exs. P-634, P-635, P-636 & P-637.)[20] One of those exhibits does reflect three transfers on or after February 1, 2009, to Core: $308,714 on 2/2/2009, $15,000 on 3/3/2009, and $933,345 on 3/10/2009. (Ex. P-637.)

Core was the entity through which the salaries and deferred compensation for all of the senior officers of the operating subsidiaries, Corp, LLC, and other related entities were paid. (Exs. P-311 & P-102.) Core was a pass-through payroll-services

---

[20] In the Trustee's post-trial submissions, the check registers are referred to only in connection with the distributions to the Trusts for taxes, income, and charitable contributions. (Adv. D.I. 285 at ¶ 558.) The Trustee refers only to the summary exhibit as evidence of the fraudulent transfers. (Adv. D.I. 283, 284 & 285.)

entity, meaning that funds received were for the purpose of
paying current payroll of senior employees.  (Tr. 2/5/14 at 192;
Exs. P-311 & P-102.)  The Core allocations for the senior
executive's compensation were paid through Core so that the
executive's compensation could be kept confidential.  (Tr. 2/5/14
at 192.)  Nonetheless, Bolin did have an understanding of what
the Core numbers represented.  (Exs. P-559, P-125, P-254, P-256,
P-257 & P-844.)  Core did not set compensation for anyone and did
not have the ability to redirect the funds transferred to it.
(Tr. 2/5/14 at 194-95.)  The CEO of the Debtor set the
compensation for the Debtor's officers and employees, and the
Human Resources Committee of LLC's board set the compensation for
the Debtor's CEO.  (Tr. 2/4/14 at 14-15; Tr. 2/5/14 at 194-95.)

    The Debtor was provided with a breakdown of its Core
allocation that showed both (1) the portion of the Debtor's
allocation that was related directly to the Debtor's employees
(which the Debtor accounted for as a salary expense), and (2) the
portion related to the Corp employees paid through Core (which
the Debtor accounted for as an overhead expense).  (Ex. P-559 at
1465-66; Tr. 2/5/14 at 195-98, 200.)

    The Trustee complains that the Debtor was charged for its
share of Core's overhead while it got no explanation of that
amount.  (Exs. P-256, P-254 & P-844.)  Similar to the payment of
its share of Corp's overhead, however, the Court concludes that

97

the Debtor received a benefit from the payment of Core overhead because otherwise Core could not have provided the services it did to the Debtor.  (Tr. 2/5/14 at 178-80.)  Further, the allocation did not harm the Debtor, because if the Debtor did not pay for the overhead directly to Core, it would have earned more income which would have been distributed up to its parent to pay the overhead anyway.  (Tr. 2/5/14 at 178-80.)

The Trustee's evidence shows, however, that in 2009 the Core charges increased.  In contrast to the payments made to Core in February and March, 2009, which exceed $1.2 million, the payment made to Core in May, 2008, was only $115,000 per month.  (Ex. P-559 at 1466.)  The Trustee notes that the Defendants refused to provide the Debtor with any explanation for that increase.  (Exs. P-256, P-254 & P-844.)  When the Debtor's CFO, Bolin, asked why the Debtor's share of overhead expenses was nearly double what she had calculated, she was told "Opus Core policy" prevented the disclosure of a detailed explanation of the allocation amounts. (Ex. P-257; Tr. 12/18/13 at 146).  Similarly, when the CFO of Northwest questioned why his allocation went up by 600%, he was simply told "[b]ecause it did."  (Ex. P-256.)  Further, the Trustee notes that at the time Rauenhorst told Corp's Controller that "off the record, between us, I see no reason why we shouldn't have the larger discussion of 'how do we think we are going to get all of these paid for since these allocations are

98

b.s.' conversation soon and should attempt to start forecasting the 'real' allocations and possible reimbursements immediately." (Ex. P-129).

Based on the evidence presented that the Core invoices increased precipitously in the spring of 2009 without explanation, the Court is unable to conclude that the two large payments made to Core ($308,714 on 2/2/2009 and $933,345 on 3/10/2009) were for reasonably equivalent value. (Ex. P-637.) Fedders, 405 B.R. at 547 ("[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'").

Therefore, the Court will enter judgment in favor of the Trustee and against Core in the amount of $1,242,059 on Counts 32 and 33 of the Third Amended Complaint.

e.   Transfers to Northwest

The Trustee seeks to avoid certain transfers made by the Debtor to Northwest as fraudulent conveyances. (Ex. P-1328A; Tr. 2/4/14 at 178-79). The Trustee's summary exhibit shows (and the Defendants admitted in their answer) that Northwest received $20,587.06 within one year and $15,131.12 within 90 days of the Petition Date. (Ex. P-1328A; Adv. D.I. 183 at ¶ 198.)

The Trustee presented no evidence of what portion of the $5,455.94 paid from July 2, 2008, through April 1, 2009, was paid on or after February 1, 2009. Therefore, the Court concludes

99

that the Trustee has only met his burden of showing potential fraudulent transfers totaling $15,131.12 were made to Northwest while the Debtor was insolvent.

The Trustee contends that no value was given for the transfers and therefore they are avoidable.  There is no evidence that Northwest provided any services to the Debtor or that the transfers were in payment of invoices due.  See R.M.L., 92 F.3d at 154 (holding that to determine whether "reasonably equivalent value" was exchanged, courts must first determine whether the debtor received any value in the transaction).

Although the Defendants generally denied that the transfers were fraudulent, they have cited no evidence about what those payments represented or what value was given in exchange.  (Adv. D.I. 279, 280, 281 & 291.)

The Court concludes that it is Northwest who would have the best evidence of what value was provided for those payments and its failure to present any evidence of value convinces the Court that there was no value given.  See, e.g., Jensen v. Brown, 19 F.3d 1413, 1417 (Fed. Cir. 1994) ("the general rule [is] that where evidence required to prove a fact is peculiarly within the knowledge and competence of one of the parties, fairness requires that party to bear the burden of coming forward.") (citing Campbell v. United States, 365 U.S. 85, 96 (1961)).

100

Accordingly, the Court will enter judgment in the amount of $15,131.12 for the Trustee and against Northwest on Counts 35 and 36 of the Third Amended Complaint.

f.    Transfers to A&E and A&E PC

The Trustee seeks to avoid certain transfers made by the Debtor to A&E and to A&E PC as fraudulent conveyances.  The Defendants contend that the transfers were for reasonably equivalent value.

The payments made by the Debtor to A&E and A&E PC were for invoices sent representing architectural and engineering services performed by them on the Debtor's projects.  (Tr. 2/6/14 at 195-201; Exs. D-2168 & D-2169.)  The Trustee presented no evidence that the payments made by the Debtor exceeded the value of those services.

Therefore, the Court concludes that the Debtor received reasonably equivalent value for the payments to A&E and A&E PC. See, e.g., R.M.L., 92 F.3d at 145 (holding that payments made for services a creditor provides to a debtor "constitute reasonably equivalent value"); Pashaian, 88 F.3d at 85 ("the general rule is that the satisfaction of a preexisting debt qualifies as fair consideration. . . .").

Accordingly, the Court will enter judgment for the Defendants on Counts 26, 27, 29, and 30 of the Third Amended Complaint.

101

g.    Transfer of Management Co Property

The Trustee contends that the transfer of the Management Co contracts and fees to OPS were fraudulent conveyances.  The Defendants argue that they were for reasonably equivalent value.

The Court concludes that the transfer of Management Co's property is not avoidable as a fraudulent conveyance because it was not a transfer of property of the Debtor; it was a transfer of property owned by Management Co.  (See Part C2b supra.)

Even if it were a transfer of the Debtor's property, however, the Court finds that reasonably equivalent value was given.  The sale of the hard assets at book value was a fair price, because they were largely used equipment.  (Tr. 2/5/14 at 150-51.)  Further, the Management Co contracts were essentially worthless because they were cancellable at will and never realized any profit for Management Co.  (Tr. 2/4/14 at 283-85; Exs. D-2154, D-2155, D-2156 & D-2157; Tr. 12/18/13 at 218-20; Tr. 2/4/14 at 280-82.)  When the real estate market collapsed and the Debtor was no longer able to operate, the Management Co contracts became a burden, rather than an asset.

The Trustee's contention that the value of those contracts was reflected in the price paid by NorthMarq to OPS six months later is not probative.  The contracts that were transferred to NorthMarq were fundamentally different from the ones conveyed to OPS because OPS had renegotiated those contracts.  (Tr. 12/19/13

102

at 38-39; Tr. 2/5/14 at 149.)  Further, the NorthMarq sale included management contracts that the other operating subsidiaries had transferred to OPS.  (Exs. P-269 & P-289.) Thus, the sale to NorthMarq included a much larger number of property management contracts, which were more valuable because they were non-cancellable for at least one year, and included a five-year non-compete agreement from OPS.  (Ex. P-289 at § 7.5; Tr. 2/4/14 at 25-27; Tr. 2/5/14 at 149; Tr. 12/19/13 at 39.)

Therefore, the Court concludes that reasonably equivalent value was given for the management contracts and physical assets of Management Co that were transferred to OPS.

Although reasonably equivalent value was not given for the April management fees earned by Management Co that were taken by OPS, they cannot be recovered as fraudulent transfers because they were not property of the Debtor.  (Ex. P-282.)

Accordingly, the Court will enter judgment for the Defendants on Counts 20 and 21 of the Third Amended Complaint.

h.  Transfer to TFC

The Trustee also seeks to avoid part of a $20 million payment made by the Debtor to TFC on September 9, 2008.  (JPTO at § IV, ¶ 52.)  He contends that at the time of the transfer, the Debtor only owed TFC $16,650,000.  (JPTO at § IV, ¶ 52.) Therefore, he contends that the transfer of $3,350,000 could not have been for reasonably equivalent value.  He seeks to recover

103

this transfer from TFC as the initial transferee.  He also seeks

to recover this transfer from Corp, LLC, and the Trusts who were

benefitted by the transfer because the funds were ultimately paid

to U.S. Bank in partial satisfaction of the loan to TFC that had

been guaranteed by Corp and LLC and for which the Trusts also had

some liability.  (Exs. P-271, P-771, P-272, & P-1207.)

The Defendants argue that reasonably equivalent value was

given for the transfer because part of it was used to satisfy

TFC's loan and the balance was used to satisfy part of

Financial's loan.  (Ex. D-2235; JPTO at § IV, ¶ 52.)  The

Defendants note that subsequent to that repayment, Financial lent

in excess of $3.4 million to the Debtor.  (Ex. D-2235; JPTO at §

IV, ¶ 52.)

The Court concludes that the Trustee's claim to recover the

$3,350,000 as a fraudulent conveyance must fail.  First, the

transfer occurred before the Debtor became insolvent.  (See Part

A supra.)  Second, the Debtor did receive reasonably equivalent

value for the transfer because it reduced the Debtor's obligation

to Financial.  See, e.g., Pashaian, 88 F.3d at 85 ("the general

rule is that the satisfaction of a preexisting debt qualifies as

fair consideration. . . ."); Champion Enters., 2010 WL 3522132,

at *18 ("The Court agrees with Defendants that generally under

the Fraudulent Conveyance Act, satisfaction of an antecedent debt

is 'fair consideration' for a conveyance.") (citing HBE Leasing

Corp. v. Frank, 48 F.3d 623, 634 (2d Cir. 1995)).

Accordingly, the Court will enter judgment for the
Defendants on Count 65 of the Third Amended Complaint.

G.   Avoidance of Preferential Transfers

In several counts of the Amended Complaint, the Trustee
seeks to avoid transfers to various Defendants under section 547
of the Bankruptcy Code.  Section 547(b) allows a trustee to
recover a pre-petition transfer that was made:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the
> debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made -
>     (A) on or within 90 days before the date of the
>     filing of the petition; or
>     (B) between ninety days and one year before the
>     date of the filing of the petition, if such
>     creditor at the time of such transfer was an
>     insider; and
> (5) that enables such creditor to receive more than
> such creditor would receive if -
>     (A) the case were a case under chapter 7 of this
>     title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to
>     the extent provided by the provisions of this
>     title.

11 U.S.C. § 547(b).

The Trustee must prove each element of section 547(b) by a
preponderance of the evidence.  Official Comm. of Unsecured
Creditors v. Juniper Commc'ns, Inc. (In re Network Access
Solutions Corp.), 320 B.R. 574, 576 (Bankr. D. Del. 2005).  Once
the Trustee has established that a payment constitutes an

avoidable preference under section 547(b), the burden shifts to the Defendants to demonstrate by a preponderance of the evidence that one of the exceptions to avoidance is applicable. <u>Camelot Music, Inc. v. MHW Advertising and Public Relations, Inc. (In re CM Holdings, Inc.)</u>, 264 B.R. 141, 153 (Bankr. D. Del. 2000).

Because the Debtor did not become insolvent until February 1, 2009, the Court will enter judgment in favor of the Defendants on Counts 61, 62, 63, 64, 66, and 67, which sought avoidance (and recovery) of alleged preferential transfers while the Debtor was solvent.

    1.  <u>Insider Preferences</u>

    a.  <u>Insider Preference Period</u>

A trustee may recover a preferential transfer made between 90 days and one year before the bankruptcy case if the debtor was insolvent at the time of the transfer and it was made to an insider. 11 U.S.C. § 547(b)(3) & (4)(B).

The Trustee asserts that Corp, Core, Northwest, A&E, and A&E PC[21] received payments after the Debtor became insolvent but before the 90 days before the Petition Date (from February 1 through April 1, 2009). In order to recover those transfers, the Trustee must establish that those Defendants are insiders of the

---

[21] Though other Defendants may have been insiders (including TFC and Financial), the transfers to them occurred earlier than February 1, 2009, while the Debtor was solvent. Therefore, the Court does not find it necessary to analyze whether they were insiders.

Debtor.

The Bankruptcy Code provides a non-exhaustive list of what constitutes a statutory insider.  Under section 101(31), an insider includes

> (B) if the debtor is a corporation -
>     (i) director of the debtor;
>     (ii) officer of the debtor;
>     (iii) person in control of the debtor; . . .
>     (vi) relative of a general partner, director, officer, or person in control of the debtor;
>     . . .
> (E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and
> (F) managing agent of the debtor.

11 U.S.C. § 101(31).  An "affiliate" is defined by section 101(2) as:

> (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities —
>     (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
>     (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote.
> (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities -
>     (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
>     (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote.
> (C) person whose business is operated under a lease or

107

operating agreement by a debtor, or person
substantially all of whose property is operated under
an operating agreement with the debtor; or
(D) entity that operates the business or substantially
all of the property of the debtor under a lease or
operating agreement.

11 U.S.C. § 101(2).

None of the remaining Defendants (Corp, Core, Northwest,
A&E, and A&E PC) are directors or officers of the Debtor, nor are
they relatives of the same. (JPTO at § IV, ¶¶ 16, 21 & 22.)
However, Corp, Core and A&E were all owned by the Trusts. (JPTO
at § IV, ¶¶ 13 & 29; Tr. 2/6/14 at 195-196.) Northwest was owned
by Corp, which was owned by the Trusts. (JPTO at § IV, ¶ 22.)
The Trusts indirectly, through their ownership of LLC, owned the
Debtor. (JPTO at § IV, ¶¶ 13 & 19.) Therefore, the Court
concludes that Corp, Core, Northwest, and A&E are affiliates of
the Debtor because they are "corporation[s] 20 percent or more of
whose outstanding voting securities are directly or indirectly
owned . . . by an entity that . . . indirectly owns . . . 20
percent or more of the outstanding voting securities of the
debtor . . . ." 11 U.S.C. § 101(2)(B).

The Defendants contend, however, that common ownership is
not sufficient to make one an affiliate, there must also be
evidence that the alleged insider had control of the Debtor.
See, e.g., Serrano v. Gulf Chem. Corp., Ltd. (In re Caribbean
Petroleum LP), 322 B.R. 726, 728 (D. Del. 2005).

108

However, the Serrano ruling flies in the face of the express language of section 101(2)(B) of the Code and provides no reasoning for its conclusion.  Cases to the contrary rely on the express language of the Code.  See, e.g., In re Emerson Radio Corp., 173 B.R. 490, 493 (D.N.J. 1994), aff'd, 52 F.3d 50 (3d Cir. 1995) (holding that "while this Court does not dispute the fact that some type of direct or indirect control must exist before there can be any affiliate relationship, it is equally incontrovertible that the literal language of 101(2)(B) provides that such control exists by virtue of the debtor holding, directly or indirectly, 20% of the outstanding voting shares of the affiliate, or by that entity holding 20% of the debtor's voting shares."); In re Reichmann Petroleum Corp., 364 B.R. 916, 921 (Bankr. E.D. Tex. 2007) (concluding that because one company owned or controlled at least 20 percent of the outstanding voting shares of two other companies, the latter were affiliates under the horizontal relationship prong of § 101(2)(B)).

Section 101(2)(B) describes an affiliate as having either a "vertical relationship" or a "horizontal relationship" with the debtor.

> The typical vertical relationship which will give rise
> to an affiliate status involves a debtor, A, who owns,
> controls, or holds with the power to vote at least 20
> percent of the outstanding voting stock of another
> company, C. Under this scenario, A and C are
> affiliates. However, the language describing this type
> of relationship is broad enough to include more complex
> relationships, such as when a debtor, A, has a wholly-

> owned subsidiary, B, which owns at least 20 percent of
> the outstanding stock of another company, C. Under this
> "tiered" scenario, though A neither directly owns,
> controls, nor holds with power to vote, any interest in
> C, C could still constitute an affiliate of A, because
> at least 20 percent of C's outstanding voting stock is
> indirectly controlled by A.

Reichmann, 364 B.R. at 920.

The horizontal relationship under section 101(2)(B)'s

definition of affiliate was described by the Reichmann Court as

follows:

> The preponderance of the evidence presented at the
> hearing, though conflicting, established that . . . .
> Striker owns at least 20% of the voting shares of
> Reichmann.  The evidence additionally established that
> Striker owns 70% of Emergent, which in turn owns 100%
> of Freedom.  Therefore, Striker indirectly controls at
> least 20 percent of the outstanding voting shares of
> Freedom.  Because Striker directly or indirectly owns
> or controls at least 20 percent of the outstanding
> voting shares of both Reichmann and Freedom, Freedom
> and Reichmann are, in fact, affiliates based upon the
> existence of the requisite horizontal relationship upon
> which affiliate status is conferred by the second prong
> of § 101(2)(B) of the Bankruptcy Code.

Id. at 921.

In this case, Corp, Core, Northwest, and A&E all have a

horizontal relationship with the Debtor because the Trusts own,

directly or indirectly, more than 20% of them and the Trusts also

indirectly own more than 20% of the Debtor.  Consequently, the

Court concludes that Corp, Core, Northwest, and A&E are statutory

insiders of the Debtor.

However, the Court finds no evidence that A&E PC was owned,

directly or indirectly, by the Trusts or any other Opus entity.

110

(Tr. 2/6/14 at 199.)   Although the Trustee cites testimony for
the proposition that A&E PC was owned by officers of A&E, the
witness did not so testify and there is no other evidence offered
by the Trustee to that effect.   (Adv. D.I. 285 at ¶ 534; Tr.
2/6/14/ at 199.)

A&E PC could still be liable as a non-statutory insider.
See, e.g., Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns,
Inc.), 554 F.3d 382, 396-97 (3d Cir. 2009) (holding that large
supplier of debtor qualified as non-statutory insider); Anstine
v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.), 531 F.3d 1272,
1276 (10th Cir. 2008) (holding that because definition of insider
"includes" specific examples, there must be other insiders that
are not listed).   Actual control over the Debtor is not necessary
in order for a creditor to be deemed a non-statutory insider.
U.S. Med., 531 F.3d at 1227 n.5 (because actual control would
make defendant a statutory insider, actual control is not needed
to be a non-statutory insider).   Accord Winstar, 554 F.3d at 396.
Instead, courts have determined that to be a non-statutory
insider there must be a close relationship with the debtor and
some evidence, other than the relationship, that the transaction
was not conducted at arm's length.   Winstar, 554 F.3d at 396-97
(finding such evidence where debtor's largest creditor was able
to influence debtor into purchasing additional equipment from it
before the end of each quarter to inflate the creditor's earnings

even though the debtor did not need the equipment).

Courts focus on three factors to determine if an entity is a non-statutory insider of the debtor: (1) the closeness of the relationship between the transferor and transferee, (2) the degree of influence the transferee exerts over the transferor, and (3) whether the transactions were arms-length. OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.), 340 B.R. 510, 523-24 (Bankr. D. Del. 2006) (citing S. REP. No. 95-989, 1978 WL 8531, 1978 U.S.C.C.A.N. 5787, 5810). "One-sided transactions" and the ability to coerce the debtor into entering into transactions that are not in its best interests are evidence of a relationship that is too close. See Winstar, 554 F.3d at 395.

The Trustee has presented no evidence that A&E PC had an inordinately close relationship with the Debtor or that it had an undue influence over the Debtor.  Instead, all payments from the Debtor to A&E PC were pursuant to arms-length transactions.  (Tr. 2/6/14 at 199-201.)

Therefore, the Court concludes that A&E PC was not an insider, statutory or non-statutory, of the Debtor.  Thus, only transfers within the 90 days prior to the Petition Date (April 2 to July 1, 2009) are potentially recoverable from A&E PC.

b.   <u>Proof of Insider Preferences Beyond 90 Days</u>

The Court has concluded that Corp, Core, Northwest, and A&E are insiders of the Debtor and therefore may be liable for any transfers which occurred earlier than 90 days before the Petition Date while the Debtor was insolvent (from February 1 through April 1, 2009).

In support of his claims for avoidance of preferences, the Trustee relies primarily on a summary chart of the Debtor's voluminous books and records which reflected transfers to the Defendants which the Trustee asserts are avoidable as preferential (and fraudulent) transfers.  (Ex. 1328A; Tr. 2/4/14 at 178-79.)  That exhibit does not identify the specific date of any particular transfer but instead gives only a total amount of transfers per Defendant in specific time periods (12/1/06 to 7/1/09, 7/1/07 to 7/1/09, 7/1/08 to 7/1/09, and 4/2/09 to 7/1/09).  The Defendants have admitted (except as to Core) that the summary exhibit evidences the <u>total</u> transfers within each period, although they have not admitted each specific transfer.  (Adv. D.I. 183 at ¶¶ 149, 160, 169, 180 & 192.)   Therefore, the exhibit does provide evidence of the total preferential transfers that occurred within the 90 days before the Petition Date.  (Ex. 1328A.)  However, because the summary lists only the total transfers that occurred between July 1, 2008, and July 1, 2009, it does not provide any evidence of which specific transfers

113

occurred from February 1, 2009, through April 1, 2009.

Courts have held, in deciding motions to dismiss preference complaints, that relying on such a summary analysis does not meet the plaintiff's burden of establishing what payments are preferences.  See, e.g., TWA Inc. Post-Confirmation Estate v. Marsh USA Inc. (In re  TWA Inc. Post-Confirmation Estate), 305 B.R. 228, 232 (Bankr. D. Del. 2004) (dismissing preference complaint suing for "approximately two million dollars" because it failed to provide the "dates of payment transactions [and] amounts of the payment transactions"); Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.), 288 B.R. 189, 192 (Bankr. D. Del. 2003) (dismissing preference complaint which stated only the total amount of preferential transfers and did not identify "each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer.").

The Trustee did introduce into evidence, through his expert Mimms, a print-out of the Debtor's check/cash register for the years 2006 to 2009.  (Tr. 12/16/13 at 41-43; Exs. P-634, P-635, P-636 & P-637.)[22]  However, the register for 2009 does not contain all the preferential transfers alleged by the Trustee.

---

[22]  In the Trustee's post-trial submissions, the check registers are used only in connection with the distributions to the Trusts for taxes, income, and charitable contributions. (Adv. D.I. 285 at ¶ 558.)  The Trustee refers only to the summary exhibit as evidence of the preferences.  (Adv. D.I. 285.)

(Ex. P-637.)  In fact, the only alleged preferential transfers on or after February 1, 2009, on that exhibit are three transfers to Core: $308,714 on 2/2/2009; $15,000 on 3/3/2009; and $933,345 on 3/10/2009.  (Ex. P-637.)  Therefore, the Trustee has cited no evidence of any specific preferential transfers to Corp, A&E, or Northwest before the 90 day preference period for non-insiders.

Because the Trustee has not met his burden of proof, the Court will find in favor of Corp, A&E, and Northwest for any preferences before the 90 day pre-petition period.[23]  See, e.g., In re Carolina Fluid Handling Intermediate Holding Corp., Civ. No. 12-494 (SLR), 2013 WL 1124064, at *4 (D. Del. 2013) (plaintiff has the burden of proof on all elements of a preference under §547(b)); Network Access, 320 B.R. at 576 (same).

### 2.  Defenses to Remaining Preferences

The Defendants raise both a new value and an ordinary course of business defense to the alleged preferences asserted by the Trustee.  11 U.S.C. § 547(c)(2) & (4).  The burden of proof is on

---

[23]  In presenting their defenses to the preferences, the Defendants have identified some of the specific alleged preferences at issue (those to Corp and A&E) for the period from February 1, 2009, through April 1, 2009.  (Exs. D-2168, D-2170, D-2171 & D-2173.)  Even if the Court were to conclude that the Trustee could use that evidence to satisfy his burden of proof to identify the alleged preferences, the Defendants' evidence still establishes that their defenses are sufficient to eliminate liability for all the alleged preferences.  (See Part G2 infra.)

the Defendants to prove any defense by a preponderance of the evidence.  CM Holdings, 264 B.R. at 153.

The Defendants contend that they are entitled to use the new value defense and the ordinary course defense cumulatively.  See Gonzales v. Conagra Grocery Prods. Co. (In re Furr's Supermarkets, Inc.), 373 B.R. 691, 708 (B.A.P. 10th Cir. 2007) (defendant "is entitled to 'the maximum effect of the defenses'"); Hyman v. Stone Lumber Co. (In re Winter Haven Truss Co.), 154 B.R. 592, 594-96 (Bankr. M.D. Fla. 1993) (applying both defenses to challenged transfers); S. REP. NO. 95-989, at 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874 (if a creditor qualifies under several of the exceptions in section 547(c), "he is·protected by each to the extent that he can qualify under each.").

a.   New Value

The Defendants argue that the alleged preferences may not be recovered because they provided new value to the Debtor after the transfers.  11 U.S.C. § 547(c)(4).  See, e.g., In re Friedman's, Inc., 738 F.3d 547, 555 (3d Cir. 2013) (stating that section 547(c)(4)(B) provides a defense to avoidance of a preference if the creditor gave unsecured new value to the debtor after the preference which has not been repaid); Winstar, 554 F.3d at 402 (same).

i.  Corp

The Trustee's summary chart shows that the Debtor paid $255,230.84 to Corp from April 2, 2009, to July 1, 2009 (the "Corp Preference Period").  The Defendants presented evidence that Corp provided $218,486.72 in services to the Debtor that has not been paid.  (Ex. D-2167; Adv. D.I. 279 at ¶ 481.)[24] However, none of that appears to represent services provided subsequent to the preferences.[25]  (Id.)  Therefore, the Court concludes that Corp has no new value defense.

ii.  A&E

The Trustee established that the Debtor transferred $249,838.38 to A&E from April 2, 2009, to July 1, 2009 (the "A&E Preference Period").  (Ex. P-1328A; Tr. 2/4/14 at 178-79).  The Defendants presented evidence that A&E provided $371,676.48 in services to the Debtor that has not been paid.  (Ex. D-2165.) Only $84,208.08 represents services provided subsequent to the preferences.  (See Exhibit B-3 attached hereto;[26] Tr. 2/6/14 at

---

[24] Although the evidence presented reflects in excess of $1.2 million unpaid, much of that represents pass-through payments due to taxing authorities or other entities, which is not included in the Court's analysis, not services rendered by Corp.  (Ex. D-2167.)  (See footnote 29 infra.)

[25] This is true even if the Court were to use the Defendants' Exhibits D-2170 and D-2171 as evidence of preferential transfers to Corp from February 1, 2009, through April 1, 2009.  (Adv. D.I. 279 at ¶ 481.)

[26] Exhibit B-3 is derived from Exhibits D-2165 and D-2173.

117

198-99.)  That new value reduces the transfers which may be avoided to $165,630.30.[27]

### iii. A&E PC

The Trustee established that the Debtor transferred $35,010.62 to A&E PC from April 2, 2009, to July 1, 2009 (the "A&E PC Preference Period").  (Ex. P-1328A; Tr. 2/4/14 at 178-79).  The Defendants presented evidence that A&E PC provided $71,945.93 in services to the Debtor that has not been paid. (Ex. D-2166.)  Only $17,642.61 represents services provided subsequent to the preferences.  (See Exhibit C-3 attached hereto.)[28]  That new value reduces the transfers which may be avoided to $17,368.01.

### b.  Ordinary Course of Business Defense

The Defendants argue that the alleged preferential transfers remaining after application of the new value defense cannot be recovered because the payments were made in the ordinary course of business between the parties.  11 U.S.C. § 547(c)(2).  The Defendants contend that the payments satisfy both the subjective and the objective tests for ordinary course of business

---

[27]  If the Court were to use the Defendants' Exhibits D-2168 and D-2173 as evidence of preferential transfers to A&E from February 1, 2009, through April 1, 2009, the result would be the same because the new value given before April 2, 2009, is sufficient to eliminate any preferences paid before that date. (See Exhibit B-4 attached hereto.)

[28]  Exhibit C-3 is derived from Exhibits D-2166 and D-2175.

transactions.  See, e.g., Sass v. Vector Consulting, Inc. (In re
Am. Home Mortg. Holdings, Inc.), 476 B.R. 124, 135, 140 (Bankr.
D. Del. 2012) (noting that the subjective test considers whether
the payment was made according to the parties' "normal payment
practice" while the objective test considers whether the payment
was made according to the "general norms within the creditor's
industry.").

The subjective inquiry first has courts determine whether
the parties' relationship "was of sufficient length to establish
an ordinary course of dealing" and then compares the history of
transfers before the preference period - the historical period -
against those made during the preference period to determine if
the transactions are sufficiently similar.  Burch v. Detroit
Forming, Inc. (In re Archway Cookies), 435 B.R. 234, 243 (Bankr.
D. Del. 2010), aff'd sub nom. Burch v. Detroit Forming, Inc. (In
re Archway Cookies LLC), 511 B.R. 726 (D. Del. 2013) (comparing
"historical period" of approximately 20 months before the
preference period with the preference period).  Courts typically
consider the following factors in making that determination: (1)
how long the parties engaged in the type of dealing at issue, (2)
whether the subject transfers were in an amount more than usually
paid, (3) whether the payments were tendered in a manner
different from previous payments, (4) whether there appears to
have been an unusual action by the debtor or creditor to pay or

collect on the debt, and (5) whether the creditor did anything to gain an advantage (such as take additional security) of the debtor's deteriorating financial condition.  <u>Id.</u> at 241-42.  "In determining ordinary course of dealings between the parties, however, '[c]ourts place particular importance on the timing of payment.'"  <u>Id.</u> at 243 (quoting <u>Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)</u>, Adv. No. 08-51184, 2009 WL 2004226, at *5 (Bankr. D. Del. July 9, 2009)).

The Third Circuit has held that a departure of 13 days from the industry average time to pay was not so unusual but that a departure of 44 days beyond the industry average was too extreme to constitute the ordinary course of business.  <u>In re Molded Acoustical Prods., Inc.</u>, 18 F.3d 217, 227 & 228 at n.15 (3d Cir. 1994) (adopting Seventh Circuit's <u>Tolona</u> test with a minor change and holding that only transfers that are so "unusual" as to fall outside the broad range of ordinary business terms in the industry can be avoided as preferential); <u>In re Tolona Pizza Prods. Corp.</u>, 3 F.3d 1029, 1033 (7th Cir. 1993) (holding that "'ordinary business terms' refers to the range of terms that encompass the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of" the ordinary course of business defense).  Other courts have held

120

that even a difference of 33 days in the average payment time between the historic period and the preference period (24.7 days versus 57.4 days) was sufficiently similar that the transfers were made in the ordinary course of business.  Am. Home Mortg., 476 B.R. at 137.

In support of their ordinary course of business defense, the Defendants submitted exhibits listing all the invoices and payments for those invoices for the period from July 1, 2006, to July 1, 2009, as well as a summary of those invoices and payments.  (Exs. D-2170, D-2171, D-2168, D-2173, D-2169 & D-2175.)  Although the summary for Corp appeared to have some inaccuracies, the Court concluded that they were immaterial and admitted the exhibit.  (Tr. 2/6/14 at 251.)

The Trustee also sought to discredit the Defendants' summaries, noting that the "check date" listed on the exhibits is irrelevant to the preference analysis because it is not the date the check was honored.  (Tr. 2/6/14 at 234-36.)  See, e.g., Barnhill v. Johnson, 503 U.S. 393, 399-400 (1992) (holding that under section 547(b) a transfer made by check occurs on the date the check is honored); Mora v. Vasquez (In re Mora), 199 F.3d 1024, 1027-28 (9th Cir. 1999) (noting that "under section 547(b), the transfer of an ordinary check does not take place until the check is honored" and applying the same rationale to conclude that a cashiers check is not transferred until received);  HLI

Creditor Trust v. Hyundai Motor Co. (In re Hayes Lemmerz Int'l, Inc.), 329 B.R. 136, 141 (Bankr. D. Del. 2005) (holding that "[f]or purposes of section 547(b), a check is deemed transferred on the date the check is honored by the drawee bank.").

In this case, the witness clarified that the "check date" on the exhibits was in fact the date that the check was received, not the date the check was issued by the Debtor.  (Tr. 2/6/14 at 232-36, 249-50.)  Although the date the check was honored is the date that the preference occurred for purposes of section 547(b), the date the check was received is the relevant date to be considered in connection with defenses under section 547(c). See, e.g., Barnhill, 503 U.S. at 401-02 (noting that delivery of check is relevant date for defenses under section 547(c)); Braniff Airways, Inc. v. Midwest Corp., 873 V.2d 805, 806-08 (5th Cir. 1989) (same); Am. Home Mortg., 476 B.R. at 138 (same). Therefore, the Court concludes that the information in the exhibits is probative of the Defendants' ordinary course defense.

### i.   Corp

The Trustee established that the Debtor paid $255,230.84 to Corp during the Corp Preference Period.  (Exs. P-1328A; Tr. 2/4/14 at 178-79.)  The Defendants contend that all those payments were made in the ordinary course of business between the parties.

The payments made by the Debtor to Corp during the Corp Preference Period were for Shared Services provided by Corp to the Debtor (including corporate accounting, human resources, legal, risk management, payroll, office services, and tax services).  (Ex. D-2080 at 399; Tr. 2/5/14 at 180-81.)  The Defendants presented copies and a summary of all the invoices for such Shared Services from July 1, 2006 to July 1,2009.  (Exs. D-2170 & D-2171; Tr. 2/6/14 at 188-89.)[29]

_____

[29]  The invoices and summary included some invoices and payments (shaded in red) that were not for Shared Services but were for "pass-through" payments collected from the Debtor's employees (e.g., for their 401k plans or for medical expenses). (Tr. 2/6/14 at 190, 194; Ex. D-2171.)  The Court has not considered those payments in its preference analysis because Corp was a mere conduit for those payments and therefore not liable for the funds that it passed on to another.  See, e.g., Bailey v. Big Sky Motors, Ltd. (In re Ogden), 314 F.3d 1190, 1201-05 (10th Cir. 2002) (holding that escrow agent which could not disburse funds without express directions was mere conduit and not initial transferee of preference); Christy v. Alexander & Alexander of New York Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 58 (2d Cir. 1997) (concluding that insurance broker which received premiums and remitted them to insurance company was mere conduit and not liable for preferential transfer); Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.), 892 F.2d 26, 28 (4th Cir. 1989) (holding that creditors' committee which received funds from debtor and distributed them to creditors was mere conduit but that creditor who received funds from committee and used them to pay its secured creditors was not a mere conduit); Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988) (determining that an initial transferee liable for a fraudulent conveyance must be one who has "dominion over the money or other asset [and] the right to put the money to one's own purposes."); Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.), 287 B.R. 41, 47 (Bankr. D.N.J. 2002) (finding insurance company which administered 401k plan for debtor was mere conduit for plan funds).

From a review of the summary, it is apparent that the
transfers made during the Corp Preference Period are
substantially similar to those made to Corp from July 1, 2006,
through April 1, 2009 (the "Corp Historical Period").  (See
Exhibits A-1 & A-2 attached hereto.)[30]  The average time from
invoice date to payment receipt date between the Corp Historical
Period and the Corp Preference Period differs by only 15 days (21
days versus 6 days).  (Id.)  The median time from invoice date to
payment receipt date between the Corp Historical Period and the
Corp Preference Period differs by only 14 days (14 days versus 0
days).  Further, all Shared Services payments made by the Debtor
during both the Corp Historical Period and the Corp Preference
Period were paid by check.  (Ex. D-2171.)  The payment amounts
were not substantially different between the Corp Historical
Period and the Corp Preference Period, and it was common for the
Debtor to pay multiple invoices with a single check.  (Id.)
There is nothing in the record suggesting any unusual collection
practices or advantage gained by Corp to secure payment during
the Corp Preference Period.  (Tr. 2/5/14 at 216.)

Therefore, the Court concludes that the Defendants have
established that all payments to Corp during the Corp Preference
Period were made in the ordinary course of business between the

---

[30]  Exhibits A-1 and A-2 are derived from the information in
Exs. D-2170 and D-2171.

124

parties and are not recoverable as preferences.  See, e.g.,
Molded Acoustical, 18 F.3d at 227 & 228 at n.15 (finding
transfers unavoidable based on ordinary course defense where
difference of 13 days but suggesting that 44 days difference was
too extreme to constitute the ordinary course of business); Am.
Home Mortg., 476 B.R. at 137 (finding transfers unavoidable based
on ordinary course defense where difference of 33 days in the
average payment time between the historic period and the
preference period).

If the Court were to accept Defendants' Exhibits D-2170 and
D-2171 as evidence of potential preferential transfers from
February 1, 2009, to the Petition Date, the result would not
change.  The average time from invoice date to payment receipt
date varied by only 15 days before and after February 1, 2009 (21
days versus 6 days).  (See Exhibits A-1 and A-2.)  The median
time from invoice date to payment receipt date varied by only 14
days before and after February 1, 2009 (14 days versus 0 days).
(Id.)

Accordingly, the Court will enter judgment in favor of Corp
on Count 22 of the Third Amended Complaint.

### ii.  A&E

After reduction for new value, the remaining preference
that the Trustee may recover from A&E is $165,649.74.  The
Defendants contend that they were all payments made in the

ordinary course of business between the Debtor and A&E.

The payments to A&E during the A&E Preference Period were made in payment of architectural and engineering services performed on the Debtor's projects. (Tr. 2/6/14 at 195-201.) Those payments were similar to payments made by the Debtor to A&E from July 27, 2006, through April 1, 2009 (the "A&E Historical Period"). (See Exhibits B-1 & B-2 attached hereto.)[31] When A&E provided services to the Debtor or one of its SPEs, it issued an invoice. (Ex. D-2168; Tr. 2/6/14 at 195-201.) All of the Debtor's payments to A&E were made by check. (Ex. D-2173.) In both the A&E Preference Period and the A&E Historical Period, each payment, except one,[32] was made between 0 and 86 days of the invoice. (See Exhibits B-1 & B-2.) The vast majority of payments during the A&E Preference Period (93%) and the A&E Historical Period (91%) were made within 60 days of invoice. The average time from invoice date to payment receipt date varied by only 16 days between the A&E Preference Period and the A&E Historical Period (50 days versus 34 days). (Id.) The median time from invoice date to payment receipt date varied by only 20

---

[31] Exhibits B-1 and B-2 are derived from the information in Exhibits D-2168 and D-2173, which contain all the invoices issued by A&E between July 27, 2006, and July 1, 2009, and a summary of those invoices.

[32] The outlier is a payment in the amount of $880 made during the A&E Historical Period which was 556 days after the invoice date (invoice no. 585585-JUNE 2007). (Ex. D-2173.) That is not included in the Court's analysis.

days between the A&E Preference Period and the A&E Historical Period (52 days versus 32 days). (Id.) There is no evidence in the record that A&E engaged in any unusual efforts to collect the challenged transfers during the A&E Preference Period or that the amount of each payment changed dramatically.

Therefore, the Court concludes that the Defendants have established that all payments to A&E during the A&E Preference Period were made in the ordinary course of business between the parties and are not recoverable as preferences. See, e.g., Molded Acoustical, 18 F.3d at 227 & 228 at n.15 (finding transfers unavoidable based on ordinary course defense where difference of 13 days but suggesting that 44 days difference was too extreme to constitute the ordinary course of business); Am. Home Mortg., 476 B.R. at 137 (finding transfers unavoidable based on ordinary course defense where difference of 33 days in the average payment time between the historic period and the preference period).

If the Court were to accept Defendants' Exhibits D-2168 and D-2173 as evidence of potential preferential transfers from February 1, 2009, to the Petition Date, the result would not change. The average time from invoice date to payment receipt date varied by only 11 days before and after February 1, 2009 (33 days versus 44 days). (See Exhibits B-1 and B-2.) The median time from invoice date to payment receipt date varied by only 10

127

days before and after February 1, 2009 (30 days versus 40 days).
(Id.)

Accordingly, the Court will enter judgment in favor of A&E
on Count 28 of the Third Amended Complaint.

### iii. A&E PC

The Trustee established that the Debtor transferred
$35,010.62 to A&E PC during the A&E PC Preference Period.  (Ex.
P-1328A; Tr. 2/4/14 at 178-79). After application of the new
value defense, $17,368.01 remains as a potential preference.  The
Defendants contend that all those payments were made in the
ordinary course of business between the parties.

A&E PC performed services for the Debtor and its SPEs, where
the architectural firm of record for the project had to be owned
by a licensed architect as opposed to a corporation.  (Ex. D-
2169; Tr. 2/6/14 at 199-200.)  A&E PC subcontracted with A&E to
perform the architectural and engineering work necessary for the
Debtor's projects.  (Ex. D-2169; Tr. 2/6/14 at 199-200.)  When
A&E PC provided services to the Debtor or one of its SPEs, it
created an invoice for the service.  (Ex. D-2169; Tr. 2/6/14 at
195-201.)  The payments to A&E PC during the A&E PC Preference
Period were made in payment of those architectural and
engineering services performed on the Debtor's projects.  (Tr.
2/6/14 at 195-201.)  All of the Debtor's payments to A&E PC were
made via check.  (Ex. D-2175.)  The payments during the A&E PC

128

Preference Period were similar in amount and timing to payments
made by the Debtor to A&E PC from July 27, 2006, through April 1,
2009 (the "A&E PC Historical Period").  (See Exhibits C-1 & C-2
attached hereto.)[33]

The vast majority of payments during the A&E PC Preference
Period (75%) and the A&E PC Historical Period (66%) were made
within 60 days of invoice.  The median time from invoice date to
payment receipt date varied by only 7 days between the A&E PC
Preference Period and the A&E PC Historical Period (46 days
versus 53 days).  (Id.)  The average time from invoice date to
payment receipt date varied by only 8 days between the A&E PC
Preference Period and the A&E PC Historical Period (60 days
versus 52 days).  (Id.)  There is no evidence in the record that
A&E PC engaged in any unusual efforts to collect the challenged
transfers during the A&E PC Preference Period.

Therefore, the Court concludes that the Defendants have
established that all payments to A&E PC from April 2 to July 1,
2009, were made in the ordinary course of business between the
parties and are not recoverable as preferences.  See, e.g.,
Molded Acoustical, 18 F.3d at 227 & 228 at n.15 (finding
transfers unavoidable based on ordinary course defense where

_____

[33]  Exhibits C-1 and C-2 are derived from the information in
Exhibits D-2169 and D-2171, which contain all the invoices issued
by A&E PC between July 27, 2006, and July 1, 2009, and a summary
of those invoices.

difference of 13 days but suggesting that 44 days difference was too extreme to constitute the ordinary course of business); Am. Home Mortg., 476 B.R. at 137 (finding transfers unavoidable based on ordinary course defense where difference of 33 days in the average payment time between the historic period and the preference period).

Accordingly, the Court will enter judgment in favor of the Defendants on Count 25 of the Third Amended Complaint.

        c.    No Defenses Offered

            i.    Core

The Trustee's summary exhibit evidences that the Debtor transferred $2,374,059.00 (between July 1, 2008, and July 1, 2009) and $15,000(between April 2 and July 1, 2009) to Core. (Ex. P-1328A; Tr. 2/4/14 at 178-79.)  The Debtor's check/cash register reflects three transfers on or after February 1, 2009, to Core: $308,714 on 2/2/2009, $15,000 on 3/3/2009, and $933,345 on 3/10/2009.  (Ex. P-637; Tr. 12/16/13 at 41-43.)

The Trustee has the burden of proving all elements of a preferential transfer, including that it was on account of an antecedent debt.  See, e.g., In re Carolina Fluid Handling Intermediate Holding Corp., Civ. No. 12-494 (SLR), 2013 WL 1124064, at *4 (D. Del. 2013) (plaintiff has the burden of proof on all elements of a preference under §547(b)); Network Access, 320 B.R. at 576 (same).

From the evidence presented, the Court concludes that the payments made were for services that Core alleges it performed and, thus, for a debt it alleged it was owed. Therefore, the Court concludes that the three transfers (totaling $1,257,059) made from February 1, 2009, through April 1, 2009, and the transfers made from April 2, 2009, to the Petition Date (totaling $15,000) are recoverable from Core as preferences.

In their answer, the Defendants denied all allegations as to any transfers to Core or their preferential nature. (Adv. D.I. 183 at ¶¶ 180-183.) However, the Defendants presented no evidence to support a new value or ordinary course of business defense on behalf of Core. See, e.g., CM Holdings, 264 B.R. at 153 (holding that the burden of proof is on the defendant to establish any defense to a preference).

Therefore, the Court will enter judgment in favor of the Trustee against Core in the amount of $1,272,059 on Count 31 of the Third Amended Complaint.

ii. Northwest

The Trustee seeks to recover certain transfers made to Northwest as preferences. The Trustee's summary exhibit evidences (and the Defendants admitted in their answer) that the Debtor transferred $20,587.06 within one year and $15,131.12 within 90 days of the Petition Date to Northwest. (Ex. P-1328A; Tr. 2/4/14 at 178-79; Adv. D.I. 183 at ¶ 192.) The Trustee

131

presented no evidence of what portion of the $5,455.94 paid before April 2, 2009, was paid on or after February 1, 2009. As a result, the Court concludes that the Trustee has only met his burden of showing potential preferential transfers were made to Northwest while the Debtor was insolvent totaling $15,131.12.

There was no evidence presented by either party about what the transfers represented. There is no evidence that Northwest provided any services to the Debtor or that the transfers were in payment of any debt owed by the Debtor. In their answer, the Defendants denied all allegations as to the preferential nature of the transfers. (Adv. D.I. 183 at ¶¶ 192-195.)

The burden is on the Trustee to establish all the elements of a preference by a preponderance of the evidence, including that the payment was on account of an antecedent debt. See, e.g., Carolina Fluid, 2013 WL 1124064, at *4; Network Access, 320 B.R. at 576. The Trustee has failed to meet that burden with respect to the Northwest transfers.

Therefore, the Court will enter judgment in favor of Northwest on Count 34 of the Third Amended Complaint.

H.    Unjust Enrichment

1.    Standard of Review

The Trustee also claims that many of the transfers previously mentioned constituted an unjust enrichment for Rauenhorst, Campa, Corp, Bednarowski, and the Trusts.

Under Delaware law, "a claim for unjust enrichment requires a plaintiff to demonstrate that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted or retained the benefit under such circumstances as to make non-payment inequitable." In re Intel Corp. Microprocessor Antitrust Litig., 496 F. Supp. 2d 404, 420-21 (D. Del. 2007). The Delaware Supreme Court has identified five elements of an unjust enrichment claim: "(1) an enrichment, (2) an impoverishment, (3) a relationship between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010). See also, Burtch v. Huston (In re USDigital, Inc.), 443 B.R. 22, 48 (Bankr. D. Del. 2011).

## 2.   Specific Transfers

The Trustee contends that several actions by the Defendants resulted in unjust enrichment: the Northwest Management transfers, the transfer of the $5 million deposit, the Defendants' tax scheme to force the Debtor into liquidation, and the transfers related to GAMD, Management Co, and the ODP Entities.

### a.   Northwest Management Transfers

The Trustee contends that LLC, Northwest, and Rauenhorst were enriched when Rauenhorst directed Northwest Management, a wholly owned subsidiary of Northwest, to confiscate funds in

April, 2009, in the amount of $75,203 earned by the Debtor's
property management subsidiary, Management Co.  (Exs. P-281, P-
699, P-357 & P-414; Tr. 12/16/13 at 178-79.)  He argues that the
Debtor was impoverished by the confiscation of funds.  The
Trustee asserts that Northwest Management's taking of the funds
was not justified because: (1) it deprived the Debtor of much
needed capital; (2) neither the Debtor nor Management Co received
any consideration in return; and (3) it was effected on the eve
of bankruptcy and only exacerbated the Debtor's already dire
financial condition.  Finally, the Trustee contends that there is
no adequate remedy at law through which the Debtor can recover
the funds taken by Northwest Management.

This claim must fail because the funds in question did not
belong to the Debtor (they belonged to Management Co) and
therefore the Debtor was not diminished by them.  (See Part C2b
supra.)  Further, the transfer did not even diminish Management
Co because the funds were used to satisfy an obligation that it
had to Northwest Management for services previously rendered.
(Exs. P-281, P-699, P-357 & P-414.)  Nor is there any evidence
that the funds transferred to Northwest Management enriched the
Trusts.

The Court will therefore enter judgment in favor of the
Defendants on Count 55 of the Third Amended Complaint.

134

b.   $5 Million Deposit

The Trustee contends that Rauenhorst, Corp, and the Trusts were unjustly enriched when the $5 million deposit for the 100 M Street Project was transferred to a BOA account and ultimately set off by BOA.  The Trustee asserts that the transfer harmed the Debtor by depriving it of funds it needed to reorganize and that it benefitted the Defendants by aiding them in their negotiations with BOA over resolution of obligations owed by other Opus Entities.

The Court concludes that the transfer did not harm the Debtor because the $5 million was not the Debtor's property and could not have been used by the Debtor to reorganize.  (See Part C2d supra.)  Therefore, the transfer of the $5 million did not diminish the Debtor in any way.

Accordingly, the Court will enter judgment in favor of the Defendants on Count 53 of the Third Amended Complaint.

c.   Tax Scheme

The Trustee argues that the Debtor's liquidation in 2009 enriched the Trusts because they benefitted from their ability to carry back losses generated by the Debtor in 2009 offsetting the Trusts' income from 2006 and resulting in substantial tax refunds.  (Tr. 12/16/13 at 147, 182-83; Ex. P-1270.)  The Trustee asserts that the Debtor was impoverished because the Trusts crippled the Debtor's ability to operate and/or emerge from

135

bankruptcy to cause increased loss recognition by the Trusts. The Trustee argues that the actions the Trusts took to prevent the Debtor from reorganizing caused both the Trusts' enrichment and the Debtor's impoverishment. The Trustee contends that the Debtor is without an adequate remedy provided by law with respect to recovery of the benefit conferred upon the Trusts. Therefore, the Trustee asserts that the Debtor is entitled to recover from the Trusts the $27,286,966 in tax benefits realized by them from this scheme as unjust enrichment. (Tr. 12/16/13 at 147, 182-83; Ex. P-1270.)

The Defendants contend that there was no impoverishment on the part of the Debtor. The Debtor and its parent company, LLC, were pass-through entities which paid no taxes. (JPTO at § IV, ¶ 48.) Instead, it was the Trusts that paid taxes for the Debtor. Thus, the Defendants argue that the pass-through of the taxes (and corresponding tax benefits) did not impoverish the Debtor.

The Court agrees with the Defendants that the Trustee has failed to prove the Debtor was impoverished by the tax policy or by any actions taken by the Trusts in 2008 or 2009. The Trustee is contending essentially that the Trusts were enriched and the Debtor was impoverished by the failure of the Trusts to finance the Debtor and assure its continued operation. The Court disagrees because the Trusts had no obligation to finance the Debtor ad infinitum. While a parent may be liable under an alter

136

ego theory if it fails initially to capitalize its subsidiary, the Court has found that LLC (and the Trusts) are not liable for that here.  (See Part B1 supra.)  The Debtor was initially adequately capitalized and was able to grow its business for years.  There is no obligation of a parent to stand by for the life of its "child" to be sure it is always profitable.  At some point, the child must stand on its own.

Further, it is not clear that even if the Trusts had continued to finance the Debtor, the Debtor could have reorganized and survived.  The market collapse in 2008, and resulting adverse effect on the real estate market, lasted far longer than anyone expected.  Some contend that the markets have still not recovered fully as of this date.  Thus, the Court finds that the failure of the Trusts to finance the Debtor did not unjustly enrich them at the Debtor's expense.

The fact that the Trusts were able to realize tax benefits when the Debtor liquidated is simply the result of the tax laws. In claiming that the Debtor was impoverished by the Trusts' receipt of that tax benefit, it appears that the Trustee is suggesting that the Debtor should have been entitled to the benefit of any tax refund realized by the Trusts as a result of the Debtor's operating losses.  This is not correct.  As limited liability companies, the Debtor and its parent, LLC, paid no taxes and therefore were entitled to no tax refunds.  Cf. In re

137

Majestic Star Casino, LLC, 716 F.3d 736, 759 (3d Cir. 2013)
(noting that a debtor that was an S corporation was "merely a
'conduit' for tax benefits that flow through to shareholders.
The corporation retains no real benefit from its tax-free status
in that, while there is no entity-level tax, all of its pre-tax
income is passed on to its shareholders").  Similarly, the Debtor
was a mere conduit for tax attributes for its ultimate parent,
the Trusts.  Because the Debtor was not entitled to realize the
tax benefits of a refund, the Trustee has failed to establish
that the Debtor was impoverished by the tax policy.

Therefore, no claim for unjust enrichment has been proven,
and the Court will enter judgment in favor of the Defendants on
Count 42 of the Third Amended Complaint.

d.   GAMD, Management Co, and ODP Transfers

In Count 52 of the Complaint, the Trustee also contends that
Rauenhorst, Campa, Bednarowski, and the Trusts were unjustly
enriched by several transfers, including the transfers of ME to
GAMD, the Management Co contracts to OPS, and the Debtor's
projects to the ODP Entities.  The Trustee argues that those
transfers deprived the Debtor of valuable assets without
reasonably equivalent value and were manifestly unjust.

As the Court has found, however, the NOAA Project had no
value to the Debtor because the Debtor did not have the funds to
complete it, GSA refused to pay for change orders in whole and

138

only on completion, and the cost to complete it exceeded the amount the Debtor would receive. (See Part C2a supra.) Even the lawsuit against GSA had no value, as evidenced by the fact that the Defendants did not realize anything from its prosecution. (Id.) Therefore, the Court concluded that the transfer of ME to GAMD was not a breach of fiduciary duty by Rauenhorst. (Id.) Similarly, because the NOAA Project and the GSA suit did not have any value, the Court concludes that there is no basis to find that the Defendants were unjustly enriched by the transfer of ME to GAMD.

In addition, the Court has found that the transfer of the Management Co contracts was not a breach of fiduciary duty or a fraudulent transfer of property of the Debtor. (See Parts C2b & F2g supra.) The Management Co contracts were not property of the Debtor and, even if they were, they had no value as they had resulted in losses in the prior three years and were projected to lose money in 2009 as well. (Id.) Therefore, the Court concludes that there is no basis to find that the Defendants were unjustly enriched by the transfer of the Management Co contracts.

Likewise, the Court has found that the transfers to the ODP Entities were not breaches of fiduciary duties or fraudulent transfers of property of the Debtor. (See Parts C2c & F2c supra.) The ODP Entities were joint ventures in which the Debtor obtained an ownership interest and entitlement to development and

other fees in exchange for its contributions. (Id.) The Court concludes that there is no basis to find that the Defendants were unjustly enriched by the transfers to the ODP Entities.

Therefore, no claim for unjust enrichment has been proven, and the Court will enter judgment in favor of the Defendants on Count 52 of the Third Amended Complaint.

I.    Disallowance of Claims

The Trustee argues that grounds exist to disallow all the claims of the Defendants.

Section 502(d) of the Bankruptcy Code gives the Court the authority to disallow any filed or scheduled claim if the claimant has received a transfer that has been avoided as a preference or fraudulent conveyance. 11 U.S.C. § 502(d). Section 502(d) states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section . . . 547, 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable . . . .

11 U.S.C. § 502(d).

Pursuant to section 502(j), the Court also has the power to reconsider any allowed or disallowed claim for cause. In re Genesis Health Ventures, Inc., 362 B.R. 657, 661 (D. Del. 2007); 11 U.S.C. § 502(j). The term "cause" is not defined in section 502(j) and is a matter of judicial construction. In re Lomas

140

Fin. Corp., 212 B.R. 46, 51-52 (Bankr. D. Del 1997).

Because the Court has concluded that Core and Northwest are liable for preferential and/or fraudulent transfers, the Court agrees that any claim they hold must be disallowed unless and until they have returned the transfers. As a result, the Court will enter judgment in favor of the Trustee against Core and Northwest on Count 39 of the Third Amended Complaint.

Because the Court has found that none of the other Defendants is liable for any preferential or fraudulent transfer, however, the Court will enter judgment in favor of the other Defendants on Count 39 of the Third Amended Complaint.

J.   Equitable Subordination of Claims

The Trustee argues that grounds exist to equitably subordinate all the claims of the Defendants.

Section 510(c) authorizes the Court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1). Subordination under section 510(c) requires that the Trustee show that (1) the claimant engaged in some type of inequitable conduct; (2) the claimant's misconduct resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the Bankruptcy Code. In re Mid-American Waste

141

Sys., Inc., 284 B.R. 53, 69 (Bankr. D. Del. 2002). "[W]here the claimant is an insider, the standard for finding inequitable conduct is much lower. . . . Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." Id. at 70.

The proponent of equitable subordination has the initial burden of presenting evidence of unfair conduct by a preponderance of the evidence. In re Kreisler, 331 B.R. 364, 382 (Bankr. N.D. Ill. 2005). Accord In re Friedman, 126 B.R. 63, 71 (B.A.P. 9th Cir. 1991); Wells v. Sleep (In re Michigan Machine Tool Control Corp.), 381 B.R. 657, 674 (Bankr. E.D. Mich. 2008); Official Comm. of Unsecured Creditors v. Liberty Savings Bank (In re Toy King Distrib., Inc.), 256 B.R. 1, 203 (Bankr. M.D. Fla. 2000).

The Court has found that the Defendants committed no fraud, breach of fiduciary duty, undercapitalization, or action sufficient to warrant piercing the corporate veil. (See Parts B, C & F supra.) Therefore, the Court finds no basis to equitably subordinate the claims of the Defendants. Accordingly, the Court will enter judgment in favor of the Defendants on Count 40 of the Third Amended Complaint.

142

K.   <u>Revocation of Core's Certification of Dissolution</u>

The Trustee asks the Court to revoke the certification of dissolution of Core filed on June 2, 2009, so that he may pursue his claims against it.

Under Delaware law, an LLC that seeks to dissolve "[s]hall pay or make reasonable provision to pay all claims and obligations, including all contingent conditional or unmatured contractual claims, known to the limited liability company," and "[s]hall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution." Del. Code Ann. tit. 6, § 18-804(b)(3).  Failure to comply with the statutory requirements for winding up an LLC results in revocation or nullification of the certificate of cancellation. See <u>Metro Commc'n Corp., BVI v. Advanced Mobilecomm Techs., Inc.</u>, 854 A.2d 121, 139-140 (Del. Ch. 2004).  "[I]f the Court finds that an LLC's affairs were not wound up in compliance with the Delaware Limited Liability Company Act, it may nullify the certificate of cancellation, which effectively revives the LLC and allows claims to be brought by and against it."  <u>Matthew v. Laudamiel</u>, No. 5957-VCN, 2012 WL 605589, at *22, n.148 (Del. Ch.

143

Feb. 21, 2012).

In this case, the Court has found that the Trustee has a valid claim for a preference and fraudulent transfer against Core. Therefore, the Court will grant the Trustee's request to revoke the dissolution certificate of Core. Accordingly, the Court will enter judgment in favor of the Trustee against Core on Count 47 of the Third Amended Complaint.

The Trustee also seeks an order directing that any distributions made by Core to the Trusts on its dissolution be returned. The Trustee has presented no evidence that there were any such distributions. Therefore, the Court will not grant such a request. Accordingly, the Court will enter judgment in favor of the Defendants on Count 48 of the Third Amended Complaint.

L.    Constructive Trust

The Trustee seeks the imposition of a constructive trust over all property in the hands of the Defendants that rightfully belongs to the Debtor. "A constructive trust is an equitable remedy of great flexibility and generality." Ruggerio v. Estate of Poppiti, No. 18961-NC, 2005 WL 517967, at *3 (Del. Ch. Feb. 23, 2005) (internal quotations omitted).

Although a constructive trust typically is imposed when the defendant wrongfully obtains specific property or identifiable proceeds of specific property from the plaintiff, this equitable remedy also can be applied to the recovery of money when the

144

right asserted by the plaintiff is distinctly equitable in nature, including a right arising from breach of a fiduciary duty. Standard Chlorine of Delaware, Inc. v. Sinibaldi, 821 F. Supp. 232, 254 (D. Del. 1992). See also Sanders v. Wang, No. 16640, 1999 WL 1044880, at *10 (Del. Ch. Nov. 8, 1999) ("It is, of course, fundamental that a fiduciary who breaches his duty is liable for any loss suffered by the beneficiary of his trust and any profit made through the breach of trust may be disgorged through the device of constructive trust.")

The imposition of a constructive trust is also appropriate where a defendant has been unjustly enriched. Dodge v. Wilmington Trust Co., Civ. A. No. 1257-K, 1995 WL 106380, at *7 (Del. Ch. Feb. 3, 1995). "Constructive trusts are regularly imposed by courts of equity to remedy unjust enrichment." Nash v. Schock, No. 14721-NC, 1998 WL 474161, at *2 (Del. Ch. July 23, 1998). A party must establish by a preponderance of the evidence that it is entitled to the imposition of a constructive trust. Elliott v. Holladay, No. Civ. A. 2011-S, 2003 WL 1240497, at *5 (Del. Ch. March 7, 2003).

The Court has concluded that the Defendants have not breached their fiduciary duties, wrongfully received any property of the Debtor, been unjustly enriched, or engaged in any inequitable conduct. (See Parts C, F, G, H & J supra.) Therefore, the Court concludes that there is no basis to impose a

constructive trust on any of the Defendants' property. Accordingly, the Court will enter judgment in favor of the Defendants on Count 60 of the Third Amended Complaint.

M.    Tortious Interference with Contract

The Trustee contends that Corp and the Trusts are liable for tortious interference with the contracts owned by Management Co by causing them to be transferred to OPS.[34]  As a result, he asserts that the Debtor's estate has been damaged by $702,355 (the value of those contracts as evidenced by the price OPS received upon their sale to NorthMarq).  (Ex. P-289.)

"There are five elements to a claim for tortious interference with contract: (1) the existence of a contract; (2) the defendant was aware of the contract; (3) the defendant acted intentionally to cause a breach of the contract; (4) a lack of justification; and (5) injury."  In re New Stream Secured Cap., Inc., Bankr. No. 22-10753, 2014 WL 2608873, at *5 (Bankr. D. Del. 2014) (citing Aspen Advisors LLC v. United Artists Theatre Co., 861 A.2d 1251, 1265-66 (Del. 2004)).

The Court finds that this claim must fail because the Court has already found that the contracts were in the name of Management Co, not the Debtor.  (See Part C2b supra.)  Further,

---

[34]  Although the Trustee included this claim in the Joint Pre-trial Order as one he intended to establish at trial, he did not include any discussion of it in his post trial brief or proposed findings of fact or conclusions of law. (JPTO at § IX, Part XI; Adv. D.I. 283, 284 & 285.)

the Court has concluded that there was no value in the management
contracts to Management Co or the Debtor.  (Id.)  The contracts
were essentially worthless because (1) they were cancellable at
will; (2) Management Co had lost money on those contracts for the
prior three years; and (3) Management Co was projected to lose
substantial money on them in 2009.  (Tr. 12/18/13 at 112-13, 218-
20; Tr. 2/4/14 at 280-85; Exs. D-2154, D-2155, D-2156 & D-2157.)

Therefore, the Court will enter judgment in favor of the
Defendants on Count 41 of the Third Amended Complaint.

N.    Conversion/Conspiracy to Commit Conversion

The Trustee contends that Northwest committed conversion
(and that Rauenhorst and LLC conspired in that conversion) of the
$75,203 in funds owed to Management Co that were offset by
Northwest Management in April, 2009.[35]  The Trustee also
complains that OPS "stole" the April management fees due to
Management Co in May 2009 in order to fund its performance of the
management contracts transferred to it.

Conversion is the "unauthorized exercise of dominion or
control over property by one who is not the owner which
interferes with and is in defiance of a superior possessory right
of another in the property."  Schwartz v. Capital Liquidators,

---

[35]  Although the Trustee included this claim in the Joint
Pre-trial Order as one he intended to establish at trial, he did
not include any discussion of it in his post trial brief or
proposed findings of fact or conclusions of law.  (JPTO at § IX,
Part X; Adv. D.I. 283, 284 & 285.)

147

Inc., 984 F.2d 53, 53 (2d Cir. 1993) (citation omitted).  See also In re Musicland Holding Co., 386 B.R. 428, 440 (S.D.N.Y. 2008) (holding that conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.") (citations omitted).

Where the transfer is of money, however, it cannot be the subject of an action in conversion unless it is segregated or specifically identifiable.  See, e.g., G.D. Searle & Co. v. Medicore Commc'ns, Inc., 843 F. Supp. 895, 912 (S.D.N.Y. 1994) ("[M]oney can be the subject of conversion and a conversion action only when it can be described, identified, or segregated in the manner that a specific chattel can be."); Republic of Haiti v. Duvalier, 211 A.D. 2d 379, 384 (N.Y. App. Div. 1995) ("Where the property is money, it must be specifically identifiable and subject to an obligation to be returned or to be otherwise treated in a particular manner.").

This claim must fail because the Court has already found that the funds in question did not belong to the Debtor (but instead belonged to Management Co) and therefore could not be funds that were "described, identified, or segregated" as property of the Debtor.  (See Parts C2b supra; Exs. P-281, P-699, P-357 & P-414.)

Consequently, the Court will enter judgment in favor of the Defendants on Counts 56 and 57 of the Third Amended Complaint.

O.   <u>Prejudgment Interest</u>

The Trustee also seeks prejudgment interest on any award it receives.

> There is no reference to prejudgment interest in the Bankruptcy Code, but courts have relied on the word "value" in § 550(a) as authorizing an interest award. <u>In re Art Shirt Ltd., Inc.</u>, 93 B.R. 333, 341 n.9 (E.D. Pa. 1988). "[T]he award of prejudgment interest in a preference action is within the discretion of the bankruptcy court." <u>In re USN Commc'n, Inc.</u>, 280 B.R. 573, 602 (Bankr. D. Del.2002) (collecting courts of appeals cases). However, "[d]iscretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so." <u>In re Milwaukee Cheese Wis., Inc.</u>, 112 F.3d 845, 849 (7th Cir. 1997).

<u>In re Hechinger Inv. Co. of Dela., Inc.</u>, 489 F.3d 568, 579-80 (3d Cir. 2007) (remanding for explanation of denial of prejudgment interest).

The Trustee asserts that interest begins to accrue on preferential transfers on the date of the commencement of the adversary proceeding. <u>Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)</u>, 127 B.R. 903, 913 (Bankr. S.D. Fla. 1991) ("[T]he universally recognized rule in preference actions [is] that prejudgment interest runs from the date of demand for the return of the preference, or, in the absence of a prior demand, from the date of the commencement of the adversary proceeding.") (citations omitted).

149

The Trustee contends, however, that with respect to fraudulent transfers the Court may award prejudgment interest accruing from the date on which the fraudulent transfer occurred. <u>McHale v. Boulder Capital LLC (In re 1031 Tax Group, LLC)</u>, 439 B.R. 84, 90 (Bankr. S.D.N.Y. 2010). Further, the Trustee argues that Delaware law requires the award of prejudgment interest to successful plaintiffs on state law claims. <u>Moskowitz v. Mayor & Council of Wilmington</u>, 391 A.2d 209, 210 (Del. 1978) ("Interest is awarded in Delaware as a matter of right and not of judicial discretion."). Generally, Delaware courts apply the "legal rate of interest" for prejudgment interest. <u>See, e.g.</u>, <u>In re Mobilactive Media, LLC</u>, C.A. No. 5725-VCP, 2013 WL 297950, at *27 (Del. Ch. Jan. 25, 2013); <u>Beard Research, Inc. v. Kates</u>, 8 A.3d 573, 620 (Del. Ch. 2010) ("In the absence of an express contract rate, Delaware courts use the 'legal rate' as a default rate.").

The Court agrees with the Trustee that prejudgment interest is appropriate in this case. The Trustee has provided a list of suggested rates based on the Federal Reserve Discount Rate. The Court concludes, however, that the appropriate rate for prejudgment interest is the federal judgment interest rate. 28 U.S.C. § 1961. For the preference counts, the federal judgment interest rate as of the date the Complaint was filed on June 30, 2011, was .17%. For the fraudulent transfer claims, the federal judgment interest rate between February 1, 2009, and June 30,

2009, varied from .47% to .60%.

The Court will, therefore, award prejudgment interest on the preference claims from the date of the filing of the Complaint until paid at the rate of .17% and award prejudgment interest on the fraudulent transfer claims from the date of the transfer until paid at the federal judgment rate applicable on the date of the transfer.

V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court will enter partial judgment in favor of the Trustee on Counts 31, 32, 33, 35, 36, 39, and 47 of the Third Amended Complaint.  The Court will enter judgment in favor of the Defendants on all the remaining Counts.

Dated: March 23, 2015                    BY THE COURT:

                                         Mary F. Walrath
                                         United States Bankruptcy Judge

## EXHIBIT A-1
### Corp.  Historical Period (Before 4-2-09)

| Invoice Number | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| | | | | | |
| 4565 | 7/19/06 | 7/14/06 | 10,713.18 | 7/20/06 | 6 |
| 4347B | 7/19/06 | 7/6/06 | 1,932.94 | 7/20/06 | 14 |
| 4347 | 7/18/06 | 7/6/06 | 4,564.69 | 7/20/06 | 14 |
| 4449 | 7/18/06 | 6/30/06 | 3,539.00 | 7/20/06 | 20 |
| 36971 | 7/18/06 | 6/30/06 | 108,931.86 | 7/20/06 | 20 |
| 4583 | 8/1/06 | 7/17/06 | 32,954.60 | 7/27/06 | 10 |
| 4696 | 8/2/06 | 7/26/06 | 550.00 | 8/11/06 | 16 |
| 4717 | 8/22/06 | 7/28/06 | 14,662.81 | 8/25/06 | 28 |
| 5104 | 8/29/06 | 8/29/06 | 44.00 | 9/1/06 | 3 |
| 5091 | 8/31/06 | 8/24/06 | 133,871.35 | 9/1/06 | 8 |
| 5103 | 8/29/06 | 8/23/06 | 650.00 | 9/1/06 | 9 |
| 5042 | 8/31/06 | 8/21/06 | 43.60 | 9/1/06 | 11 |
| 3680 | 8/31/06 | 5/22/06 | 1,460.02 | 9/1/06 | 102 |
| 5278 | 9/23/06 | 9/8/06 | 7,371.82 | 9/14/06 | 6 |
| 3518 | 10/2/06 | 10/2/06 | 79,194.00 | 10/2/06 | 0 |
| 5527 | 9/30/06 | 9/26/06 | 5,850.00 | 10/5/06 | 9 |
| 5481 | 9/30/06 | 9/21/06 | 53,813.66 | 10/5/06 | 14 |
| 5447 | 9/30/06 | 9/20/06 | 236,103.89 | 10/5/06 | 15 |
| 5433 | 9/30/06 | 9/19/06 | 25,050.45 | 10/5/06 | 16 |
| 5439 | 9/30/06 | 9/18/06 | 150.17 | 10/5/06 | 17 |
| 4641 | 9/30/06 | 7/19/06 | 7,335.00 | 10/5/06 | 78 |
| 5707 | 10/11/06 | 10/4/06 | 26,862.36 | 10/12/06 | 8 |
| 5829 | 10/12/06 | 9/29/06 | 4,445.16 | 10/12/06 | 13 |
| 5593 | 10/10/06 | 9/29/06 | 9,092.85 | 10/12/06 | 13 |
| 5872 | 10/18/06 | 10/11/06 | 40,200.63 | 10/19/06 | 8 |
| 110106 | 11/1/06 | 11/1/06 | 149,165.00 | 11/1/06 | 0 |
| 5927 | 10/27/06 | 10/24/06 | 3,240.00 | 11/2/06 | 9 |
| 7672 | 11/8/06 | 11/1/06 | 2,386.00 | 11/13/06 | 12 |
| 7673 | 11/8/06 | 11/1/06 | 143.00 | 11/13/06 | 12 |
| 7626 | 11/8/06 | 11/1/06 | 97,665.25 | 11/13/06 | 12 |
| 8491 | 11/15/06 | 11/9/06 | 42,714.79 | 11/16/06 | 7 |
| 8512 | 11/13/06 | 11/8/06 | 10,806.51 | 11/16/06 | 8 |
| 8406 | 11/13/06 | 11/8/06 | 8,445.15 | 11/16/06 | 8 |
| 120106 | 12/1/06 | 12/1/06 | 85,555.00 | 12/1/06 | 0 |
| 8655 | 11/28/06 | 11/21/06 | 2,522.50 | 12/1/06 | 10 |
| 8640 | 11/29/06 | 11/20/06 | 15,684.70 | 12/1/06 | 11 |
| 8621 | 12/1/06 | 11/17/06 | 6,075.00 | 12/4/06 | 17 |
| 8941 | 12/4/06 | 11/30/06 | 84,608.00 | 12/7/06 | 7 |
| 8936 | 12/4/06 | 11/28/06 | 92,299.00 | 12/7/06 | 9 |

| Invoice Number | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| 9793 | 12/13/06 | 12/7/06 | 42,714.79 | 12/14/06 | 7 |
| 9602 | 12/13/06 | 12/5/06 | 15,218.59 | 12/14/06 | 9 |
| 5145 | 12/13/06 | 8/24/06 | 7,400.00 | 12/14/06 | 112 |
| 9942 | 12/14/06 | 12/11/06 | 1,565.00 | 12/18/06 | 7 |
| 10199 | 12/21/06 | 12/12/06 | 7,510.22 | 12/22/06 | 10 |
| 10149 | 12/26/06 | 12/13/06 | 52,124.79 | 12/27/06 | 14 |
| 11041 | 12/31/06 | 12/30/06 | 67,031.50 | 1/4/07 | 5 |
| 11144 | 12/31/06 | 12/28/06 | 19,229.00 | 1/4/07 | 7 |
| 11136 | 12/31/06 | 12/28/06 | 16,942.00 | 1/4/07 | 7 |
| 11204 | 12/31/06 | 1/2/07 | 636.92 | 1/8/07 | 6 |
| 11491 | 12/31/06 | 12/31/06 | 3,718.81 | 1/8/07 | 8 |
| 11492 | 12/31/06 | 12/31/06 | 223.29 | 1/8/07 | 8 |
| 11529 | 1/5/07 | 12/31/06 | 45,062.00 | 1/8/07 | 8 |
| 12312006 | 12/31/06 | 12/31/06 | 510,041.00 | 1/8/07 | 8 |
| 11470 | 12/31/06 | 1/3/07 | 7,974.77 | 1/11/07 | 8 |
| 11723 | 1/11/07 | 1/4/07 | 500.00 | 1/15/07 | 11 |
| 11898 | 1/23/07 | 1/5/07 | 90,079.70 | 1/26/07 | 21 |
| 20107 | 2/1/07 | 2/1/07 | 171,110.00 | 2/1/07 | 0 |
| 13244 | 2/12/07 | 2/5/07 | 42,714.79 | 2/12/07 | 7 |
| 2122007 | 2/20/07 | 2/12/07 | 4,902.50 | 2/22/07 | 10 |
| 13439 | 2/20/07 | 2/9/07 | 35,465.00 | 2/22/07 | 13 |
| 13506 | 2/26/07 | 2/15/07 | 3,433.61 | 2/27/07 | 12 |
| 30107 | 3/1/07 | 3/1/07 | 85,555.00 | 3/1/07 | 0 |
| 13736 | 2/28/07 | 2/16/07 | 67,216.00 | 3/1/07 | 13 |
| 13804 | 2/28/07 | 2/15/07 | 16,705.98 | 3/1/07 | 14 |
| 4897 | 3/8/07 | 3/6/07 | 42,714.79 | 3/8/07 | 2 |
| 15152 | 3/19/07 | 3/12/07 | 7,012.09 | 3/19/07 | 7 |
| 15385 | 3/22/07 | 3/12/07 | 4,070.00 | 3/22/07 | 10 |
| 40207 | 4/2/07 | 4/2/07 | 85,555.00 | 4/2/07 | 0 |
| 16235 | 3/31/07 | 3/30/07 | 13,002.07 | 4/5/07 | 6 |
| 16436 | 4/5/07 | 4/2/07 | 1,336.00 | 4/9/07 | 7 |
| 16880 | 4/10/07 | 4/5/07 | 550.00 | 4/12/07 | 7 |
| 16927 | 4/10/07 | 4/5/07 | 4,788.34 | 4/12/07 | 7 |
| 17171 | 4/17/07 | 4/12/07 | 12,020.00 | 4/19/07 | 7 |
| 17202 | 4/17/07 | 4/11/07 | 2,084.61 | 4/19/07 | 8 |
| 171891 | 4/18/07 | 4/11/07 | 13,495.79 | 4/19/07 | 8 |
| 16838 | 4/17/07 | 4/4/07 | 42,714.79 | 4/19/07 | 15 |
| 50107 | 5/1/07 | 5/1/07 | 85,555.00 | 5/1/07 | 0 |
| 15445 | 5/2/07 | 3/13/07 | 23,764.04 | 5/3/07 | 51 |
| 11910 | 5/7/07 | 1/5/07 | 4,675.00 | 5/10/07 | 125 |
| 11081 | 5/7/07 | 12/29/06 | 2,460.00 | 5/10/07 | 132 |
| 18797 | 5/14/07 | 5/10/07 | 11,065.00 | 5/17/07 | 7 |
| 18709 | 5/14/07 | 5/8/07 | 5,980.92 | 5/17/07 | 9 |
| 18534 | 5/14/07 | 5/2/07 | 42,714.80 | 5/17/07 | 15 |

| Invoice Number | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| 18838 | 5/23/07 | 5/15/07 | 3,000.00 | 5/24/07 | 9 |
| 18771 | 5/23/07 | 5/9/07 | 15,141.80 | 5/24/07 | 15 |
| 60107 | 6/12/07 | 6/1/07 | 85,555.00 | 6/1/07 | 0 |
| 19617 | 6/1/07 | 5/25/07 | 51,711.00 | 6/4/07 | 10 |
| 19937 | 6/7/07 | 6/4/07 | 32,214.20 | 6/11/07 | 7 |
| 61407 | 6/14/07 | 6/14/07 | 433,742.77 | 6/14/07 | 0 |
| 20314 | 6/13/07 | 6/8/07 | 42,714.81 | 6/14/07 | 6 |
| 20330 | 6/18/07 | 6/11/07 | 3,695.58 | 6/25/07 | 14 |
| 20970 | 6/26/07 | 6/19/07 | 10,082.50 | 6/28/07 | 9 |
| 20492 | 6/27/07 | 6/15/07 | 41,701.14 | 6/28/07 | 13 |
| 70107 | 7/7/07 | 7/1/07 | 85,555.00 | 7/1/07 | 0 |
| 21891 | 7/12/07 | 7/6/07 | 914.28 | 7/12/07 | 6 |
| 21892 | 7/12/07 | 7/6/07 | 71.71 | 7/12/07 | 6 |
| 21249 | 7/6/07 | 6/28/07 | 800.00 | 7/12/07 | 14 |
| 22022 | 7/17/07 | 7/9/07 | 21,400.00 | 7/19/07 | 10 |
| 21972 | 7/13/07 | 7/6/07 | 181,573.90 | 7/19/07 | 13 |
| 21912 | 7/17/07 | 7/5/07 | 4,937.85 | 7/19/07 | 14 |
| 21267 | 7/13/07 | 7/5/07 | 6,753.82 | 7/19/07 | 14 |
| 22114 | 7/25/07 | 7/11/07 | 1,258.86 | 7/30/07 | 19 |
| 80107 | 8/1/07 | 8/1/07 | 85,555.00 | 8/1/07 | 0 |
| 23377 | 8/7/07 | 8/2/07 | 80,601.92 | 8/9/07 | 7 |
| 23690 | 8/21/07 | 8/15/07 | 9,450.00 | 8/24/07 | 9 |
| 23489 | 8/10/07 | 8/6/07 | 23,093.00 | 8/24/07 | 18 |
| 90407 | 9/4/07 | 9/4/07 | 85,555.00 | 9/4/07 | 0 |
| 23618 | 8/21/07 | 8/10/07 | 44,931.06 | 9/4/07 | 25 |
| 23421 | 8/10/07 | 8/6/07 | 6,215.19 | 9/4/07 | 29 |
| JULY TAX LIA | 8/17/07 | 8/17/07 | 509.00 | 9/6/07 | 20 |
| 24921 | 9/19/07 | 9/13/07 | 19,271.29 | 9/20/07 | 7 |
| 25614 | 10/5/07 | 9/28/07 | 6,389.33 | 10/8/07 | 10 |
| 25632 | 10/2/07 | 9/26/07 | 4,956.49 | 10/8/07 | 12 |
| 25633 | 10/2/07 | 9/26/07 | 302.01 | 10/8/07 | 12 |
| 24965 | 10/5/07 | 9/21/07 | 10,750.00 | 10/8/07 | 17 |
| 26353 | 10/5/07 | 10/3/07 | 517.76 | 10/11/07 | 8 |
| 24992 | 10/4/07 | 9/19/07 | 84,086.06 | 10/11/07 | 22 |
| 26496 | 10/10/07 | 10/4/07 | 1,805.00 | 10/15/07 | 11 |
| 26495 | 10/10/07 | 10/4/07 | 6,435.00 | 10/15/07 | 11 |
| 26228 | 10/10/07 | 10/3/07 | 700.00 | 10/15/07 | 12 |
| 26180 | 9/30/07 | 10/2/07 | 6,018.23 | 10/15/07 | 13 |
| 22838 | 10/12/07 | 7/31/07 | 20,620.21 | 10/15/07 | 76 |
| 24882 | 9/21/07 | 9/12/07 | 7,896.69 | 10/18/07 | 36 |
| 26543 | 10/12/07 | 10/8/07 | 26,644.27 | 10/30/07 | 22 |
| 26521 | 10/10/07 | 10/5/07 | 7,598.00 | 10/30/07 | 25 |
| 26241 | 9/30/07 | 10/1/07 | 136,836.06 | 10/30/07 | 29 |
| 110907 | 11/9/07 | 11/9/07 | 349,321.00 | 11/9/07 | 0 |

| Invoice Number | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| 27796 | 11/14/07 | 11/2/07 | 195,734.13 | 11/15/07 | 13 |
| 28018 | 11/16/07 | 11/12/07 | 17,730.00 | 11/19/07 | 7 |
| 27969 | 11/16/07 | 11/7/07 | 9,266.37 | 11/19/07 | 12 |
| 120307 | 12/3/07 | 12/3/07 | 101,756.00 | 12/1/07 | -2 |
| 28530 | 12/4/07 | 11/19/07 | 9,530.00 | 12/6/07 | 17 |
| 28145 | 12/4/07 | 11/19/07 | 50,467.18 | 12/6/07 | 17 |
| 29702 | 12/17/07 | 12/11/07 | 950.00 | 12/21/07 | 10 |
| 29633 | 12/14/07 | 12/10/07 | 29,402.86 | 12/21/07 | 11 |
| 29399 | 12/10/07 | 12/5/07 | 15,234.79 | 12/21/07 | 16 |
| 29849 | 12/27/07 | 12/17/07 | 6,507.59 | 12/28/07 | 11 |
| 29850 | 12/27/07 | 12/17/07 | 428.28 | 12/28/07 | 11 |
| 29752 | 12/27/07 | 12/13/07 | 850.00 | 12/28/07 | 15 |
| 29783 | 12/21/07 | 12/13/07 | 1,718.21 | 12/28/07 | 15 |
| 29714 | 12/21/07 | 12/11/07 | 21,990.28 | 12/28/07 | 17 |
| 29701 | 12/21/07 | 12/11/07 | 8,670.00 | 12/28/07 | 17 |
| 29655 | 12/21/07 | 12/11/07 | 96,545.62 | 12/28/07 | 17 |
| 30545 | 12/31/07 | 12/28/07 | 1,186.70 | 1/7/08 | 10 |
| 30100 | 12/27/07 | 12/21/07 | 3,749.01 | 1/7/08 | 17 |
| 29992 | 12/27/07 | 12/19/07 | 29,402.86 | 1/7/08 | 19 |
| 29969 | 12/27/07 | 12/19/07 | 1,818.99 | 1/7/08 | 19 |
| 30077 | 12/27/07 | 12/19/07 | 45,458.59 | 1/7/08 | 19 |
| 29954 | 12/27/07 | 12/18/07 | 11,775.72 | 1/7/08 | 20 |
| 29604 | 12/27/07 | 12/10/07 | 134,117.17 | 1/7/08 | 28 |
| 31821 | 12/31/07 | 12/31/07 | 11,555.88 | 1/14/08 | 14 |
| 32339 | 1/18/08 | 1/7/08 | 1,250.00 | 1/21/08 | 14 |
| 32340 | 1/18/08 | 1/7/08 | 3,536.00 | 1/21/08 | 14 |
| TBD-ACCRUE | 12/31/07 | 12/31/07 | 193,736.00 | 1/21/08 | 21 |
| 32338 | 1/18/08 | 1/7/08 | 74,411.00 | 2/7/08 | 31 |
| 31905 | 12/31/07 | 12/31/07 | 30,050.00 | 2/7/08 | 38 |
| TBD-ACCRUE | 12/31/07 | 12/31/07 | 57,820.00 | 2/7/08 | 38 |
| TBD-ACCRUE | 12/31/07 | 12/31/07 | 150,733.00 | 2/7/08 | 38 |
| 33830 | 2/7/08 | 2/5/08 | 29,402.86 | 2/11/08 | 6 |
| 34184 | 2/15/08 | 2/12/08 | 8,250.17 | 2/21/08 | 9 |
| 35020 | 3/6/08 | 2/26/08 | 3,701.00 | 3/6/08 | 9 |
| 34167 | 3/3/08 | 2/20/08 | 39,156.39 | 3/6/08 | 15 |
| 35816 | 3/10/08 | 3/7/08 | 29,402.86 | 3/13/08 | 6 |
| 34264 | 3/6/08 | 2/27/08 | 2,660.00 | 3/13/08 | 15 |
| 34263 | 3/6/08 | 2/27/08 | 4,370.00 | 3/13/08 | 15 |
| 34262 | 3/6/08 | 2/27/08 | 10,090.00 | 3/13/08 | 15 |
| 36190 | 3/19/08 | 3/18/08 | 2,517.50 | 3/24/08 | 6 |
| 36189 | 3/20/08 | 3/18/08 | 10,120.00 | 3/24/08 | 6 |
| 37056 | 4/3/08 | 3/31/08 | 4,789.98 | 4/18/08 | 18 |
| 36948 | 4/2/08 | 3/27/08 | 29,402.86 | 4/18/08 | 22 |
| 36944 | 4/2/08 | 3/27/08 | 21,716.05 | 4/18/08 | 22 |

| Invoice Number | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| 36925 | 4/2/08 | 3/26/08 | 1,250.00 | 4/18/08 | 23 |
| 36816 | 4/2/08 | 3/25/08 | 10,095.21 | 4/18/08 | 24 |
| 36758 | 3/25/08 | 3/19/08 | 9,266.16 | 4/18/08 | 30 |
| 36192 | 4/10/08 | 3/18/08 | 930.00 | 4/18/08 | 31 |
| 36205 | 3/25/08 | 3/18/08 | 8,571.98 | 4/18/08 | 31 |
| 38024 | 4/10/08 | 4/7/08 | 6,332.97 | 4/21/08 | 14 |
| 37806 | 4/14/08 | 4/4/08 | 910.00 | 4/21/08 | 17 |
| 37814 | 4/10/08 | 4/4/08 | 5,225.00 | 4/21/08 | 17 |
| 37805 | 4/10/08 | 4/4/08 | 7,795.00 | 4/21/08 | 17 |
| 37827 | 4/10/08 | 4/4/08 | 111,958.75 | 4/21/08 | 17 |
| 40048 | 5/16/08 | 5/7/08 | 8,412.97 | 5/20/08 | 13 |
| 38948 | 5/15/08 | 4/25/08 | 29,402.87 | 5/20/08 | 25 |
| 38180 | 5/1/08 | 4/10/08 | 25,898.28 | 5/20/08 | 40 |
| 37961 | 5/5/08 | 4/7/08 | 150.00 | 5/20/08 | 43 |
| 37960 | 5/1/08 | 4/7/08 | 4,050.00 | 5/20/08 | 43 |
| 40393 | 6/9/08 | 5/15/08 | 25,912.06 | 7/2/08 | 48 |
| 40477 | 5/27/08 | 5/19/08 | 1,852.50 | 7/2/08 | 44 |
| 40476 | 5/29/08 | 5/19/08 | 5,180.00 | 7/2/08 | 44 |
| 42653 | 6/16/08 | 5/30/08 | 29,402.86 | 7/2/08 | 33 |
| 44277 | 6/19/08 | 6/4/08 | 31,215.83 | 7/2/08 | 28 |
| 46676 | 6/29/08 | 6/17/08 | 7,768.27 | 7/2/08 | 15 |
| 46636 | 6/30/08 | 6/18/08 | 3,800.00 | 7/2/08 | 14 |
| 46635 | 6/29/08 | 6/18/08 | 7,510.00 | 7/2/08 | 14 |
| 47064 | 6/29/08 | 6/24/08 | 29,402.86 | 7/2/08 | 8 |
| 46978 | 7/15/08 | 6/18/08 | 14,246.70 | 7/25/08 | 37 |
| 47172 | 7/15/08 | 6/25/08 | 1,172.96 | 7/25/08 | 30 |
| 47173 | 7/15/08 | 6/25/08 | 1,272.97 | 7/25/08 | 30 |
| 47171 | 7/15/08 | 6/25/08 | 2,606.45 | 7/25/08 | 30 |
| 47223 | 7/15/08 | 6/25/08 | 35,986.60 | 7/25/08 | 30 |
| 47558 | 7/15/08 | 6/26/08 | 182.54 | 7/25/08 | 29 |
| 47557 | 7/15/08 | 6/26/08 | 2,462.37 | 7/25/08 | 29 |
| 47669 | 7/15/08 | 6/30/08 | 368.24 | 7/25/08 | 25 |
| 47541 | 7/15/08 | 6/30/08 | 7,393.35 | 7/25/08 | 25 |
| 47074 | 7/15/08 | 6/30/08 | 1,400.00 | 7/25/08 | 25 |
| 47578 | 7/15/08 | 7/2/08 | 8,511.40 | 8/1/08 | 30 |
| 48847 | 7/15/08 | 7/7/08 | 10,781.55 | 8/1/08 | 25 |
| 48747 | 7/15/08 | 7/3/08 | 107,867.86 | 8/12/08 | 40 |
| 51737 | 9/2/08 | 8/6/08 | 3,420.00 | 9/4/08 | 29 |
| 51736 | 8/26/08 | 8/6/08 | 3,802.50 | 9/4/08 | 29 |
| 52022 | 8/26/08 | 8/8/08 | 2,558.50 | 9/4/08 | 27 |
| 52934 | 8/26/08 | 8/14/08 | 27,731.99 | 9/4/08 | 21 |
| 53760 | 9/12/08 | 8/26/08 | 380.00 | 9/18/08 | 23 |
| 52922 | 9/8/08 | 8/13/08 | 52,293.69 | 10/3/08 | 51 |
| 53759 | 9/22/08 | 8/26/08 | 2,470.00 | 10/3/08 | 38 |

| Invoice Number | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| 53758 | 9/8/08 | 8/26/08 | 5,715.00 | 10/3/08 | 38 |
| 64599 | 9/10/08 | 9/5/08 | 1,863.00 | 10/3/08 | 28 |
| 65432 | 9/15/08 | 9/12/08 | 18,782.35 | 10/3/08 | 21 |
| 65560 | 9/29/08 | 9/19/08 | 1,662.50 | 10/3/08 | 14 |
| 65559 | 9/25/08 | 9/19/08 | 4,015.00 | 10/3/08 | 14 |
| 66169 | 9/25/08 | 9/19/08 | 55,825.69 | 10/3/08 | 14 |
| 65561 | 10/2/08 | 9/19/08 | 560.00 | 10/7/08 | 18 |
| 66621 | 10/15/08 | 9/30/08 | 16,115.05 | 11/13/08 | 44 |
| 67866 | 10/15/08 | 10/3/08 | 1,400.66 | 11/13/08 | 41 |
| 68043 | 10/15/08 | 10/6/08 | 7,774.85 | 11/13/08 | 38 |
| 67345 | 10/15/08 | 10/6/08 | 349.14 | 11/13/08 | 38 |
| 67344 | 10/15/08 | 10/6/08 | 4,618.89 | 11/13/08 | 38 |
| 67845 | 10/15/08 | 10/6/08 | 27,713.63 | 11/13/08 | 38 |
| 69381 | 10/31/08 | 10/22/08 | 1,140.00 | 11/13/08 | 22 |
| 69380A | 11/5/08 | 10/22/08 | 3,520.00 | 11/13/08 | 22 |
| 66598 | 10/15/08 | 10/1/08 | 56,572.95 | 11/18/08 | 48 |
| 68014 | 10/15/08 | 10/6/08 | 243,856.42 | 11/18/08 | 43 |
| 70806 | 11/12/08 | 11/5/08 | 68,684.82 | 11/18/08 | 13 |
| 69382 | 11/18/08 | 10/22/08 | 560.00 | 11/21/08 | 30 |
| 71434 | 11/18/08 | 11/6/08 | 5,217.57 | 11/21/08 | 15 |
| 70843 | 11/18/08 | 11/7/08 | 14,800.78 | 11/21/08 | 14 |
| 38867 | 12/1/08 | 4/23/08 | 37.00 | 12/3/08 | 224 |
| 69313 | 10/28/08 | 9/30/08 | 47,000.00 | 12/3/08 | 64 |
| 68703 | 10/28/08 | 9/30/08 | 352,000.00 | 12/3/08 | 64 |
| 32065 | 8/18/08 | 12/31/07 | 439,569.00 | 12/16/08 | 351 |
| 64713 | 10/15/08 | 10/2/08 | 90,931.00 | 12/16/08 | 75 |
| 69322 | 10/28/08 | 10/16/08 | 111,749.00 | 12/16/08 | 61 |
| 72363 | 12/9/08 | 11/20/08 | 1,425.00 | 12/16/08 | 26 |
| 72364 | 12/11/08 | 11/20/08 | 1,757.50 | 12/16/08 | 26 |
| 72590 | 12/9/08 | 11/25/08 | 32,177.48 | 12/16/08 | 21 |
| 72365 | 12/18/08 | 11/20/08 | 380.00 | 12/31/08 | 41 |
| 74118 | 12/9/08 | 12/4/08 | 1,000.00 | 12/31/08 | 27 |
| 74318 | 12/16/08 | 12/8/08 | 32,177.48 | 12/31/08 | 23 |
| 75096 | 12/29/08 | 12/16/08 | 1,067.75 | 12/31/08 | 15 |
| 75096A | 12/29/08 | 12/16/08 | 1,217.75 | 12/31/08 | 15 |
| 73934 | 12/29/08 | 12/16/08 | 111,749.00 | 12/31/08 | 15 |
| 75006 | 12/29/08 | 12/17/08 | 372.74 | 12/31/08 | 14 |
| 75005 | 12/29/08 | 12/17/08 | 4,696.39 | 12/31/08 | 14 |
| 74960 | 12/29/08 | 12/18/08 | 70,323.63 | 12/31/08 | 13 |
| 75675A | 12/29/08 | 12/19/08 | 3,867.16 | 12/31/08 | 12 |
| 75675 | 12/29/08 | 12/19/08 | 5,431.86 | 12/31/08 | 12 |
| 75153 | 12/29/08 | 12/19/08 | 190.00 | 12/31/08 | 12 |
| 75151A | 12/29/08 | 12/19/08 | 190.00 | 12/31/08 | 12 |
| 75151 | 12/29/08 | 12/19/08 | 902.50 | 12/31/08 | 12 |

| Invoice Number | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| 75152 | 12/29/08 | 12/19/08 | 3,752.50 | 12/31/08 | 12 |
| 75189 | 12/29/08 | 12/19/08 | 31,091.22 | 12/31/08 | 12 |
| 75910 | 12/29/08 | 12/19/08 | 48,269.66 | 12/31/08 | 12 |
| 75917 | 12/31/08 | 12/19/08 | 900.00 | 1/8/09 | 20 |
| 76493 | 12/31/08 | 12/30/08 | 51,200.00 | 1/8/09 | 9 |
| 77783 | 12/31/08 | 12/31/08 | 15,427.00 | 1/8/09 | 8 |
| 76707 | 12/31/08 | 12/31/08 | 22,849.08 | 1/8/09 | 8 |
| 40109 | 4/1/09 | 4/1/09 | 14,562.40 | 4/1/09 | 0 |
|  |  |  | **9,391,390.77** |  | **5703** |

# of Invoices before 4/2/09: 267
Total Lag Days  before 4/2/09 : 5703
Average Lag before 4/2/09:  21 Days
Median Lag  before 4/2/09: 14 Days

# of Invoices before 2/1/09:  266
Total Lag Days  before 2/01/09 : 5703
Average Lag before 2/01/09:  21 Days
Median Lag  before 2/01/09: 14 Days

*The data herein is derived from Exhibit D  -2171

**EXHIBIT A-2**

Corp. Preference Period (on or after  4-2-09)

| Invoice Number | Invoice Date | Invoice Amount | Check Date | *Lag* |
|---|---|---|---|---|
| 40709 | 4/7/09 | 7,137.87 | 4/7/09 | 0 |
| 403 | 4/3/09 | 68.40 | 4/30/09 | 27 |
| 406 | 4/6/09 | 8,620.08 | 4/30/09 | 24 |
| 409 | 4/9/09 | 68.40 | 4/30/09 | 21 |
| 417 | 4/17/09 | 62,721.02 | 4/30/09 | 13 |
| 430 | 4/30/09 | 44,401.70 | 4/30/09 | 0 |
| 51109 | 5/11/09 | 6,776.82 | 5/11/09 | 0 |
| 51809 | 5/11/09 | 11,042.62 | 5/11/09 | -7 |
| 52109 | 5/21/09 | 43,606.14 | 5/21/09 | 0 |
| 60109 | 6/1/09 | 28,370.63 | 6/1/09 | 0 |
| 61509 | 6/15/09 | 9,488.91 | 6/15/09 | 0 |
| 61809 | 6/18/09 | 26,784.54 | 6/18/09 | 0 |
| 62909 | 6/29/09 | 6,143.71 | 6/30/09 | 1 |
|  |  | 255,230.84 |  |  |

# of Invoices on or after 4/2/09: 13          # of Invoices on or after 2/1/09:  14

Total Lag Days  on or after 4/2/09: 79          Total Lag Days on or after 2/1/09:  79
Average Lag  on or after 4/2/09: 6 Days          Average Lag on or after 2/01/09:  6 Days
Median Lag  on or after 4/2/09: 0 Days          Median Lag on or after 2/1/09:  0 Days

* The data herein is derived from Ex. D-2171

## EXHIBIT B-1
### A&E Historical Period

| Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|
| | | | | |
| Jun-06 | 7/27/06 | 1,672.31 | 7/27/06 | 0 |
| Jun-06 | 7/27/06 | 720.70 | 7/27/06 | 0 |
| JUNE 2006 | 7/27/06 | 11,487.01 | 7/27/06 | 0 |
| JUNE 2006 | 7/27/06 | 766.24 | 7/27/06 | 0 |
| Jun-06 | 6/25/06 | 460,257.30 | 7/27/06 | 32 |
| Mar-06 | 5/31/06 | 38.03 | 7/31/06 | 61 |
| MAR 2006 | 5/31/06 | 287.13 | 7/31/06 | 61 |
| Jul-06 | 7/30/06 | 603.00 | 8/29/06 | 30 |
| Jul-06 | 7/30/06 | 66.00 | 8/29/06 | 30 |
| JLUY 2006 | 7/30/06 | 763,896.88 | 8/29/06 | 30 |
| JULY006 | 7/30/06 | 10,036.57 | 8/29/06 | 30 |
| 55399 | 9/13/06 | 2,585.00 | 9/25/06 | 12 |
| 55395 | 8/27/06 | 12,649.15 | 9/25/06 | 29 |
| 55396 | 8/27/06 | 358.00 | 9/25/06 | 29 |
| 55397 | 8/27/06 | 434.00 | 9/25/06 | 29 |
| 55400 | 8/27/06 | 15,415.30 | 9/25/06 | 29 |
| 55401 | 8/27/06 | 10,266.93 | 9/25/06 | 29 |
| 55402 | 8/27/06 | 21,583.96 | 9/25/06 | 29 |
| 55403 | 8/27/06 | 49,910.34 | 9/25/06 | 29 |
| 55404 | 8/27/06 | 12,199.65 | 9/25/06 | 29 |
| 55406 | 8/27/06 | 120.00 | 9/25/06 | 29 |
| 55407 | 8/27/06 | 12,074.88 | 9/25/06 | 29 |
| 55408 | 8/27/06 | 47,258.78 | 9/25/06 | 29 |
| 55409 | 8/27/06 | 3,172.69 | 9/25/06 | 29 |
| 55410 | 8/27/06 | 120.00 | 9/25/06 | 29 |
| 55411 | 8/27/06 | 720.00 | 9/25/06 | 29 |
| 82706 | 8/27/06 | 8,000.00 | 9/25/06 | 29 |
| 525398 | 8/27/06 | 230.00 | 9/25/06 | 29 |
| Sep-06 | 9/24/06 | 763,310.92 | 10/26/06 | 32 |
| SEPT2006-1 | 9/24/06 | 1,532.96 | 10/26/06 | 32 |
| SEPT2006-2 | 9/24/06 | 13,209.51 | 10/26/06 | 32 |
| SEPT2006-3 | 9/24/06 | 3,175.38 | 10/26/06 | 32 |
| JULY 2006R | 8/29/06 | (825.94) | 10/26/06 | 58 |
| JULY2006R | 8/29/06 | 825.94 | 10/26/06 | 58 |
| Oct-06 | 11/29/06 | 16,502.57 | 11/30/06 | 1 |
| OCT. 2006 | 11/29/06 | 468,535.31 | 11/30/06 | 1 |
| OCTOBER. 2006 | 11/29/06 | 6,875.38 | 11/30/06 | 1 |
| Nov-06 | 11/26/06 | 119,806.02 | 12/21/06 | 25 |
| NOV .2006 | 11/26/06 | 9,253.21 | 12/21/06 | 25 |
| NOV 2006. | 11/26/06 | 69,881.63 | 12/21/06 | 25 |

| | | | | |
|---|---|---|---|---|
| Dec-06 | 12/24/06 | 5,741.04 | 1/23/07 | 30 |
| Dec-06 | 12/24/06 | 9,402.27 | 1/23/07 | 30 |
| Dec-06 | 12/24/06 | 316,007.45 | 1/23/07 | 30 |
| Dec-06 | 12/24/06 | 111,685.64 | 1/23/07 | 30 |
| Dec-06 | 12/24/06 | 574.00 | 1/23/07 | 30 |
| Jan-07 | 2/26/07 | 648,598.63 | 2/26/07 | 0 |
| 57023 | 1/28/07 | 82,922.15 | 2/26/07 | 29 |
| Feb-07 | 3/28/07 | 533,801.86 | 3/28/07 | 0 |
| Mar-07 | 4/28/07 | 140,326.87 | 5/2/07 | 4 |
| 7-Apr | 6/7/07 | 689,972.54 | 6/7/07 | 0 |
| Apr-07 | 4/29/07 | 11,944.57 | 6/7/07 | 39 |
| Apr-07 | 4/29/07 | 36,825.38 | 6/7/07 | 39 |
| May-07 | 5/27/07 | 24,124.87 | 6/21/07 | 25 |
| May-07 | 5/27/07 | 96.16 | 6/21/07 | 25 |
| May-07 | 5/27/07 | 94.24 | 6/21/07 | 25 |
| May-07 | 5/27/07 | 6,807.32 | 6/21/07 | 25 |
| 7-May | 5/27/07 | 69,184.61 | 6/21/07 | 25 |
| Jun-07 | 6/24/07 | 146,476.28 | 8/10/07 | 47 |
| 7-Jun | 6/24/07 | 27,346.58 | 8/10/07 | 47 |
| JUN07-2 | 6/24/07 | 4,935.45 | 8/10/07 | 47 |
| Jul-07 | 7/29/07 | 254,939.35 | 9/14/07 | 47 |
| 7-Jul | 7/29/07 | 21,086.63 | 9/14/07 | 47 |
| Aug-07 | 8/26/07 | 525,663.89 | 11/9/07 | 75 |
| Aug-07 | 8/26/07 | 97,020.06 | 11/9/07 | 75 |
| Oct-07 | 10/28/07 | 587,375.95 | 12/6/07 | 39 |
| Oct-07 | 10/28/07 | 69,951.03 | 12/6/07 | 39 |
| Sep-07 | 9/23/07 | 233,155.61 | 12/6/07 | 74 |
| Sep-07 | 9/23/07 | 22,138.05 | 12/6/07 | 74 |
| Nov-07 | 11/25/07 | 610,648.17 | 2/12/08 | 79 |
| Dec-07 | 12/23/07 | 255,727.80 | 2/27/08 | 66 |
| Jan-08 | 1/27/08 | 429,053.95 | 3/17/08 | 50 |
| Feb-08 | 2/24/08 | 262,289.67 | 4/25/08 | 61 |
| Mar-08 | 3/23/08 | 207,474.65 | 5/28/08 | 66 |
| Apr-08 | 4/27/08 | 424,487.45 | 6/25/08 | 59 |
| May-08 | 5/25/08 | 262,304.15 | 7/10/08 | 46 |
| Jun-08 | 7/8/08 | 405,584.33 | 7/18/08 | 10 |
| Jul-08 | 7/27/08 | 310,891.17 | 9/4/08 | 39 |
| Aug-08 | 8/24/08 | 468,039.51 | 9/16/08 | 23 |
| Sep-08 | 9/28/08 | 350,124.11 | 11/19/08 | 52 |
| Oct-08 | 10/26/08 | 271,998.03 | 12/3/08 | 38 |
| Nov-08 | 11/23/08 | 884,697.33 | 12/31/08 | 38 |
| 8-Dec | 12/21/08 | 100,980.06 | 1/20/09 | 30 |
| 81127 | 1/25/09 | 258.00 | 2/26/09 | 32 |
| 81166 | 1/25/09 | 1,152.36 | 2/26/09 | 32 |
| 81168 | 1/25/09 | 1,397.00 | 2/26/09 | 32 |
| 81198 | 1/25/09 | 21,194.97 | 2/26/09 | 32 |
| 81327 | 1/25/09 | 6,415.01 | 2/26/09 | 32 |

| | | | | |
|---|---|---|---|---|
| 81328 | 1/25/09 | 845.50 | 2/26/09 | 32 |
| 81329 | 1/25/09 | 182.00 | 2/26/09 | 32 |
| 81330 | 1/25/09 | 6.00 | 2/26/09 | 32 |
| 81331 | 1/25/09 | 113.88 | 2/26/09 | 32 |
| 81332 | 1/25/09 | 21.16 | 2/26/09 | 32 |
| 81333 | 1/25/09 | 913.63 | 2/26/09 | 32 |
| 81335 | 1/25/09 | 256.00 | 2/26/09 | 32 |
| 81334-DUTKO | 1/25/09 | 321.00 | 2/26/09 | 32 |
| 81097 | 1/25/09 | (22.00) | 3/6/09 | 40 |
| 81128 | 1/25/09 | 8,603.14 | 3/6/09 | 40 |
| 81267 | 1/25/09 | 1,143.00 | 3/6/09 | 40 |
| 81338 | 1/25/09 | 1,379.00 | 3/6/09 | 40 |
| 81339 | 1/25/09 | 978.99 | 3/6/09 | 40 |
| 81631 | 1/25/09 | 1,272.71 | 3/6/09 | 40 |
| 81632 | 1/25/09 | 2,970.93 | 3/6/09 | 40 |
| 81167 | 1/25/09 | 25,914.47 | 3/13/09 | 47 |
| 81272 | 1/25/09 | 1,120.00 | 3/13/09 | 47 |
| 81633 | 1/25/09 | 1,300.54 | 3/13/09 | 47 |
| 81634 | 1/25/09 | 1,811.61 | 3/13/09 | 47 |
| 84648 | 2/22/09 | 256.00 | 3/26/09 | 32 |
| 81126 | 1/25/09 | 385.00 | 3/26/09 | 60 |
| | | **12,921,701.50** | | **0** |

# of Invoices before 4/2/09: 108                # of Invoices before 2/1/09: 82

Total lag Days  before 4/2/09: 3702            Total lag Days  before 2/1/09: 2726
Average Lag before 4/2/09: 34 days            Average lag before 2/1/09:  33
Median lag before 4/2/09: 32 days              Median lag before 2/1/09:  30

* The data herein is derived from Ex. D - 2173

** One invoice in the Historical Period (dated 6/24/07 for $880) was paid well outside the norm
   (18 months) and so is not included in the analysis.

## EXHIBIT B-2
### A&E Preference Period (on or after 4/2/09)

| Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|
| 84650 | 2/22/09 | 10,127.17 | 4/2/09 | 39 |
| 84692 | 2/22/09 | 6,776.06 | 4/2/09 | 39 |
| 84693 | 2/22/09 | 25,816.06 | 4/2/09 | 39 |
| 84722 | 2/22/09 | 29,901.69 | 4/2/09 | 39 |
| 84862 | 2/22/09 | 246.03 | 4/2/09 | 39 |
| 84908 | 2/22/09 | 2,771.96 | 4/2/09 | 39 |
| 81273 | 1/25/09 | 1,365.00 | 4/9/09 | 74 |
| 84853 | 2/22/09 | 355.00 | 4/21/09 | 58 |
| 84854 | 2/22/09 | 256.00 | 4/21/09 | 58 |
| 84855 | 2/22/09 | 97.58 | 4/21/09 | 58 |
| 84856 | 2/22/09 | 1,119.28 | 4/21/09 | 58 |
| 84857 | 2/22/09 | 131.08 | 4/21/09 | 58 |
| 84858 | 2/22/09 | 1,105.50 | 4/21/09 | 58 |
| 84859 | 2/22/09 | 11,543.01 | 4/21/09 | 58 |
| 84904 | 2/22/09 | 2,309.69 | 4/21/09 | 58 |
| 81325 | 1/25/09 | 8,899.38 | 4/21/09 | 86 |
| 88310 | 3/22/09 | 16,307.45 | 5/4/09 | 43 |
| 88313 | 3/22/09 | 198.00 | 5/4/09 | 43 |
| 88164 | 3/22/09 | 2,370.68 | 5/12/09 | 51 |
| 88165 | 3/22/09 | 14,191.79 | 5/12/09 | 51 |
| 88192 | 3/22/09 | 46,682.70 | 5/13/09 | 52 |
| 88193 | 3/22/09 | 2,084.89 | 5/13/09 | 52 |
| 95640 | 4/26/09 | 29,514.53 | 6/17/09 | 52 |
| 95641 | 4/26/09 | 5,270.00 | 6/17/09 | 52 |
| 98514 | 5/24/09 | 10,180.92 | 6/18/09 | 25 |
| 98515 | 5/24/09 | 8,282.96 | 6/18/09 | 25 |
| 95611 | 4/26/09 | 6,930.87 | 6/18/09 | 53 |
| 95612 | 4/26/09 | 5,003.10 | 6/18/09 | 53 |
| | | 249,838.38 | | |

# of Invoices on or after 4/2/09: 28        # of Invoices on or after 2/1/09: 54
Total Lag Days on or after 4/2/09: 1410      Total Lag Days on or after 2/1/09: 2386
Average lag on or after 4/2/09: 50 days      Average lag on or after 2/1/09: 44 Days
Median lag on or after 4/2/09: 52 Days       Median lag on or after 2/1/09: 40 Days

* The data herein is derived from Ex. D-2173

**EXHIBIT B-3**

New Value Analysis on or after 4/2/09

|  | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| B-2 | 84650 | 2/22/09 | 10,127.17 | 4/2/09 | 39 |
| B-2 | 84692 | 2/22/09 | 6,776.06 | 4/2/09 | 39 |
| B-2 | 84693 | 2/22/09 | 25,816.06 | 4/2/09 | 39 |
| B-2 | 84722 | 2/22/09 | 29,901.69 | 4/2/09 | 39 |
| B-2 | 84862 | 2/22/09 | 246.03 | 4/2/09 | 39 |
| B-2 | 84908 | 2/22/09 | 2,771.96 | 4/2/09 | 39 |
| B-2 | 81273 | 1/25/09 | 1,365.00 | 4/9/09 | 74 |
| B-2 | 84853 | 2/22/09 | 355.00 | 4/21/09 | 58 |
| B-2 | 84854 | 2/22/09 | 256.00 | 4/21/09 | 58 |
| B-2 | 84855 | 2/22/09 | 97.58 | 4/21/09 | 58 |
| B-2 | 84856 | 2/22/09 | 1,119.28 | 4/21/09 | 58 |
| B-2 | 84857 | 2/22/09 | 131.08 | 4/21/09 | 58 |
| B-2 | 84858 | 2/22/09 | 1,105.50 | 4/21/09 | 58 |
| B-2 | 84859 | 2/22/09 | 11,543.01 | 4/21/09 | 58 |
| B-2 | 84904 | 2/22/09 | 2,309.69 | 4/21/09 | 58 |
| B-2 | 81325 | 1/25/09 | 8,899.38 | 4/21/09 | 86 |
|  | Total preferences |  | 102,820.49 |  |  |
|  |  |  |  |  |  |
| D-2165 | 95580 | 4/26/2009 | 2472.50 |  |  |
| D-2165 | 95581 | 4/26/2009 | 113.64 |  |  |
| D-2165 | 95629 | 4/26/2009 | 484.00 |  |  |
| D-2165 | 95538 | 4/26/2009 | 3241.22 |  |  |
| D-2165 | 95694 | 4/26/2009 | 525.00 |  |  |
| D-2165 | 95701 | 4/26/2009 | 200.33 |  |  |
| D-2165 | 95751 | 4/26/2009 | 944.30 |  |  |
| D-2165 | 95752 | 4/26/2009 | 1687.25 |  |  |
| D-2165 | 95753 | 4/26/2009 | 1439.58 |  |  |
| D-2165 | 95754 | 4/26/2009 | 185.20 |  |  |
| D-2165 | 95755 | 4/26/2009 | 33.28 |  |  |
| D-2165 | 95756 | 4/26/2009 | 4282.50 |  |  |
| D-2165 | 95757 | 4/26/2009 | 910.00 |  |  |
| D-2165 | 95760 | 4/26/2009 | 320.29 |  |  |
| D-2165 | 98529 | 5/24/2009 | 10203.74 |  |  |
| D-2165 | 98529 | 5/24/2009 | 300.00 |  |  |
| D-2165 | 98529 | 5/24/2009 | 7215.00 |  |  |
| D-2165 | 98530 | 5/24/2009 | 306.00 |  |  |
| D-2165 | 98614 | 5/24/2009 | 2218.09 |  |  |
| D-2165 | 98615 | 5/24/2009 | 250.00 |  |  |

| | | | | |
|---|---|---|---|---|
| D-2165 | 98615 | 5/24/2009 | 2216.46 | |
| D-2165 | 98616 | 5/24/2009 | 337.50 | |
| D-2165 | 98617 | 5/24/2009 | 58.55 | |
| D-2165 | 98618 | 5/24/2009 | 1192.50 | |
| D-2165 | 98619 | 5/24/2009 | 11383.73 | |
| D-2165 | 101751 | 6/28/2009 | 12.52 | |
| D-2165 | 101779 | 6/28/2009 | 1311.87 | |
| D-2165 | 101780 | 6/28/2009 | 10484.00 | |
| D-2165 | 101780 | 6/28/2009 | 2750.00 | |
| D-2165 | 101797 | 6/28/2009 | 6198.26 | |
| D-2165 | 101797 | 6/28/2009 | 55.66 | |
| D-2165 | 101798 | 6/28/2009 | 840.00 | |
| D-2165 | 101798 | 6/28/2009 | 102.00 | |
| D-2165 | 101835 | 6/28/2009 | 2000.00 | |
| D-2165 | 101888 | 6/28/2009 | 74.44 | |
| D-2165 | 101889 | 6/28/2009 | 816.69 | |
| D-2165 | 101889 | 6/28/2009 | 771.78 | |
| D-2165 | 104219 | 7/26/2009 | 1974.98 | |
| D-2165 | 104219 | 7/26/2009 | 6.35 | |
| D-2165 | 104281 | 7/26/2009 | 155.00 | |
| D-2165 | 106568 | 8/30/2009 | 3723.18 | |
| D-2165 | 106634 | 8/30/2009 | 83.82 | |
| D-2165 | 106635 | 8/30/2009 | 326.87 | |
| | Total New Value | | 84,208.08 | |
| | | | | |
| | Remaining Preference: | | 18,612.41 | |
| | | | | |
| B-2 | 88310 | 3/22/09 | 16,307.45 | 5/4/09 |
| B-2 | 88313 | 3/22/09 | 198.00 | 5/4/09 |
| B-2 | 88164 | 3/22/09 | 2,370.68 | 5/12/09 |
| B-2 | 88165 | 3/22/09 | 14,191.79 | 5/12/09 |
| B-2 | 88192 | 3/22/09 | 46,682.70 | 5/13/09 |
| B-2 | 88193 | 3/22/09 | 2,084.89 | 5/13/09 |
| B-2 | 95640 | 4/26/09 | 29,514.53 | 6/17/09 |
| B-2 | 95641 | 4/26/09 | 5,270.00 | 6/17/09 |
| B-2 | 98514 | 5/24/09 | 10,180.92 | 6/18/09 |
| B-2 | 98515 | 5/24/09 | 8,282.96 | 6/18/09 |
| B-2 | 95611 | 4/26/09 | 6,930.87 | 6/18/09 |
| B-2 | 95612 | 4/26/09 | 5,003.10 | 6/18/09 |
| | | | 147,017.89 | |

Total preference due: $165,630.30

**EXHIBIT B-4**
New Value Analysis (2/1/09 through 4/1/09)

|  | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| B-1 | 81127 | 1/25/09 | 258.00 | 2/26/09 | 32 |
| B-1 | 81166 | 1/25/09 | 1,152.36 | 2/26/09 | 32 |
| B-1 | 81168 | 1/25/09 | 1,397.00 | 2/26/09 | 32 |
| B-1 | 81198 | 1/25/09 | 21,194.97 | 2/26/09 | 32 |
| B-1 | 81327 | 1/25/09 | 6,415.01 | 2/26/09 | 32 |
| B-1 | 81328 | 1/25/09 | 845.50 | 2/26/09 | 32 |
| B-1 | 81329 | 1/25/09 | 182.00 | 2/26/09 | 32 |
| B-1 | 81330 | 1/25/09 | 6.00 | 2/26/09 | 32 |
| B-1 | 81331 | 1/25/09 | 113.88 | 2/26/09 | 32 |
| B-1 | 81332 | 1/25/09 | 21.16 | 2/26/09 | 32 |
| B-1 | 81333 | 1/25/09 | 913.63 | 2/26/09 | 32 |
| B-1 | 81335 | 1/25/09 | 256.00 | 2/26/09 | 32 |
| B-1 | 81334-DUTKO | 1/25/09 | 321.00 | 2/26/09 | 32 |
| B-1 | 81097 | 1/25/09 | (22.00) | 3/6/09 | 40 |
| B-1 | 81128 | 1/25/09 | 8,603.14 | 3/6/09 | 40 |
| B-1 | 81267 | 1/25/09 | 1,143.00 | 3/6/09 | 40 |
| B-1 | 81338 | 1/25/09 | 1,379.00 | 3/6/09 | 40 |
| B-1 | 81339 | 1/25/09 | 978.99 | 3/6/09 | 40 |
| B-1 | 81631 | 1/25/09 | 1,272.71 | 3/6/09 | 40 |
| B-1 | 81632 | 1/25/09 | 2,970.93 | 3/6/09 | 40 |
| B-1 | 81167 | 1/25/09 | 25,914.47 | 3/13/09 | 47 |
| B-1 | 81272 | 1/25/09 | 1,120.00 | 3/13/09 | 47 |
| B-1 | 81633 | 1/25/09 | 1,300.54 | 3/13/09 | 47 |
| B-1 | 81634 | 1/25/09 | 1,811.61 | 3/13/09 | 47 |
|  | Total Preferences |  | 79,548.90 |  |  |
|  |  |  |  |  |  |
| D-2165 | 88124 | 3/22/09 | 665.00 |  |  |
| D-2165 | 88134 | 3/22/2009 | 24,681.00 |  |  |
| D-2165 | 88134 | 3/22/2009 | 1,245.02 |  |  |
| D-2165 | 88135 | 3/22/2009 | 192.00 |  |  |
| D-2165 | 88189 | 3/22/2009 | 34,187.00 |  |  |
| D-2165 | 88246 | 3/22/2009 | 1,680.00 |  |  |
| D-2165 | 88255 | 3/22/2009 | 39,896.04 |  |  |
| D-2165 | 88309 | 3/22/2009 | 582.00 |  |  |
| D-2165 | 88309 | 3/22/2009 | 250.00 |  |  |
| D-2165 | 88309 | 3/22/2009 | 240.89 |  |  |
| D-2165 | 88309 | 3/22/2009 | 1,596.18 |  |  |

| | | | |
|---|---|---|---|
| D-2165 | 88311 | 3/22/2009 | 614.50 |
| D-2165 | 88312 | 3/22/2009 | 384.00 |
| D-2165 | 88316 | 3/22/2009 | 440.00 |
| D-2165 | 88370 | 3/22/2009 | 2036.25 |
| | | | |
| | Total New Value | | $108,689.88 |
| | Total Remaining Preferences | | 0 |

## EXHIBIT C-1
## A & E PC Historical Period

| | Invoice Number | Invoice Date | Invoice Amt | Check Date | Lag |
|---|---|---|---|---|---|
| | | | Column7 | | |
| | Jun-06 | 6/25/06 | 61,430.62 | 7/28/06 | 33 |
| | Jul-06 | 7/30/06 | 124,985.53 | 9/11/06 | 43 |
| | MAY 2006R | 9/28/06 | 8,291.97 | 10/2/06 | 4 |
| | MAY2006R | 9/28/06 | (8,291.97) | 10/2/06 | 4 |
| | AUG 2006R | 9/11/06 | (338.65) | 10/2/06 | 21 |
| | AUG2006R | 9/11/06 | 338.65 | 10/2/06 | 21 |
| | AUGUST 200 | 9/11/06 | 51,801.76 | 10/2/06 | 21 |
| | AUGUST200 | 9/11/06 | (51,801.76) | 10/2/06 | 21 |
| | Aug-06 | 8/27/06 | 148,981.32 | 10/2/06 | 36 |
| | JUN2006R | 7/31/06 | (656.85) | 10/2/06 | 63 |
| | JUNE 2006R | 7/31/06 | 656.85 | 10/2/06 | 63 |
| | MAY 2006 R | 6/29/06 | (1,990.71) | 10/2/06 | 95 |
| | R MAY 2006 | 6/29/06 | 1,990.71 | 10/2/06 | 95 |
| | Sep-06 | 9/24/06 | 70,809.45 | 11/8/06 | 45 |
| | Oct-06 | 10/29/06 | 131,463.77 | 12/12/06 | 44 |
| | Nov-06 | 11/26/06 | 70,481.38 | 12/28/06 | 32 |
| | Dec-06 | 1/23/07 | 168,499.56 | 1/23/07 | 0 |
| | Jan-07 | 3/6/07 | 97,984.59 | 3/6/07 | 0 |
| | Feb-07 | 3/28/07 | 124,384.38 | 3/28/07 | 0 |
| | Mar-07 | 3/31/07 | 225,784.63 | 5/2/07 | 32 |
| | May-07 | 5/27/07 | 151,561.51 | 8/1/07 | 66 |
| | Apr-07 | 4/29/07 | 265,342.40 | 8/1/07 | 94 |
| | Jun-07 | 6/24/07 | 167,728.65 | 8/10/07 | 47 |
| | Jul-07 | 7/29/07 | 141,696.41 | 9/26/07 | 59 |
| | Aug-07 | 8/26/07 | 133,491.48 | 11/9/07 | 75 |
| | Oct-07 | 10/28/07 | 241,955.11 | 12/27/07 | 60 |
| | Sep-07 | 9/23/07 | 150,562.21 | 12/27/07 | 95 |
| | Nov-07 | 11/25/07 | 122,419.79 | 2/12/08 | 79 |
| | Dec-07 | 12/23/07 | 132,763.80 | 2/27/08 | 66 |
| | Aug-07 | 8/26/07 | 2,012.49 | 3/17/08 | 204 |
| | Jan-08 | 1/27/08 | 85,539.80 | 4/25/08 | 89 |
| | Feb-08 | 2/24/08 | 101,339.57 | 5/28/08 | 94 |
| | Apr-08 | 4/27/08 | 104,552.44 | 6/25/08 | 59 |
| | Mar-08 | 3/23/08 | 69,760.88 | 6/25/08 | 94 |
| | Jun-08 | 6/22/08 | 59,839.00 | 7/28/08 | 36 |
| | May-08 | 5/25/08 | 51,429.58 | 7/28/08 | 64 |
| | Jul-08 | 7/27/08 | 83,448.14 | 9/4/08 | 39 |
| | Aug-08 | 8/24/08 | 86,856.90 | 9/16/08 | 23 |
| | Sep-08 | 9/28/08 | 74,401.83 | 11/19/08 | 52 |
| | Oct-08 | 11/14/08 | 53,798.54 | 12/3/08 | 19 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | Nov-08 | 11/23/08 | 48,598.03 | 12/31/08 | 38 |
|  | 78488 | 12/21/08 | 2,803.70 | 2/12/09 | 53 |
|  | 78489 | 12/21/08 | 9,801.96 | 2/12/09 | 53 |
|  | 78492 | 12/21/08 | 1,436.44 | 2/12/09 | 53 |
|  | 78493 | 12/21/08 | 1,878.26 | 2/12/09 | 53 |
|  | 78502 | 12/21/08 | 4,289.19 | 2/12/09 | 53 |
|  | 78503 | 12/21/08 | 10,046.60 | 2/12/09 | 53 |
|  |  |  | **3,584,159.94** |  |  |

# of Invoices - 47                    Total Lag Days:                    **2443**

Average Lag before  4/2/09:  52 Days
Median Lag before  4/2/09:  53 Days

*The data herein is derived from Ex. D-2175
** One invoice in the Historical Period (dated 12/31/07 for $22,136.27)
   was paid well outside the norm (1 year) and so is not included in the analysis

## EXHIBIT C-2
## A&E PC Preference Period

| Invoice Number | INVOICE DATE | Invoice Amt | check date | Lag |
|---|---|---|---|---|
| | | Column6 | | |
| 84998 | 2/22/09 | 8,515.01 | 4/2/09 | 39 |
| 84999 | 2/22/09 | 3,639.00 | 4/2/09 | 39 |
| 85000 | 2/22/09 | 949.00 | 4/9/09 | 46 |
| 85001 | 2/22/09 | 719.00 | 4/9/09 | 46 |
| 85002 | 2/22/09 | 1,132.17 | 4/9/09 | 46 |
| 85008 | 2/22/09 | 3,447.04 | 4/9/09 | 46 |
| 85007 | 2/22/09 | (59.00) | 4/9/09 | 46 |
| 78501 | 12/21/08 | 2,899.96 | 4/9/09 | 109 |
| 88576 | 3/22/09 | 4,177.50 | 5/5/09 | 44 |
| 81642 | 1/25/09 | 8,178.49 | 5/5/09 | 100 |
| 79069 | 12/21/08 | 59.00 | 5/5/09 | 135 |
| 95852 | 4/26/09 | 1,353.45 | 5/26/09 | 30 |
| | | 35,010.62 | | |

# of Invoices: 12          Total Lag Days: 726

Average Lag on or after 4/2/09: 60 days
Median Lag on or after 4/2/09 : 46 days

* The data herein is derived from Ex. D-2175

# EXHIBIT C-3
## New Value Analysis

| | Invoice Date | Invoice Number | Invoice Amount | Check Date | |
|---|---|---|---|---|---|
| C-2 | 2/22/2009 | 84998 | 8515.01 | 4/2/2009 | |
| C-2 | 2/22/2009 | 84999 | 3639.00 | 4/2/2009 | |
| C-2 | 2/22/2009 | 85000 | 949.00 | 4/9/2009 | |
| C-2 | 2/22/2009 | 85001 | 719.00 | 4/9/2009 | |
| C-2 | 2/22/2009 | 85002 | 1132.17 | 4/9/2009 | |
| C-2 | 2/22/2009 | 85008 | 3447.04 | 4/9/2009 | |
| C-2 | 2/22/2009 | 85007 | -59.00 | 4/9/2009 | Credit |
| | 12/21/2008 | 78501 | 2899.96 | 4/9/2009 | |
| Total Preferences | | | 21242.18 | | |
| | | | | | |
| New value given>4/9 | | | | | |
| D-2166 | 4/26/2009 | 95843 | 35.00 | | |
| D-2166 | 4/26/2009 | 95843 | 287.50 | | |
| D-2166 | 4/26/2009 | 95844 | 2210.01 | | |
| D-2166 | 4/26/2009 | 95849 | 834.50 | | |
| D-2166 | 4/26/2009 | 95849 | 574.00 | | |
| D-2166 | 4/26/2009 | 95849 | 4469.01 | | |
| D-2166 | 4/26/2009 | 95850 | 678.32 | | |
| D-2166 | 4/26/2009 | 95851 | 166.75 | | |
| D-2166 | 4/26/2009 | 95851 | 574.00 | | |
| D-2166 | 4/26/2009 | 95851 | 5345.51 | | |
| D-2166 | 4/26/2009 | 55853 | 559.58 | | |
| D-2166 | 4/26/2009 | 95854 | 652.43 | | |
| D-2166 | 4/26/2009 | 98913 | 696.00 | | |
| D-2166 | 4/26/2009 | 98918 | 250.00 | | |
| D-2166 | 4/26/2009 | 101940 | 77.50 | | |
| D-2166 | 4/26/2009 | 108771 | 232.50 | | |
| Total New value | | | 17642.61 | | |
| | | | | | |
| Remaining preference | | | 3599.57 | | |
| | | | | | |
| Preferences paid >4/26/09 | | | | | |
| C-2 | 3/22/2009 | 88576 | 4,177.50 | 5/5/09 | |
| C-2 | 1/25/2009 | 81642 | 8,178.49 | 5/5/09 | |
| C-2 | 12/21/2008 | 79069 | 59.00 | 5/5/09 | |
| C-2 | 4/26/2009 | 95852 | 1,353.45 | 5/26/09 | |
| | | | | | |
| Total Remaining Preferences | | | 17368.01 | | |